# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| TWENTY TWO TEN LTD. (d/b/a) THE BOILER ROOM LOGAN SQUARE, an Illinois Corporation; MOOSCA, LLC (d/b/a) FLORAFAUNA, an Illinois Limited Liability Company; CORK CITY PRODUCTIONS, LLC/676 CLUB, LLP (d/b/a) THE GREEN DOOR TAVERN/THE DRIFTER, an Illinois Limited Liability Company; PENNYVILLE STATION LLC, an Illinois Limited Liability Company; NEW LOTTIES, INC. (d/b/a) LOTTIES, an Illinois Corporation; CHR CORPORATION (d/b/a) FRONTIER CHICAGO, an Illinois Corporation; INA MAE TAVERN & PACKAGED GOODS, INC., an Illinois Corporation; 18TH ST. CAFÉ, LLC (d/b/a) SIMONE'S, an Illinois Limited Liability Company; and, HENDRICKX BELGIAN BREAD CRAFTER, LLC, an Illinois Limited Liability Company, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 20-CV-05483<br><br>Hon.<br><br><br>JURY TRIAL DEMANDED |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) | |
| SOCIETY INSURANCE, A MUTUAL COMPANY, a Wisconsin Corporation, | ) ) ) | |
| Defendant. | ) ) | |

**COMPLAINT (INCLUDING CLASS ACTION COMPLAINT PLED IN THE ALTERNATIVE)**

Plaintiffs Twenty Two Ten Ltd. (d/b/a) The Boiler Room Logan Square; Moosca, LLC (d/b/a)

Florafauna; Cork City Productions, LLC/676 Club, LLP (d/b/a) The Green Door Tavern/The Drifter;

Pennyville Station LLC; New Lotties, Inc. (d/b/a) Lotties; CHR Corporation (d/b/a) Frontier Chicago; Ina

Mae Tavern & Packaged Goods, Inc.; 18TH St. Café, LLC (d/b/a) Simone's; and, Hendrickx Belgian Bread

Crafter, LLC, by and through their attorneys, Fuksa Khorshid, LLC, and on behalf of all those similarly

situated (with respect to Counts IV and V only seeking a rebate of premium on behalf of a Nationwide

Class, in the alternative under Fed. R. Civ. P. 8(d)(2) and (3)), state and allege their Complaint against

1

Society Insurance, a Mutual Company ("Defendant" or "Defendant Society") as follows:

## NATURE OF THE ACTION

1.      Plaintiffs are small businesses – restaurants, dining establishments and bars – in the Chicago area.

2.      Plaintiffs assert claims for business interruption insurance coverage under "all-risk" commercial property insurance issued and sold to them by the Defendant Society. Under longstanding and bedrock principles of insurance law, Plaintiffs are entitled to payment under those policies for business income losses suffered as a direct result of state, municipal and local executive shutdown orders and restrictive executive reopening orders ("Closure Orders") that caused direct physical loss or damage to their properties by physically impairing, detrimentally altering, and rendering them nonfunctional or only partially functional as the businesses and institutions they formerly were.

3.      Prior to the Closure Orders, Plaintiffs' businesses were vibrant, bustling and successful. But the Closure Orders brought an end to all of that activity by imposing direct physical restrictions that impaired Plaintiffs' properties and rendered them nonfunctional for their intended purposes.  By altering the physical premises – all of which are critical to Plaintiffs' operations – their establishments were materially and detrimentally altered by the Closure Orders.  Under the Closure orders, Plaintiffs had to close or block off sections of their physical space, create or install barriers, manipulate fixtures and other equipment into nonfunctional arrangements, place physical markers on floors and walls, and redesign routes for entrance and egress. Vast amounts of square footage in their space – many painstakingly designed to maximize the customer's experience and the business' revenues – were lost, detrimentally altered, and rendered nonfunctional for their intended purposes.

4.      To protect their businesses from risk, Plaintiffs all purchased a "Businessowners Policy" from Defendant Society.  True and Correct copies of the Businessowners Policy for each Plaintiff are attached hereto as Exhibits A-I and incorporated by reference herein.  These 100+ page Policies are substantially identical in relevant part, and were authored and issued by Defendant and contain numerous promises to pay Plaintiffs – also known as "coverages" – for a broad range of losses that the Plaintiffs might

suffer including business interruption.

5.      At the time Defendant underwrote and sold the Policies, it understood and expected that it would be insuring these properties as fully functioning and operational businesses.  Defendant knowingly calculated Plaintiffs' business interruption premiums based in material part on the revenue they expected Plaintiffs to generate as fully functioning and operational businesses. Defendant is fully aware that Plaintiffs' businesses and properties have been physically impaired by the Closure Orders and that Plaintiffs have lost the means to generate that revenue – *i.e.,* that Plaintiffs have suffered direct physical loss of and damage to their insured properties. Defendant is fully aware that with no operations or partial operations, a universe of risks for which they would pay business interruption and other claims are now mitigated or entirely absent. A shuttered kitchen (for example) has no fires. When (for example) bars and restaurants have no customers (or customers limited to fractional capacity) there are no or fewer other kinds of claims under the Policies.  Defendant's claims payout records since March 1, 2020 (and compared to prior years) will bear out what they have saved.  Yet Defendant has continued to charge and accept full premium payments from Plaintiffs as if their insured properties remained fully functional and operational.  This is the basis for an unjust enrichment claim against the Defendant, which must be upheld in the event that coverage is denied.  This unjust enrichment claim is pled in the alternative pursuant to Fed. R. Civ. P. 8(d)(2) and (3) on behalf of a Fed. R. Civ. P. 23(b)(3) Nationwide Class of Society's policyholders whose businesses were in any manner impaired or constrained by Closure Orders, and is found in Count VI.  This same misconduct also supports a claim (Count V) by Plaintiffs and the Nationwide Class  for violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 et seq ("ICFA") and the similar laws of other states where Defendant sells insurance.

6.      Stated in plain terms, Defendant can't "have its cake and eat it too" – either it needs to pay Plaintiffs on business income losses they sustained due to their Closure Orders, or, if Society prevails against coverage, then these Plaintiffs and all others similarly situated in a Nationwide Class must receive a rebate of premium for the windfall that Society kept for itself by reduced claims due to Closure Order shutdowns, partial operations mandates and other constraints.  This is a prime example of why Fed. R. Civ.

P. 8(d)(2) and (3) exist to render complete justice to the aggrieved. As set out in Counts IV and V, this premium rebate claim is eminently appropriate for class adjudication, and these are claims Defendant must face if it prevails on its arguments against coverage.

7.      Despite the fact that Defendant has accepted Plaintiffs' insurance premium payments, Defendant has summarily denied Plaintiffs' claims for coverage arising from government-ordered interruption and complete or partial closure of their business operations, in breach of Defendant's contractual obligations under the Policy. Defendant denied Plaintiffs' claims with cursory letters sent (on information and belief) in substantially similar form to all of Defendant's insureds, without any reasonable explanation or individualized investigation or consideration. In some cases (like Pennyville), Society denied the claim in less than 24 hours after receiving the claim. True and correct copies of the forms of denial letters for each Plaintiff are attached hereto as Exhibits J – R and incorporated by reference herein.

8.      Defendant on information and belief, is using at least two form denial letters and only altering minor details. Specifically, Exhibits J, K, L and Q use one form, (with the same typographical errors on page 2), while Exhibits M, N, O and P use another form. Furthermore, Defendant sent out form denial letters despite promising that "[w]e have investigated your claim" and denied coverage only after "careful review of the claim." (Exhibits M, N, O and P, p. 1). Those representations are palpably false.

9.      Significantly, Defendant admits in its form denial letter that: *"Society is here to support our insureds to the best of our ability."* (Exhibits J, K, L and Q, p. 1) (emphasis added).

10.     As Defendant Society is well aware, "all risk" commercial property policies cover all possible risks of any kind or description, unless specifically excluded. Unlike "enumerated perils" property insurance, which covers only specified causes of loss, all-risk property insurance provides business insureds with the comfort of knowing that even unprecedented and unanticipated risks of loss are covered. Due to the breadth of coverage, Plaintiffs paid a substantial premium for this type of insurance. Here, the Closure Orders are clearly within the scope of "all risks" covered by the Policies. This basis for coverage is referred to herein as the "Closure Order Basis for Coverage" and is one of two major bases of coverage alleged by the Plaintiffs herein. Fed. R. Civ. P. 8(d)(2), (3).

4

11.     As set forth at length herein, Plaintiffs have been forced to file this action for a declaratory judgment in response to Defendant's misconduct and refusal to meet its obligations under the Policy, in order for this Court to establish that Plaintiffs are entitled to receive the benefit of the insurance coverage they purchased. Plaintiffs seek reimbursement and indemnification of the business losses they have sustained, as well as all damages arising out of Defendant's breach of contract and Defendant's bad faith claims handling under 215 ILCS 5/155. As pled in more detail herein, Plaintiffs pose two major bases for coverage, one of which is known as the "Closure Order Basis for Coverage" and the other of which is the "Scientific Basis for Coverage." Fed. R. Civ. P. 8(d)(2), (3). Finally, Plaintiffs also assert Nationwide Class action claims for unjust enrichment and violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, in the alternative, as set out in Counts IV and V.

## THE PARTIES

12.     Plaintiff Twenty Two Ten Ltd. (d/b/a) The Boiler Room Logan Square ("The Boiler Room") is a corporation organized and existing under the laws of Illinois with its principal place of business at 2210-12 N. California Ave., Chicago, IL 60647-2904, located in Cook County and in the Northern District of Illinois. Plaintiff The Boiler Room conducts all of its business operations in Illinois. The Boiler Room has been a neighborhood staple in Logan Square for 10 years and is known as a destination for dining and entertainment in the city. It is known for its quality, fresh, and handmade products as well as innovative marketing, delivered in a unique environment. The Boiler Room is a diverse, inclusive, and socially conscious business that has served this community with passion. Due to Closure Orders, The Boiler Room had to close its restaurant to dine-in and bar operations beginning on March 16, 2020. On June 4, 2020, The Boiler Room was able to reopen outdoor dining but only at 25% of the restaurant's total capacity due to social distancing measures. The Boiler Room lost over $66,534 in sales within the first two weeks (44.02% decrease from last year), over $94,672 in April (68.35% decrease from last year), over $103,529 in May (66.76% decrease from last year), over $78,229 in June (51.74% decrease from last year), and over $41,998 in July (31.12% decrease from last year). Moreover, The Boiler Room lost approximately $500 in fresh produce. The Boiler Room also had to spend approximately $700 on PPE and sanitation supplies to comply

with the requirements of the Closure Orders and subsequent reopening plans. Furthermore, The Boiler Room incurred a sewer bill for $1,820 due to customers' flushable disinfectant wipes.

13.     Plaintiff Moosca, LLC DBA Florafauna ("Florafauna") is a limited liability company organized and existing under the laws of Illinois with its principal place of business at 11 W. Illinois St., Chicago, IL 60654 located in Cook County and in the Northern District of Illinois. Plaintiff Florafauna conducts all of its business operations in Illinois. Furthermore, Florafauna, has one managing member Louis Waddle, with an address at 676 N. Orleans St., Chicago, IL 60654-3916, located in Cook County and in the Northern District of Illinois. Florafauna opened for business on June 14, 2019. Created by a husband and wife team, Florafauna is a global rustic restaurant in River North that features vibrant flavors from around the world. The space is a tropical-themed, open-concept loft design with large windows that flood the space with natural light. Due to Closure Orders, Florafauna had to completely close its restaurant beginning on March 16, 2020. To date, it remains closed. During the summer months last year, Florafauna's sales were at least $100,000 per month; this year, it has a 100% decrease in sales.

14.     Plaintiff Cork City Productions, LLC/676 Club LLP (d/b/a) The Green Door Tavern/The Drifter ("The Green Door") is a limited liability company organized and existing under the laws of Illinois with its principal place of business at 676-678 N. Orleans St., Chicago, IL 60654-3916, located in Cook County and in the Northern District of Illinois. Plaintiff The Green Door conducts all of its business operations in Illinois. Furthermore, The Green Door, has one managing member Louis Waddle, with an address at 676 N. Orleans St., Chicago, IL 60654-3916, located in Cook County and in the Northern District of Illinois. First built in the 1870s following the Great Chicago Fire, The Green Door has been a Chicago staple for over 150 years. Still a neighborhood favorite, its warm wooden interiors, decorative backsplash of Chicago memorabilia, and down-to-earth staff have kept its many loyal customers happy through Chicago's winters and its hot, summer nights. Due to Closure Orders, The Green Door had to close its restaurant to dine-in services in March of 2020, losing approximately $122,924 in sales in March (58% decrease from last year), approximately $162,110 in sales in April (95% decrease from last year), approximately $162,810 in sales in May (96% decrease from last year), approximately $148,740 in sales in

June (95% decrease from last year), and losses continue to accumulate. Although open in limited capacity, The Green Door cannot fully open due to restrictions in the Closure Orders.

15.    Plaintiff Pennyville Station LLC ("Pennyville") is a limited liability company organized and existing under the laws of Illinois with its principal place of business at 112 Main St., Park Ridge, IL 60068-4030, located in Cook County and in the Northern District of Illinois.  Plaintiff Pennyville conducts all of its business operations in Illinois.  Furthermore, Pennyville, has one managing member Anthony Antonacci, with an address at 2920 Lahon, Park Ridge, IL 60068, located in Cook County and in the Northern District of Illinois. Pennyville's owner, a Park Ridge native, returned to his hometown to open a family friendly, community-based restaurant. A true testament to hard work, the owner has worked his way up from various serving roles, to restaurant management, and has recently opened up Pennyville as his first independent restaurant venture. Due to Closure Orders, Pennyville had to close its restaurant to dine-in services beginning on March 16, 2020, losing approximately $40,000 in sales within the first two weeks, $70,000 in sales in March, $100,000 in sales in April, $100,000 in sales in May, and loses continuing to mount as of the date of filing. Moreover, Pennyville had to spend approximately $30,000 in outdoor furniture, personal protective equipment, outdoor heaters, and an awning.

16.    Plaintiff New Lotties, Inc. (d/b/a) Lotties ("Lotties") is a corporation organized and existing under the laws of Illinois with its principal place of business at 1923-1925 W. Cortland St., Chicago, IL 60622-1038, located in Cook County and in the Northern District of Illinois.  Plaintiff Lotties conducts all of its business operations in Illinois. Rich in Chicago history, Lotties began as a grocery store with a speakeasy in the basement during prohibition, and is now featured on the popular television show, Chicago Fire. Patrons come for the rich Chicago history and tasty beverages. Due to Closure Orders, Lotties has lost approximately $700,000 in sales over the span of 15 weeks (March to July). In the summer months, Lotties typically has approximately $60,000 in sales per week. However, due to the closure Orders Lotties has made only approximately $13,000 per week. Additionally, Lotties had to spend at least a couple thousand dollars to make the establishment safe, which included purchasing personal protective equipment and more disposable products.

17.     Plaintiff CHR Corporation (d/b/a) Frontier Chicago ("Frontier") is a corporation organized and existing under the laws of Illinois with its principal place of business at 1072-1074 N. Milwaukee Ave., Chicago, IL 60642, located in Cook County and in the Northern District of Illinois. Plaintiff Frontier conducts all of its business operations in Illinois. Featured in West Town, patrons frequent Frontier to enjoy the inventive food experience, stylish lodge and beer garden. Due to Closure Orders, Frontier has lost approximately 75% in sales over the span of 15 weeks (March to July). Compared to previous years, the net income should have been $418,084 but was instead approximately $51,666 from March to July. Losses continue to mount. Additionally, Frontier had to spend at least a couple thousand dollars to make the establishment safe, which included purchasing personal protective equipment and more disposable products.

18.     Plaintiff Ina Mae Tavern & Packaged Goods, Inc. ("Ina Mae"), is a corporation organized and existing under the laws of Illinois with its principal place of business at 1415 N. Wood St., Chicago, Illinois 60614, located in Cook County and in the Northern District of Illinois. Plaintiff Ina Mae conducts all of its business operations in Illinois. Ina Mae, with its funky New Orleans vibe is located in Wicker Park and features live music. Due to Closure Orders, Ina Mae has lost approximately 65% in sales over the span of 15 weeks (March to July). Compared to previous years, the net income should have been $255,298 but was instead approximately $81,611 from March to July. Losses continue to rise. Additionally, Ina Mae had to spend at least a couple thousand dollars to make the establishment safe, which included purchasing personal protective equipment and more disposable products.

19.     Plaintiff 18TH St. Café, LLC (d/b/a) Simone's ("Simone's") is a limited liability company organized and existing under the laws of Illinois with its principal place of business at 960 W. 18th St., Chicago, IL 60608-2312, located in Cook County and in the Northern District of Illinois. Plaintiff Simone's conducts all of its business operations in Illinois. Furthermore, Simone's has three managing members, Michael Noone, Desiree Grant, and Alfred W. Grant, all with an address at 960 W 18th Street, Chicago, IL 60654-3916, located in Cook County and in the Northern District of Illinois. Simone's is a well-known Pilsen Café that supports local artists. Located in the back of the café is a community space used for art

exhibits and various cultural events. It features fresh food and live music. Due to Closure Orders, Simone's had to close its restaurant beginning on March 16, 2020, losing over $142,6000 in sales within the first two weeks (58.8% decrease from last year), over $200,800 in April (100% decrease from last year), over $236,300 in May (100% decrease from last year), and over $98,9000 in June (45.4% decrease from last year). Moreover, Simone's lost approximately $1,600 in fresh produce. Simone's also had to spend approximately $2,000 in order to make the patio comply with the requirements of the Closure Orders and subsequent reopening plans.

20.      Plaintiff Hendrickx Belgian Bread Crafter, LLC ("Hendrickx") is a limited liability company organized and existing under the laws of Illinois with its principal place of business at 100 East Walton St., Chicago, IL 60611, located in Cook County in the Northern District of Illinois. Plaintiff Hendrickx conducts all of its business operations in Illinois. Furthermore, Hendrikcx has two managing members, Renaud Hendrickx and Dominique Schewebach, all with an address at 100 East Walton St., Chicago, IL 60611. Hendrickx advertises itself as an authentic Belgium bakery in Chicago and, as such, is an attraction to tourists. Due to the Closure Orders, Hendrickx has lost approximately $21,500 per month since mid-March of 2020. Sales have dropped by 32% in March, 41% in April, and 31% in May. Hendrickx reopened on June 3, 2020 for outdoor seating with 50% capacity, and June 26, 2020 for indoor seating at 25% capacity. However, in order to open safely Hendrickx had to spend extra money to make the establishment safe, which included purchasing personal protective equipment, gloves, masks, and hand sanitizer.

21.      Defendant Society Insurance, a Mutual Company is a Wisconsin insurance company organized and existing under the laws of Wisconsin with its principal place of business at 150 Camelot Drive P.O. Box 1029, Fond du Lac, WI 54936-1029.  Defendant is registered with the Illinois Department of Insurance to conduct business in Illinois. Defendant specializes in both commercial and personal lines of insurance.

## JURISDICTION AND VENUE

### *Subject Matter Jurisdiction*

22.     This Court has federal subject matter jurisdiction over the claims set forth in this action under 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

23.     Each Plaintiff is incorporated in and has its principal place of business in Illinois. Additionally, on information and belief, all members of the limited liability companies have an address in Illinois. Accordingly, Plaintiffs are all citizens of Illinois.

24.     Society is incorporated in and has its principal place of business in Wisconsin. Accordingly, Society is a citizen of Wisconsin.

25.     The amount in controversy in this action is well in excess of $75,000. Plaintiffs have had their operations reduced to carryout and delivery only and in some cases had to close completely. Each Plaintiff has lost business income of anywhere from $20,000 to $230,000 per month. As of the date of filing of this action, Plaintiffs have sustained collectively over 3.5 million dollars in business income losses that continue to mount. Additionally, as set forth in Count III below, Plaintiffs make a claim for statutory bad faith under 215 ILCS 5/154.6, which entitles Plaintiffs to statutory penalties and attorneys' fees of an additional $540,000 or more as of the time of filing of this action. Therefore, the amount in controversy in this action at time of filing for each Plaintiff is well in excess of $75,000.

26.     This Court also has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2) because Counts IV and V allege class action claims where "any member of a class of plaintiffs is a citizen of a state different from any defendant and the aggregated amount in controversy exceeds $5,000,000, exclusive of interest and costs." Plaintiffs are informed and believe that Defendant wrote over $100 million in commercial insurance premiums for 2019, so a premium rebate of less than 5 percent would fulfill this amount in controversy.

### *Personal Jurisdiction*

27.     The Court may exercise general personal jurisdiction over Defendant due to the fact that

Defendant's activities in Illinois are such that Defendant may fairly be regarded as submitting itself to jurisdiction of the courts in Illinois. Defendant exercises substantial, systematic and continuous contacts with Illinois by doing business in Illinois, serving insureds in Illinois, and seeking additional business in Illinois.

28. The Court may exercise specific personal jurisdiction over Defendant in this matter, as Plaintiffs' claims arise out of Defendant's activities in Illinois.

29. Further, Defendant has submitted to jurisdiction in the Northern District of Illinois pursuant to the Illinois "long arm statute," 735 ILCS 5/2-209, by: (a) transacting business in Illinois; (b) contracting to insure a person, property or risk located within this district at the time of contracting; and (c) making a contract substantially connected with this district and Illinois. *See* 735 ILCS 5/2-209(1), (4), (7).

30. This Court has jurisdiction to grant declaratory relief under 28 U.S.C. § 2201 because an actual controversy exists between the parties as to their respective rights and obligations under the insurance Policy concerning Plaintiffs loss of business arising from the Closure Orders.

*Venue*

31. Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b)(1) and (c)(2) because Defendant is a resident in this district by virtue of being subject to the court's personal jurisdiction with respect to this action.

32. Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## FACTS

33. Plaintiffs are all restaurants, eating establishments and bars in the Chicagoland area that have been in business for years, working hard to build up a patron base and excellent reputation for quality and service. A key part of what Plaintiffs provide is atmosphere – a location for excellent food and drink in a place their patrons can enjoy. Whether it is live music or Chicago history, patrons of Plaintiffs' establishments enjoy the atmosphere and physical location and are willing to pay for it. The nature of Plaintiffs' businesses requires the utilization of its physical business premises and the specialized

equipment located therein to provide quality food, drink and service. Direct personal service to their customers are Plaintiffs' stock in trade. Plaintiffs' restaurant operations were brought to an immediate halt, restricted to takeout and delivery orders which comprise a fraction of its monthly revenue. Even when remaining partially open (in an attempt to mitigate damages), restaurants are still rapidly losing money due to the reliance on third-party delivery and pick-up applications.

### The Policy and the Coverages

34.     Like many other reputable and honest small businesses, Plaintiffs all conducted their businesses responsibly and obtained what is known in business and the insurance industry as a "Commercial General Liability" or "CGL" policy to protect themselves and others from a myriad of risks.

35.     Defendant aggressively markets and sells CGL policies, advertising such policies as designed as a way for businesses to protect themselves in the event of a loss.

36.     Plaintiffs purchased their Society Businessowners Policies through agents of Society, as indicated on their respective Policies. (Ex. A – I). Plaintiffs' Policies were all in full force and effect at the time of the losses suffered, and were renewals of identical or practically identical policies in force in years prior. Plaintiffs each paid a premium to Defendant for the coverages in their Policies. (Ex. A – I).

37.     The Policies are what is known in the insurance industry as "all risk" policies that provide broad coverage for losses sustained from *any cause*.

38.     In the Policies, Defendant promised to pay Plaintiffs for "actual loss of Business Income you sustain due to the necessary suspension of your 'operations'" when Plaintiffs experienced a "direct physical loss of" or damage to their business premises. (Ex. A – I, Coverage Form TBP2 (05-15), p 5-6 of 32).

39.     Defendant further promised in the Policy to pay Plaintiffs for "actual loss of Business Income you sustain . . . caused by action of civil authority that prohibits access" to Plaintiffs' business premises, provided that Plaintiffs' premises are "within the area" from other "damaged property" and the civil authority order is in response to "dangerous physical conditions." (Ex. A – I, Coverage Form TBP2 (05-15), p 7-8 of 32).

12

40. Moreover, Defendant promised in the Policies to pay Plaintiffs costs to clean and sanitize the premises as well as the actual loss of business income and extra expense sustained from "Contamination" (i.e., dangerous condition on the premises) that results in an action by "governmental authority." (Ex. A – I, Coverage Form TBP2 (05-15), p 8-9 of 32).

41. In the Policies, Defendant promised to provide Plaintiffs with broad coverage for lost "business income" plus "extra expense" sustained during periods of shutdown and beyond. (Ex. A – I, Coverage Form TBP2 (05-15), p 6-7 of 32).

42. What is more, although many policies issued by Society's competition in the insurance industry contained purported "Virus or Bacteria" exclusions (invalid for reasons not necessary to explore herein), Society's Policies did not. (Ex. A – I).

**<u>Defendant's Systematic Denial of Claims</u>**

43. Despite Defendant's promises in the Policies to pay for lost business income and extra expenses incurred by Plaintiffs in circumstances such as these, Defendant has denied all such claims.

44. Defendant is retaining, enjoying, and investing the premium / claims payment windfall it has achieved from profoundly lower commercial policy claims by its commercial insureds (members of the Nationwide Class) whose businesses are shuttered or reduced in operations by Closure Orders.

45. Rather than honor their policy contracts, Defendant's approach to these insurance claims has been to leave its insureds, the taxpayers, and society as a whole to bear the economic burden of Society's refusal to honor its own obligations under its policies. And Defendant's portfolio managers have been strategically investing the resulting windfall.

46. Defendant has designed and executed, in bad faith, a systematic and consistent form and cursory denial of all claims, such as Plaintiffs' claims, in order to avoid paying Defendant's obligations under the Policies. After making their claims, Plaintiffs received Defendant's cursory, form denial letters (Ex. J – Q) which Plaintiffs believe are similar in substance and form to thousands of letters Defendant has sent out to any and every insured who has made or will make a claim for losses sustained during the current

crisis. As mentioned above, Plaintiffs are aware of at least two form denial letters that Society consistently sends to policyholders.

47.     Society failed to undertake or conduct a reasonable investigation of Plaintiffs' claims under their Policies, in violation of its duties under Illinois law.

48.     Defendants' denials to Plaintiffs were not only woefully inadequate, but they were based on the false and blanket assertion that there is no "direct physical loss" or damage to property at the business premises of Plaintiffs.  (Ex. J - R).  As set forth herein, that blanket assertion runs contrary to Illinois law, established science, and the facts.

**Federal Rule of Civil Procedure 8(d) Permits Alternative Pleading**

49.     The Federal Rules of Civil Procedure embody public policy and the mandate of law that parties may both plead in the alternative, and state as many separate claims (or defenses) as they may have, regardless of consistency:

> Rule 8. General Rules of Pleading
> .    .    .
> (d) Pleading to Be Concise and Direct; Alternative Statements; Inconsistency.
> .    .    .
> (2) Alternative Statements of a Claim or Defense. A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient.
> (3) Inconsistent Claims or Defenses. A party may state as many separate claims or defenses as it has, regardless of consistency.

50.     Plaintiffs proffer in this case two fundamental, alternative bases for coverage: 1) **the Closure Order Basis for Coverage;** and 2) **the Scientific Basis for Coverage**.  Rule 8 permits, indeed mandates, that Plaintiffs may proceed with these alternative theories in the pursuit of justice.

**The Closure Order Basis for Coverage**

51.     A bedrock principle of Plaintiffs' case is that the Closure Orders caused direct physical loss and/or damage to their properties.  While Defendant contends that Plaintiffs did not sustain "direct physical loss" or "damage to" property within the meaning of their Policies, the evidence at trial will show that the Closure Orders did cause direct physical loss of and damage to Plaintiffs' properties. Under any

14

reasonable construction, the phrase "direct physical loss of or damage to" property is broad and would include detrimental physical effects which alter and impair the functioning of the tangible, material dimensions of property—especially where, as here, property is rendered nonfunctional for its intended purpose due to the altered appearance, shape, and other material aspects of the property. That is precisely the type of loss and damage caused by the Closure Orders.

52.     Defendant chose not to define the terms "direct physical loss" or "damage" in the Policies, nor did they define "direct physical damage" or "physical damage." Instead, Defendant intentionally left each of these terms undefined—even though it knew, or should have known, that these terms can reasonably be construed, and indeed have been construed by courts, more broadly than the narrow self-serving definition that they contend should provide the terms' only meaning.  As undefined terms in the Policies, each of these terms must be given its plain and ordinary meaning consistent with the knowledge and expectations of an ordinary, reasonable insured.

53.     In the Policies, "loss" is used in the alternative to "damage." Thus, there is coverage provided for both "loss" and "damage," either alternatively or collectively, because "loss" coverage is different from, and in addition to, "damage" coverage. Property "loss" refers to, among other things, being deprived of a property's function, while "damage" refers to, among other things, the impairment of property or a reduction in its functionality. The adjective "physical," among other things, distinguishes between the tangible, material aspects of an object and those that are purely intangible, such as sentiment, emotion, or imagination. In addition, under a plain grammatical reading of the phrase "direct physical loss of or damage to" property (or "direct physical loss or damage to" property), the words "direct" and "physical" can be reasonably construed as modifying only "loss" coverage—not "damage" coverage. To the extent that any language in the Policies is ambiguous, it should be construed against Defendant and in favor of coverage.

54.     Here, the Closure Orders caused both property loss and property damage by directly, physically impairing the functionality of Plaintiffs' property and dispossessing Plaintiffs of their tangible spaces. Dining rooms, bars, or floors are closed, areas blocked off, barriers erected, appearances altered,

furniture moved, fixtures altered, spaces shuttered, floors marked, plexiglass mounted—these are but some examples of the direct physical loss and damage Plaintiffs' properties have incurred.

55.    Each of the Plaintiffs understood, expected, and believed that their Policies would cover the direct physical loss of or damage to their property that they suffered as a direct result of the Closure Orders. This understanding and expectation is both subjectively and objectively reasonable. Defendant cannot now redefine or narrow the meaning of physical loss or damage—or any other undefined terms in the Policies—to support a denial of coverage in these unprecedented circumstances.

56.    Because there is a reasonable construction of these terms that provides coverage to Plaintiffs for their business interruption claims—and based on bedrock insurance law principles requiring policy terms to be construed broadly in favor of coverage for Plaintiffs—Defendant must pay Plaintiffs' claims.

### The Scientific Basis for Coverage

57.    Reports of a novel Coronavirus ("COVID-19") pandemic emerged out of Wuhan, China in early 2020.  The first case in the United States was confirmed on January 20, 2020, followed rapidly by many others, culminating in a medical and economic disaster.[1]

58.    By March 15, 2020, Illinois Governor J.B. Pritzker, exercising his emergency powers under state law, ordered many public gathering places closed in an effort to slow or stop the spread of COVID-19. On March 20, 2020, Governor Pritzker ordered all "non-essential businesses" to close.  Similar orders were issued by Chicago Mayor Lori Lightfoot pursuant to her emergency powers under state law. Many similar orders have followed, all prohibiting or severely curtailing the use of business property and premises.

59.    Illinois law, science, and the facts contradict Defendant's cursory claims denials. Illinois courts have held that dangerous substances can and do cause "direct physical loss or damage" under commercial insurance policies.  *See e.g.*, *Bd. of Educ. of Twp. High Sch. Dist. No. 211 v. Int'l Ins. Co.*, 720 N.E.2d 622, 625–26 (Ill. App. Ct. 1999), *as modified on denial of reh'g* (Dec. 3, 1999).

---

[1] New England Journal of Medicine, March 5, 2020, https://www.nejm.org/doi/full/10.1056/NEJMoa2001191.

60.     COVID-19 may well be the most dangerous physical substance to emerge upon humankind to date during the 21st century. The danger of the presence of COVID-19 on a surface or in the air at a premises renders that premises potentially fatal and directly physically affected, damaged, and unfit for human use.  Like asbestos, COVID-19 can linger in the air or on surfaces (including equipment and air ducts on a business premises) and endanger human life.  Unlike inanimate asbestos (but just like a spreading fire), COVID-19 can reproduce readily and expand its direct physical impact by infecting areas and persons quickly. Unlike inanimate asbestos, its direct physical impact cannot be encapsulated or contained on a premises. At the same time, there are no readily available and easy to administer tests to determine if COVID-19 exists on a property and no vaccine to slow or stop its spread, meaning its physical presence has a profoundly dangerous impact.

61.     Society essentially argues that because COVID-19 cannot be seen with the naked eye or is "invisible," that it can have no direct physical impact.

62.     COVID-19 physically exists.

63.     COVID-19 has a direct physical impact.

64.     COVID-19 will alter property in appearance, shape, color, or other material dimension.

65.     COVID-19 can be seen with an electron microscope to alter property in appearance, shape, color, or other material dimension.[2]

---

[2] https://www.sciencealert.com/this-is-what-the-covid-19-virus-looks-like-under-electron-microscopes

66.     This is an electron microscope image[3] of COVID-19 that depicts its physical existence:



67.     Society's arguments against coverage that COVID-19 causes a direct physical loss or damage to property (Ex. J - R) rejects the germ theory of disease proven more than a century ago by Louis Pasteur (1864). The germ theory of disease states that microscopic pathogens, which include viruses, too small to see without magnification, do physically exist. Due to their physical existence, viral pathogens can move from the physical environs of property, invade humans and other living hosts, and cause fatal disease.

68.     Emerging research and recent reports from the CDC indicate that the COVID-19 pathogen strains physically impact and infect and can stay alive on surfaces for at least 17 days.[4] Thus, a core scientific and epidemiological concept of the Closure Orders (and the loss of business property they

---

[3] https://www.sciencealert.com/this-is-what-the-covid-19-virus-looks-like-under-electron-microscopes
[4] https://www.cnbc.com/2020/03/23/cdc-coronavirus-survived-in-princess-cruise-cabins-up-to-17-days-after-passengers-left.html

18

mandate) is the necessary assumption that COVID-19 is physically and impactfully present on the surface of every premises and will be transmitted, resulting in harm and/or death.[5] This science is fundamental to the Closure Orders.[6]

69.     Government authorities on the federal, state, and local levels, including those in the jurisdictions in which the Plaintiffs are located, have based their orders on the scientifically supported presumption that COVID-19 exists at all business premises.[7]

70.     Government authorities issued Closure Orders that mandated the partial or complete shutdown of Plaintiffs' business operations.

71.     The complete shutdown of non-essential businesses, social distancing rules, mandatory masks, partial suspensions of other businesses, and many other elements underscore the scientific and governmental assumption that COVID-19 has a direct physical impact on premises everywhere.  While economically devastating, this precept is a common theme to all of the Closure Orders in the United States.[8] The Closure Orders aim to save lives by "flattening the curve."[9]

72.     Society's arguments against coverage that a virus cannot cause direct physical loss or damage are contrary to well-established and peer-reviewed science developed and accepted over the past 156 years.  Society's arguments also ignore current, cutting-edge science about COVID-19 that is saving lives in America today.

---

[5] Centers for Disease Control and Prevention, *Social Distancing, Quarantine and Isolation*, Coronavirus Disease 2019 (COVID-19) (April 4, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html; Harlan M. Krumholz, *If You Have Coronavirus Symptoms, Assume You Have the Illness, Even if You Test Negative*, The New York Times (April 1, 2020), https://www.nytimes.com/2020/04/01/well/live/coronavirus-symptoms-tests-false-negative.html.
[6] *When Could Things Reopen? How each State is Responding to COVID-19*, National Public Radio (April 9, 2020), https://www.npr.org/2020/03/12/815200313/what-governors-are-doing-to-tackle-spreading-coronavirus.
[7] *COVID-19 Expert Reality Check*, John Hopkins Bloomberg School of Public Health (April 6, 2020), https://www.globalhealthnow.org/2020-02/coronavirus-expert-reality-check.
[8] Harvey V. Fineberg, *Ten Weeks to Crush the Curve*, New England Journal of Medicine (April 1, 2020), https://www.nejm.org/doi/full/10.1056/NEJMe2007263?query=featured_coronavirus.
[9] Kathy Katella, *5 Things Everyone Should Know About the Coronavirus*, Yale Medicine (April 13, 2020), https://www.yalemedicine.org/stories/2019-novel-coronavirus/.

73.     Society failed to investigate, consider or even attempt to understand the scientific reasoning and basis of the Closure Orders, with which Plaintiffs were required to comply, leading directly to Plaintiffs' business income and other losses.

74.     In discovery and at trial, Plaintiffs will present scientific evidence to support that COVID-19 causes a direct physical impact (including altering property in one or more of "appearance, shape, color or other material dimension") and to enable a jury to justly and fairly determine the controversies created by Society's coverage positions and denials. *See* Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

**Defendant Owes Business Income Loss Coverage**

75.     Plaintiffs' dining rooms and bars are shuttered due to the Closure Orders. Plaintiffs suffered a complete loss of and damage to their business premises under the Closure Orders. Plaintiffs suffered a direct physical loss and damage to their business premises that enabled them to provide their products and services. Carryout, delivery, and outdoor dining are a mitigation of these losses that has allowed at best minimal revenue.

76.     Under well-accepted legal and scientific principles Plaintiffs sustained "a direct physical loss of or damage to" property at the described premises, Defendant owes coverage for the resulting Business Income losses. (Ex. A – I, Coverage Form TBP2 (05-15), p 5-6 of 32).

**Defendant Owes Civil Authority Coverage**

77.     In the alternative, Fed. R. Civ. P. 8(d), the Closure Orders were an "action of civil authority" that prohibited Plaintiffs "access to the described premises" to use for its business purposes. (Ex. A – I, Coverage Form TBP2 (05-15), p 7-8 of 32). Thus, Plaintiffs suffered a complete loss of access to their business premises (dining rooms and bars) under the Closure Orders.

78.     Because the Closure Orders prohibited access to every "non-essential" business in Illinois, and mandated shutdown of parts of other businesses (such as dining rooms and bars), "access to the area immediately surrounding" a "damaged property" was prohibited by governmental order encompassing many locations. (Ex. A – I, Coverage Form TBP2 (05-15), p 7-8 of 32).

20

79.     Moreover, the Closure Orders were a response to "damaged property" with dangerous physical conditions threatening to human life "within the area" of Plaintiffs' businesses. Plaintiffs' locations are all in the Chicagoland area where there are many hospitals, medical centers and other health care facilities.

80.     This proximity of Plaintiffs' premises to health care facilities (and COVID-19 testing sites), where persons suffering (and on information and belief, dying) from COVID-19 were located, is just one among many facts that Society would have discovered had it properly investigated Plaintiffs' claims before making its form denials. For instance, The Boiler Room is 1.6 miles from Norwegian American Hospital (where they do testing for COVID-19) and 1.8 miles from Presence Saints Mary Elizabeth Medical Center; Florafauna is 0.6 miles from Northwestern Memorial Hospital and 0.8 miles from Ann & Robert H. Lurie Children's Hospital; The Green Door is less than 1 mile from Winfield Moody Health Center, Northwestern Memorial Hospital, and Ann & Robert H. Lurie Children's Hospital; Pennyville is 2.6 miles from Advocate Lutheran General Hospital and approximately 2 miles from AMITA Health Resurrection Medical Center; Lotties is approximately 1 mile from the Presence Saints Mary Elizabeth Medical Center; Frontier is 0.4 miles from Kindred Chicago Lakeshore Hospital; Ina Mae is 0.7 miles from the AMITA Health Saints Mary and Elizabeth Medical Center; Simone's is less than 3 miles from 7 hospitals/health care facilities, including 0.4 miles from Alivio Medical center (where they do COVID-19 testing); and Hendrickx is 0.5 miles from the Northwestern Memorial Hospital.

81.     COVID-19 can also spread on particulate matter in the air. Plaintiffs' business premises are in an urban area or close to an urban area with pollution in the air.[10] As a result, COVID-19 was spread throughout other locations within the area of Plaintiffs' premises.[11]

82.     Therefore, Plaintiffs have sustained business income losses: a) by action of civil authority prohibiting access to their dining rooms and bars; b) because of dangerous COVID-19 within the area of

---

[10]https://www.usatoday.com/story/news/health/2020/04/27/coronavirus-found-air-pollution-particles-preliminary-study-finds/3033646001/
[11]https://www.chicagotribune.com/coronavirus/ct-viz-covid-19-cases-by-zip-code-20200407-aikakoyycje4fbqvferzjffkg4-htmlstory.html

(if not on Plaintiffs' actual premises), and c) as a result of COVID-19 creating a dangerous physical condition to which civil authority responded, Defendant owes coverage under Civil Authority Coverage. (Ex. A – I, Coverage Form TBP2 (05-15), p 7-8 of 32).

**Defendant Owes Contamination Coverage**

83.     Because COVID-19 is a dangerous disease that is assumed to be physically and impactfully present on the surface of every premises, Plaintiffs' operations were suspended due to a "dangerous condition" on the "premises." (Ex. A-I, Coverage Form TBP2 (05-15), p 9 of 32).

84.     Moreover, the "Contamination" of COVID-19 resulted in the Closure Orders, which is deemed an action by a governmental authority that prohibited access to the Plaintiffs' premises. (Ex. A-I, Coverage Form TBP2 (05-15), p 8-9 of 32).

85.     Therefore, since Plaintiffs' operations are suspended due to "Contamination" and the subsequent response by the Closure Orders, Defendant owes coverage under Contamination Coverage. (Ex. A-I, Coverage Form TBP2 (05-15), p 8-9 of 32).

## CLAIMS BY PLAINTIFFS: OVERVIEW

86.     The conduct set forth at length above constitutes Defendant's breach of the Policy contracts.  Plaintiffs have sustained damages as a result of that breach, in the form of substantial Business Income losses and damages that continue to mount, including Extra Expense.

87.     By engineering this scheme to avoid its obligations under the Policies, Defendant breached its contract and exhibited bad faith by putting itself at a tremendous economic advantage over practically all other American business enterprises who honor their contractual obligations and continue to carry this nation through the current crisis. Defendant is retaining and lucratively investing claims dollars it would have to pay out, or premium dollars it would have to rebate, if it chose to follow the law.

88.     Defendant has engaged in consistent misconduct across its claims handling in this time of crisis.  Defendant's reflexive denial of claims by Plaintiffs and thousands of other insureds at their time of

need is arbitrary and unreasonable, inconsistent with the facts and plain language of the Policy, and flies in the face of well-established science.

89.     Defendant's denials were driven by a desire to preempt its own financial exposure to the economic fallout resulting from Closure Orders, rather than to initiate, as Defendant is obligated to do, a full and fair investigation of the claims and a careful review of the Policies Defendant sold in exchange for valuable premiums.

90.      Defendant improperly shifted the burden on Plaintiffs to retain counsel, initiate litigation (such as this), and expend great time, money, and opportunity cost.  Taking time away from caring for their employees and struggling business, Plaintiffs have been forced to come to court to compel Defendant to honor its contractual obligations.

91.     Plaintiffs file this lawsuit for a declaratory judgment establishing that they are entitled to receive the benefit of the insurance coverage they purchased, for indemnification of the business losses they have sustained, for breach of contract, and for bad faith claims handling under 215 ILCS 5/155 – which entitles Plaintiffs to penalties and attorneys' fees. Alternatively, Plaintiffs, on behalf of themselves and all others similarly situated, choose to stand up against Defendant who would (as alluded to above) "have its cake and eat it too" and be unjustly enriched by retaining premium dollars it should disgorge if Defendant prevails on its coverage denials (Count IV, unjust enrichment). This same conduct also violated the Illinois Consumer Fraud and Deceptive Business Practices Act and the similar laws of other states where Defendant sells insurance.  (Count V).  Fed. R Civ. P. 8(d)(2), (3).

## COUNT I
## (DECLARATORY JUDGMENT)

92.     Plaintiffs incorporates by reference, as if fully set forth herein, the allegations set forth in paragraphs 1 to 91 above.

93.     The Policies are insurance contracts under which Plaintiffs paid premiums in exchange for Defendant's promise to pay losses and damages for claims covered by the Policies, including, but not limited to, Business Income losses, losses incurred as a result of the Closure Orders that forced Plaintiffs to suspend their businesses in whole or in part, and losses sustained from Contamination.

23

94.     Plaintiffs have complied with all applicable provisions of their Policies, including payment of the premiums in exchange for coverage under the Policy.

95.     Defendant has arbitrarily, unreasonably, and without justification refused to reimburse Plaintiffs for any losses and damages incurred in connection with the covered business losses set out at length above.

96.     An actual case or controversy exists regarding the Plaintiffs' rights and Defendant's obligations under the Policies to reimburse Plaintiffs for the full amount of losses and damages incurred by Plaintiffs.

97.     Pursuant to 28 U.S.C. § 2201, Plaintiffs seek a declaratory judgment from this Court declaring the following: (a) Plaintiffs' losses and damages are insured under their Policies; (b) Defendant has waived any right it may have had to assert defenses to coverage or otherwise to seek to bar or limit coverage for those losses and damages by issuing blanket coverage denials without conducting a claim investigation as required under Illinois law; and (c) Defendant is obligated to pay Plaintiffs for the full amount of the losses and damages incurred and to be incurred in connection with the covered business and damages losses up to the applicable limits of coverage.

## COUNT II
### (BREACH OF CONTRACT)

98.     Plaintiffs incorporate by reference, as if fully set forth herein, the allegations set forth in paragraphs 1 to 91 above.

99.     The Plaintiffs' Policies are insurance contracts under which Plaintiffs paid premiums in exchange for Defendant's promise to pay losses and damages for claims covered by the Policies, including, but not limited to, Business Income losses and damages, and losses and damages incurred as a result of the Closure Orders, and losses sustained from Contamination, as set forth at length above.

100.     Plaintiffs have complied with all applicable provisions of their Policies, including payment of the premiums in exchange for coverage, and yet Defendant has abrogated its insurance coverage obligations.

101.     By denying coverage for the business losses and damages incurred by Plaintiffs and set forth at length above, Defendant has breached its coverage obligations under the Policies.

102.     As a result of Defendant's breaches of their Policies, Plaintiffs have sustained substantial damages for which Defendant is liable, in an amount to be established at trial.

<u>COUNT III</u>
**(STATUTORY PENALTY FOR BAD FAITH DENIAL OF INSURANCE)**

103.     Plaintiffs incorporate by reference, as if fully set forth herein, the allegations set forth in paragraphs 1 to 91 above.

104.     Upon receipt of Plaintiffs' claims and (upon information and belief) upon receipt of each and every claim related to the Closure Orders, Defendants denied the claims, without conducting any investigation, let alone a "reasonable investigation based on all available information" as required under Illinois law. *See* 215 ILCS 5/154.6.

105.     To make matters worse, based on information and belief, Defendant directed its insurance agents to send sham claims communications stating that Plaintiffs' claims were not covered. Defendant formulated and executed on a plan to discourage policyholders such as Plaintiffs from submitting claim notifications in order to avoid any responsibility for its policyholders' staggering losses and damages, in violation of Illinois law.

106.     On information and belief, Defendant has also propagated rumor and innuendo that a purported government bailout of business income claims may occur, further to discourage claims.

107.     Defendant's denials were vexatious and unreasonable. Defendant's actions disregarded or ignored facts underlying the claims, ignored the law, and ignored the science designed to save human life.

108.     Defendant's denials constitute "improper claims practices" under Illinois law – namely Defendant's: (1) refusal to pay Plaintiffs' claims without conducting reasonable investigations based on all available information; and (2) failure to provide reasonable and accurate explanations of the bases in its denials. *See* 215 ILCS 5/154.6 (h), (n).

109.     Defendant has neither offered any justifiable reason for its denials, nor raised any bona fide disputes as to the whether the claims were covered.

110.    Therefore, pursuant to 215 ILCS 5/155, Plaintiffs request that, in addition to entering a judgment in favor of Plaintiffs and against Defendant for the amount owed under their Policies at the time of judgment, the Court enter a judgment in favor of Plaintiffs for an amount equal to the greater of: (1) 60% of the amount which the trier of fact finds that each Plaintiff is entitled to recover under their Policy, exclusive of costs; and (2) $540,000.  *See* 215 ILCS 5/155.

111.    Plaintiffs further request that the Court enter a judgment in favor of Plaintiffs and against Defendant in an amount equal to the attorneys' fees and costs incurred by for the prosecution of this coverage action against Defendant, which amount will be proved at or after trial, pursuant to 215 ILCS 5/155.

## **PRAYER FOR RELIEF ON COUNTS I - III**

**WHEREFORE,** Plaintiffs pray that this Honorable Court enter an order and judgment in their favor and against Defendant Society Insurance as follows:

(a) Enter a declaratory judgment on Count I of the Complaint in favor of each Plaintiff and against Defendant declaring that: losses by Plaintiffs incurred in connection with the Closure Orders and the necessary interruption of its businesses are insured losses and damages under their respective Policies; that Defendant has waived any right it may have had to assert defenses to coverage or otherwise seek to bar or limit coverage for the losses and damages of Plaintiffs by issuing blanket coverage denials without conducting a claim investigation as required under Illinois law; and that Defendant is obligated to pay Plaintiffs for the full amount of the losses and damages incurred and to be incurred in connection with the covered business losses and damages related to the Closure Orders;

(b) Enter a judgment on Count II of the Complaint in favor of each Plaintiff and against Defendant and award damages for breach of contract in an amount to be proven at trial;

(c) Enter a judgment on Count III of the Complaint in favor of each Plaintiff and against Defendant in the amount equal to the greater of (1) 60% of the amount which the trier of fact finds that Plaintiff is entitled to recover under the Policy, exclusive of costs; and (2) $540,000;

(d) Enter a judgment in favor of each Plaintiff and against Defendant in an amount equal to all attorneys' fees and related costs incurred for the prosecution of this coverage action against Defendant pursuant to 215 ILCS 5/155, such amount to be established at the conclusion of this action;

(e) Award to each Plaintiff and against Defendant prejudgment interest, to be calculated according to law, to compensate it for the loss of use of funds caused by Defendant's wrongful refusal to pay Plaintiffs what it is rightfully owed under their respective Policies; and,

(f) Award Plaintiffs such other, further, and additional relief as this Court deems just and appropriate.

**COUNT IV (in the alternative)**

**CLASS ACTION**

**UNJUST ENRICHMENT BY COLLECTION / RETENTION OF PREMIUM**

112.　Plaintiffs incorporate by reference, as if fully set forth herein, the allegations set forth in paragraphs 1 to 91 above.

113.　Plaintiffs for themselves, and on behalf of all others similarly situated, allege this class action claim against Defendant in the alternative (see Fed. R. Civ. P. 8(d)(2), (3)) and as follows:

114.　This is a class action count brought in diversity between the Plaintiff Class and Defendant, wherein jurisdiction lies under 28 U.S.C. § 1332.

115.　If Defendant's denials of coverage for Plaintiffs' claims for business interruption coverage are upheld, then Defendant has been unjustly enriched in the amount of excess premium for business interruption coverage they have charged and retained while Plaintiffs' properties have been shut down or operationally impaired as the result of the Closure Orders. These premiums should be disgorged to all affected member of a class of Defendant's insureds, as set out below.

116.　Defendant has priced and charged premiums for each of the Plaintiffs' respective Policies on the basis of their insured properties operating as fully functional business establishments. Accordingly, the insured risks included the prospect of having to pay claims for lost business income at levels commensurate with fully operational businesses, and for other risks (such as on liability insurance claims among others) commensurate with fully operational businesses.

117.　During the time period while Plaintiffs' properties have been lost, damaged, shut down or otherwise operationally impaired by the Shutdown Orders, Defendant's risk of having to pay other claims under their "all-risk" policies, including business interruption claims and others, has been reduced in many instances to zero and in all instances by substantial monetary amounts. Each of the Policies contain provisions making Defendant liable to pay business interruption loss only to the extent it would not have been incurred anyway, such as the provision taken below from the Plaintiffs' Policies:

> (c) Business Income means the: (i) Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred if no physical loss or damage had occurred . . . .

28

(Ex. A – I, Coverage Form TBP2 (05-15), p 6 of 32).

118.    For example, if Plaintiffs' establishments were to suffer a total fire loss tomorrow, Defendant would decline to pay any business interruption loss that would have been incurred anyway as the result of the Closure Orders.

119.    Defendant knows all this, yet they have intentionally continued to retain, charge and collect as "earned"—and Plaintiffs and the class have continued to pay including on renewals—premiums for which Defendant, according to their own self-serving justifications for denying coverage, assumed no commensurate risk.

120.    Defendant has been unjustly enriched, at Plaintiffs' and the Class' expense, and should be required to disgorge to Plaintiffs and each Class member the full amounts of excess premium for business interruption coverage and other coverages they have unlawfully charged, collected, and retained, as equity and good conscience require. Defendant's misconduct in this respect has been willful, wanton, and in bad faith.

121.    This action may properly be maintained as a class action pursuant to the provisions of Fed. R. Civ. P. 23(b)(3). Plaintiffs bring this action on behalf of themselves and on behalf of a Nationwide Class (as defined herein) of similarly situated businesses that have been irreparably harmed by Defendant, further defined as follows:

122.    <u>This is a Nationwide Class of similarly situated persons defined as follows:</u> all businesses in the United States who are insureds of Defendant under commercial insurance policies and who have experienced a complete or partial shutdown of their business operations as a result of a Closure Order issued by a State or local governmental authority on or after March 1, 2020, to the present.

123.    Excluded from this Class are: (1) Defendant, Defendant's agents, subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest, and those entities' current and former employees, officers, and directors; (2) the Judge to whom this case is assigned and the Judge's immediate family; (3) any person who executes and files a timely request for

exclusion from the Class; (4) any person who had their claims in this matter adjudicated and/or otherwise released; and, (5) the legal representatives, successors, and assigns of any such excluded person.

124.     This action is brought as a class action and may properly be so maintained pursuant to the provisions of Federal Rule of Civil Procedure 23(b)(3). Plaintiffs reserve the right to modify the Nationwide Class and the class period pursuant to discovery that is conducted hereafter.

125.     Plaintiffs and all members of the Nationwide Class have been harmed by Defendant in a singular and common manner – they have been overcharged for premium for "all risk" commercial insurance policies and business interruption coverage during the current crisis, all to the unjust enrichment of Defendant.

126.     Numerosity: On information and belief, the Nationwide Class is so numerous that joinder of all individual plaintiffs is not practicable. The exact number of members of the Class is unknown and can only be ascertained through discovery because that information is exclusively within the possession, custody, and control of Defendant. However, on information and belief, Plaintiffs estimate that there are many thousands of potential Class members because Defendant sells commercial insurance in a number of states spanning the United States.  Defendant is registered with the Illinois Department of Insurance and markets its policies to millions of Illinoisans and Illinois businesses, as well as in other states. The members of the Class can be identified easily through records maintained by Defendant and/or by other means.

127.     Commonality and Predominance: There are questions of fact and law common to the Plaintiffs and the Class members which predominate over any questions relating to individual class members. Some of the predominant, common questions include but are not necessarily limited to: 1) whether Defendant has been unjustly enriched in the amount of excess premium for "all risk" and business interruption coverage they have charged and retained while Plaintiff Class members' businesses have been shut down or operationally impaired as the result of Closure Orders; 2) whether Defendant has priced and charged premiums for Class members' policies on the basis of their properties operating as fully functioning businesses; 3) whether Defendant's risk of having to pay other commercial claims including business interruption claims has been reduced in many instances to zero and in all instances by substantial monetary

amounts; 4) whether the Policies contain provisions making Defendant liable to pay business interruption loss and other claims only to the extent it would not have been incurred anyway; 5) whether Defendant has, knowing all this, continued to retain, charge and collect as "earned" premiums for which Defendant, according to their own self-serving justifications for denying coverage, assumed no commensurate risk; and 6) whether Defendant has, accordingly, been unjustly enriched.

128. <u>Adequacy of Representation</u>: Plaintiffs will fairly and adequately protect the interests of the Class members in that Plaintiffs' claims are typical of the Class and Plaintiffs do not have any interests which are adverse to the other class members. Plaintiffs' claims are based on similar facts and the same legal theories as those of the Class members. Plaintiffs have retained competent counsel, experienced in handling class actions, complex business transactions and litigating complex commercial disputes. Plaintiffs intend to prosecute this action vigorously. Neither Plaintiffs nor counsel have any interests which might cause them to not vigorously prosecute this action. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the Nationwide Class.

129. <u>Typicality:</u> Plaintiffs claims are typical of the claims of the members of the Nationwide Class because Plaintiffs all paid premium for "all risk" commercial insurance policies including business interruption insurance and were shut down by Closure Orders, yet were never refunded or rebated their premium by Defendant. Plaintiffs and all members of the Nationwide Class have thus similarly suffered harm arising from Defendant's violations of law as alleged herein.

130. <u>Appropriateness</u>: Class action treatment is superior to the alternatives, if any, for the fair and efficient adjudication of the controversy described herein because it permits a large number of injured persons to prosecute their common claims in a single forum simultaneously, efficiently, and without duplication of evidence and effort. Class treatment is especially appropriate for the current controversy because it is the only practical means for Class members to receive redress given that the individual claims for refund of premium are likely not economically viable to pursue on an individual basis (as contrasted to their individual and sizeable business interruption claims, which Defendant, of course, has denied). The premium rebate damages suffered by each individual class member likely are disproportionate to the burden

and expense of individual prosecution of complex and extensive litigation to proscribe Defendant's conduct and practices. The disposition of the claims in a class action will provide a substantial benefit to the parties and the Court in avoiding a multiplicity of identical suits. A class action provides the benefits of fewer management difficulties, single adjudication, economy of scale and comprehensive supervision by a single court, and would result in reduced time, effort, and expense for all parties and the Court, and ultimately ensure the uniformity of decisions.

## COUNT V (in the alternative)

## CLASS ACTION

### ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT

131.    Plaintiffs incorporate by reference, as if fully set forth herein, the allegations set forth in paragraphs 1 to 91, and 112 to 130, above.

132.    Plaintiffs for themselves, and on behalf of all others similarly situated, allege this class action claim against Defendant in the alternative (see Fed. R. Civ. P. 8(d)(2), (3)) and as follows:

133.    This is a class action count brought in diversity between the Plaintiff Class and Defendant, wherein jurisdiction lies under 28 U.S.C. § 1332.  Plaintiffs incorporate by reference, as if fully set forth herein, the class action allegations set forth in Count IV, above.

134.    The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq* ("ICFA") and the similar laws of other states where Defendant sells insurance, provide protection to persons including Plaintiffs and the members of the Nationwide Class by mandating fair competition in commercial markets for goods and services.

135.    ICFA and the similar laws of other states where Defendant sells insurance prohibit any deceptive, unlawful, unfair or fraudulent business acts or practices using deception, fraud, false pretenses, false advertising, misrepresentation, or the concealment, suppression, or omission of any material fact, or the employment of use of any deceptive practice described as a deceptive trade practice.

136.    Defendant is a "person" as defined by ICFA and the similar laws of other states where Defendant does business.

137. Plaintiffs and each member of the Nationwide Class are persons protected by ICFA and similar laws of other states where Defendant does business.

138. Defendant's sales of the Policies, collection of premiums, and administration of claims constitutes an activity covered by ICFA and similar laws of other states where Defendant does business.

139. Defendant's retention and collection of full and undiscounted / unrebated premiums, including (but not limited to) upon renewal of policies, under the circumstances pled herein wherein the Defendant did not take on commensurate risk supporting those premiums, from businesses affected by Closure Orders, are deceptive and unfair acts or practices prohibited by ICFA and the similar laws of other states where Defendant does business.

140. Defendant violated ICFA and the similar laws of other states where Defendant does business when it misrepresented and omitted facts regarding the premium charged (at a full and undiscounted / unrebated rate) and the commensurate risk actually taken on and the coverage actually afforded (including but not limited to that Defendant would not pay for business interruption losses for businesses whose income was already interrupted or reduced by Closure Orders).

141. Defendant's conduct was knowing and intentional.

142. Plaintiffs and members of the Nationwide Class relied upon Defendant's misrepresentations and omissions when they purchased, paid on, continued and renewed their Policies with Defendant.

143. Defendant's misrepresentations and omissions pled herein were acts likely to mislead the Plaintiff and the Nationwide Class acting reasonably under the circumstances, and thus constitute unfair and deceptive practices in violation of ICFA and the similar laws of other states where Defendant does business.

144. As a direct and proximate result of Defendant's violation of ICFA and the similar laws of other states where Defendant does business, Plaintiffs and the members of the Nationwide Class have suffered harm in the form of excess premiums paid in exchange for their Policies, because they paid more

premium than what they otherwise would have paid had they known the truth – that Defendant was not assuming risk commensurate with those premiums charged.

145.     Defendant's practices set forth herein offend public policy, were and are immoral, unethical, oppressive and unscrupulous, and cause substantial injury to Plaintiffs and the members of the Nationwide Class, who were protected by ICFA and the similar laws of other states where Defendant does business.

### **PRAYER FOR RELIEF ON COUNTS IV AND V (in the alternative)**

**WHEREFORE,** Plaintiffs, individually and on behalf of all persons similarly situated, pray that this Honorable Court enter an order and judgment in their favor and against Defendant Society Insurance as follows:

(a) Finding that this action satisfies the prerequisites for maintenance of a class action set forth in Fed. R. Civ. P. 23(b)(3), and certifying the Class as defined above;

(b) Designating Plaintiffs as the representatives of the Class and the undersigned counsel as Class Counsel;

(c) Entering judgment in favor of Plaintiffs and the Class and against Defendant on the unjust enrichment claim (Count IV) set forth above in an amount to be proven at trial;

(d) Entering judgment in favor of Plaintiffs and the Class and against Defendant on the claim for violation of ICFA and the similar laws of other states where Defendant does business (Count V), including compensatory damages and punitive damages as permitted by law and in an amount to be proven at trial;

(e) Awarding Plaintiffs and the Class pre-judgment interest, their court costs, expenses, and reasonable attorneys' fees; and,

(f) Awarding Plaintiff any such other and further relief that this Court deems necessary and just.

**JURY DEMAND**

Plaintiff hereby demands trial by jury on all issues so triable.

Dated:  September 16, 2020

<div style="margin-left:50%">

Respectfully Submitted,

FUKSA KHORSHID, LLC


*/s/ William E. Meyer, Jr.*

William E. Meyer, Jr.

 *Attorneys for Plaintiffs and for the Class*

</div>

FUKSA KHORSHID, LLC
William E. Meyer, Jr. (ARDC No. 6207345) of counsel
Lucas M. Fuksa (ARDC No. 6277498)
Lema A. Khorshid (ARDC No. 6283237)
Vincent P. Formica (ARDC No. 6319168)
200 W. Superior, Suite 410
Chicago, IL 60654
T: 312.266.2221
F: 312.266.2224
william@fklawfirm.com
lucas@fklawfirm.com
lema@fklawfirm.com
vince@fklawfirm.com