# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **IN RE: SOCIETY INSURANCE** | ) | MDL No. 2964 |
| **COMPANY COVID-19 BUSINESS** | ) | |
| **INTERRUPTION PROTECTION** | ) | Master Docket No. 20 C 5965 |
| **INSURANCE LITIGATION** | ) | |
| | ) | Judge Edmond E. Chang |
| This Document Relates to Case | ) | |
| **No. 1:20-cv- 03959** | ) | Magistrate Judge Jeffrey I. Cummings |

# PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
# DEFENDANT'S MOTION TO DISMISS UNDER RULE 12(b)(6)
# OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ....................................................................................................................... 3

  I.  Plaintiffs have stated plausible, viable claims for both Business Income and Civil Authority coverage, and Society's motion to dismiss those claims should be denied ......................... 5

      A.  The primary term and condition of coverage for both Business Income and Civil Authority Coverage is the same—"direct physical loss of or damage to property"; that condition is ambiguously worded; and, therefore, it must be construed against Society and in favor of coverage. ............................................................................... 5

          1.  The phrase "direct physical loss of or damage to property" suffers from at least three significant ambiguities ............................................................. 8

          2.  The variations in how courts have construed the phrase "direct physical loss of or damage to property," underscores its ambiguity......................................... 10

          3.  The insurance industry has tacitly acknowledged the ambiguity of business income and civil authority coverage as applied to viruses, unless a policy form contains an express virus exclusion.................................................................. 12

          4.  No Illinois case rescues the operative language here—"direct physical loss of or damage to property"—from its inherent ambiguity. .................................... 12

      B.  The policies' inclusion of a "period of restoration," to establish the duration of coverage, provides no evidence that "physical" loss or damage requires a "change in the physical characteristics of property." ................................................................. 14

      C.  The fact that governmental closure orders have resulted in partial or temporary, rather than absolute or permanent limitations, on Plaintiffs' operations and their use of their properties is irrelevant to Civil Authority (or any other) coverage. ............. 14

      D.  For purposes of Civil Authority coverage, Plaintiffs have alleged damage to property "other than" their own property............................................................................... 15

  II.  Plaintiffs have stated plausible, viable claims for coverage under the Contamination Coverage Part; Society's motion to dismiss these claims should be denied. ..................... 16

  III.  Plaintiffs' claims for coverage are not defeated by the Ordinance or Law exclusion. ..... 17

  IV.  Plaintiffs' bad faith claim should be decided by a jury, after discovery........................... 18

CONCLUSION.................................................................................................................... 18

# TABLE OF AUTHORITIES

**Cases**

*Am. Guar. & Liab. Ins. Co. v. Ingram Micro, Inc.*,
   2000 U.S. Dist. LEXIS 7299 (D. Ariz. Apr. 18, 2000) ............................................... 11

*Am. States Ins. Co. v. Koloms*,
   177 Ill. 2d 473 (1997) ....................................................................................... 13

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ........................................................................................... 4

*Costello v. BeavEx, Inc.*,
   810 F.3d 1045 (7th Cir. 2016) ............................................................................. 5

*Dundee Mut. Ins. Co. v. Marifjeren*,
   587 N.W.2d 191 (N.D. 1998) .............................................................................. 9

*Essex Ins. Co. v. BloomSouth Flooring Corp.*,
   562 F.3d 399 (1st Cir. 2009) .............................................................................. 10

*Gillen v. State Farm Mut. Auto. Ins. Co.*,
   215 Ill. 2d 381 (2005) ....................................................................................... 17

*Great N. Ins. v. Benjamin Franklin Fed. Sav. & Loan, Ass'n*,
   1992 U.S. App. LEXIS 1593 (9th Cir. 1992) ......................................................... 11

*Gregory Packaging, Inc. v. Travelers Prop. Cas. Co. of Am.*,
   2014 U.S. Dist. LEXIS 165232 (D.N.J. Nov. 25, 2014) ........................................... 10

*Huntington Chase Condo. Ass'n v. Mid-Century Ins. Co.*,
   379 F. Supp.3d 687 (N.D. Ill. 2019) ..................................................................... 2

*Ill. Farmers Ins. Co. v. Farrow*,
   2012 IL App (5th) 100598-U ............................................................................... 2

*Ins. Co. of Pa. v. OCÉ-USA Holdings, Inc.*,
2013 U.S. Dist. LEXIS 41836 (N.D. Ill. Mar. 26, 2013) (Chang, J.) ............................... 3, 7, 17

*Lapham-Hickey Steel Corp. v. Prot. Mut. Ins. Co.*,
166 Ill. 2d 520 (1995) ....................................................................................................... 8

*Manpower, Inc. v. Ins. Co.*,
2009 U.S. Dist. LEXIS 108626 (E.D. Wisc., Nov. 3, 2009) ................................................. 9, 10

*Mastellone v. Lightning Rod Mut. Ins. Co.*,
884 N.E.2d 1130 (Ohio 2008) ............................................................................................ 11

*Matzner v. Seaco Ins. Co.*,
1998 Mass. Super. LEXIS 407 (Aug. 26, 1998) ......................................................................... 10

*Mellin v. N. Sec. Ins. Co.*,
167 N.H. 544 (2015) ............................................................................................................ 10

*Mutlu v. State Farm Fire and Cas.*,
337 Ill. App. 3d 420 (1st Dist. 2003) ..................................................................................... 12, 13

*Nicor, Inc. v. Associated Elec. & Gas Ins. Servs.*,
223 Ill. 2d 407 (2006) ......................................................................................................... 13

*O'Rourke v. Prudential Ins. Co.*,
294 Ill. App. 30 (1st Dist. 1938) .......................................................................................... 11

*Outboard Marine Corp. v. Liberty Mut. Ins. Co.*,
154 Ill. 90 (1992) ............................................................................................................... 3

*Pan American World Airway, Inc. v. Aetna Cas. & Surety Co.*,
505 F.3d 989 (2d Cir. 1974) .................................................................................................. 7

*Pirie v. Federal Ins. Co.*,
696 N.E.2d 553 (Mass. Ct. App. 1998) ............................................................................... 11

*Sandy Point Dental, PC v. Cincinnati Ins. Co.*,
2020 U.S. Dist. LEXIS 171979 (N.D. Ill. Sept. 21, 2020) ....................................... 14

*Santa's Best Craft, LLC v. St. Paul Fire & Marine Ins. Co.*,
611 F.3d 339 (7th Cir. 2010) ................................................................................. 17

*SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props. LLC*,
2006 U.S. Dist. LEXIS 79326 (S.D.N.Y. Oct. 31, 2006) ....................................... 18

*Sullivan v. Std. Fire Ins. Co.*,
2008 Del. LEXIS 66, 956 A.2d 643 (Del. 2008) ..................................................... 11

*Traveler's Ins. Co. v. Eljer Mfg.*,
197 Ill.2d 278 (2001) ................................................................................. 8, 12, 13

*United States Fidelity & Guaranty Co. v. Wilkin Insulation*,
144 Ill.2d 64 (1991) ............................................................................................. 11

*Universal Image Productions, Inc. v. Chubb Corp.*,
703 F. Supp. 2d 705 (E.D. Mich. 2010) ............................................................... 11

*Ward Gen. Servs., Inc. v. Emp'rs Fire Ins. Co.*,
7 Cal. Rptr. 3d 844 (Ct. App. 2003) ..................................................................... 11

*Western Fire Ins. v. First Presbyterian Church*,
165 Colo. 34 (1968) ............................................................................................. 11

*Widder v. La. Citizens Prop. Ins. Corp.*,
82 So.3d 294 (La. App. 2011) ............................................................................... 11

*Wright v. Chi. Title Ins. Co.*,
196 Ill. App. 3d 920, 925 (1st Dist. 1990) ............................................................... 3

**Statutes**

215 ILCS 5/155 ...................................................................................................... 18

**Other Authorities**

"Hotel Chain To Get Payout for SARS-Related Losses,"
*Business Insurance* (Nov. 2, 2003) ............................................................................... 1

"Business Interruption/Businessowner's Policies," National Association of Insurance
Commissioners (Center for Insurance Policy and Research) (Sept. 2, 2020) ............................ 2

Kenneth S. Abraham, INSURANCE LAW AND REGULATION 37 (5th ed. 2010) ............................... 8

Kenneth S. Abraham, *A Theory Of Insurance Policy Interpretation*,
5 Mich. L. Rev. 531 (1996) ............................................................................................ 7

Kenneth S. Abraham, ENVIRONMENTAL LIABILITY INSURANCE LAW 27 (1991) ........................... 8

M. Radhert, *Reasonable Expectations Reconsidered,* 18 CONN. L. REV. 323 (1986) ................... 7

Oxford English Dictionary ............................................................................................ 10

Restatement of the Law of Liability Insurance ............................................................... 7

**Federal Rules of Civil Procedure**

Rule 11 ..................................................................................................................... 4

Rule 12(b)(6) ............................................................................................................. 18

# INTRODUCTION

COVID-19 did not take the insurance industry by surprise—because it is not the first serious coronavirus outbreak in this country. It is the third. It has followed SARS in 2002-2003 and MERS in 2012, and over the last few years the world also faced other (non-corona) virus epidemics or pandemics, including Ebola (2014-2016), the swine flu (H1N1), Zika (2015), and various strains of the avian (or bird) flu. Complaint ¶ 5. As a result of these repeated virus scourges, both the specter of a virus pandemic and the certainty of insurance claims arising from these pandemics have been known risks. *See* "Hotel Chain To Get Payout for SARS-Related Losses," *Business Insurance* (Nov. 2, 2003) ("HONG KONG-Mandarin Oriental International Ltd. will receive $16 million from its insurers to pay for business interruption losses suffered by the group's hotels in Asia as a result of the severe acute respiratory syndrome outbreak.")[1]

Not surprisingly, therefore, most insurance companies long ago took conveniently available steps to limit or eliminate their exposure to virus-related claims. Society did not.

It isn't hard for an insurance company to exclude coverage for virus-related events. The insurance industry has a standard-form exclusion for viruses. The industry introduced that exclusion (for "loss due to disease-causing agents such as viruses and bacteria") fourteen years ago, in 2006, citing "the specter of pandemic" and in the wake of the deadly SARS-CoV outbreak. Prominent industry trade groups promptly urged insurance companies to amend their policies to include this new virus exclusion and spelled out the rationale for it: without the new exclusion, courts might find coverage for virus pandemics. *See Ill. Farmers Ins. Co. v. Farrow*,

---

[1] https://www.businessinsurance.com/article/20031102/story/100013638/hotel-chain-to-get-payout-for-sars-related-losses.

2012 IL App (5th) 100598-U, ¶ 27 ("For an exclusion to make sense, it must eliminate coverage that would have existed without the exclusion.").

Most insurance companies took notice. The vast majority amended their policies, adding the industry-recommended virus exclusion. Recently, the National Association of Insurance Commissioners has collected data indicating that an estimated 83% of commercial property policies in effect today contain a virus exclusion.[2] But Society's policies do not.

Society's sells "all-risk" commercial property coverage.[3] Under its policies, Society promises policyholders that, "unless the loss is excluded or limited under this coverage form," the company will pay for the "actual loss of business income" during any necessary suspension of operations caused by "direct physical loss of or damage to" covered property. Complaint ¶ 30.[4] Society could easily have included an exclusion for viruses or pandemics—but elected not to. Simply put, Society is impliedly asking this Court to add one now, after the fact, which is an invitation this Court should decline. Under Illinois law, "a court will not rewrite a contract to suit

---

[2] "In May 2020, state insurance regulators, through the NAIC, developed and issued a data call to collect business interruption information from insurers …. Preliminary results show that nearly 8 millions commercial insurance policies include business interruption …. Significantly, 83% of all policies included an exclusion for viral contamination, virus, disease, or pandemic …." https://content.naic.org/cipr_topics/topic_business_interruptionbusinessowners_policies_bop.htm#:~:text=Significantly%2C%2083%25%20of%20all%20policies,compared%20to%20large%20business%20polic ies (reviewed Oct. 16, 2020).

[3] All plaintiffs in these MDL proceedings appear to have been provided coverage under the same coverage form, No. TBP2 (05-15).

[4] Although Society's coverage form does not use the term "all-risk," it still functions like an "all-risk" in that unlike a policy that covers only enumerated risks, excluding all risks not specifically listed, Society's coverage works the other way around. It covers every risk causing "direct physical injury to or loss of" covered property *unless* the coverage form specifically excludes it. *See generally Huntington Chase Condo. Ass'n v. Mid-Century Ins. Co.*, 379 F. Supp.3d 687, 696-97 (N.D. Ill. 2019) (discussing coverage under a policy that similarly provided for payment for "direct physical loss of or damage to covered property" unless the loss was subject to an enumerated exclusion or limitation).

one of the parties ….[And] [t]here is a strong presumption against [implying] provisions that easily could have been included in the contract but were not." *Wright v. Chi. Title Ins. Co*., 196 Ill. App. 3d 920, 925 (1st Dist. 1990).[5]

# ARGUMENT

Front and center in this particular case (No. 1:20-cv- 03959, N.D. Ill.) are two bases for coverage that most other plaintiffs in this MDL proceeding either have not pled or have not emphasized in their briefing.

The first basis for coverage emphasized in this brief is that when language in an insurance policy is ambiguous—susceptible of more than one reasonable interpretation—it must be construed in favor of the policyholder. *Ins. Co. of Pa. v. OCÉ-USA Holdings, Inc.*, 2013 U.S. Dist. LEXIS 41836, at *20-21 (N.D. Ill. Mar. 26, 2013) (Chang, J.). Society's policy language is ambiguous. Under Society's policies, the primary trigger of coverage for both "business income" and "civil authority" coverage is a "direct physical loss of or damage to property."[6] But strikingly, Society's policies do not define any of the eight words in that critical phrase—not "direct," not "physical," not "damage," nor even "loss" or "property." Because those eight words—standing alone, strung together, and especially in their application to a risk such as a virus pandemic—are "susceptible to one more than one reasonable interpretation," they are ambiguous. *Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 154 Ill. 90, 108-09 (1992). Because they are ambiguous, they must be construed in favor of coverage. *Id*. And because they must be

---

[5] Society's policy is silent about choice-of-law. Society's brief assumes that Illinois law governs this coverage dispute. For purposes of this motion, Plaintiffs concur.

[6] In insurance law parlance, the expression "trigger of coverage" refers to the circumstances, events, or occurrences that activate an insurer's obligations under the policy.

construed in favor of coverage, Plaintiffs' complaint states a claim for relief that is more than "plausible on its face," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), for a declaratory judgment confirming coverage and for breach of contract.[7]

The second basis for coverage emphasized in this brief is that coverage is owed under Society's Contamination coverage part. That coverage provision is both uncommonly worded and important. It promises that Society "will also pay for the actual loss of Business Income and Extra Expense you sustain caused by … 'publicity' resulting from the discovery *or suspicion* of 'contamination.'" Complaint ¶ 39. Significantly, this promise of coverage does not impose any requirement of "physical" loss or damage. On its face, it promises coverage when a business is forced to close as the result of publicity generating a *suspicion* of "contamination" at a location—independently, therefore, of whether the coronavirus has actually contaminated the property. That provision is important in this case. Last March, there was a great deal of publicity and an almost universal suspicion that COVID-19 was ubiquitous, contaminating premises everywhere, and particularly restaurants and bars, including Plaintiffs' premises, contributing to their closures. On the basis of this claim, alone, Society's motion should be denied.

The arguments presented in this brief should not only defeat Society's combined Rule 12 and Rule 56 motion but also provide the basis for a judgment affirmatively in Plaintiffs' favor.

---

[7] The argument in this brief that the operative language for Business Income and Civil Authority coverages in Society's policies is ambiguous is not made in derogation of the arguments made by many other plaintiffs in these MDL proceedings that the same language has only one reasonable interpretation, which favors coverage. Rather, these are arguments in the alternative. Because they are arguments in the alternative, a favorable ruling by this Court on either set of arguments should inure to the benefit of all policyholders. And relatedly, any order dismissing claims based on either set of arguments should be entered without prejudice to leave to amend, in order to allow affected plaintiffs to replead, consistent with Rule 11, theories of coverage that they may not have pled previously and that the Court has upheld, or subsequently upholds, in ruling on any other bellwether motion.

Ultimately, Plaintiffs plan to file their own cross-motion for summary judgment in this case. However, this filing does not currently seek judgment affirmatively. *See, e.g., Costello v. BeavEx, Inc.*, 810 F.3d 1045, 1058 (7th Cir. 2016) ("[Because of the rule against one-way intervention, we] urge plaintiffs to exercise caution [before] seeking a [case dispositive affirmative] ruling on the merits … [when] the district court has [not] ruled on class certification.").

Because there has not been a Case Management Order in this case clarifying that Society's various motions for summary judgment have waived one-way intervention defenses, or that a cross-motion for summary judgment by any set of plaintiffs will not waive or prejudice class certification later, this brief only requests the denial of Society's motion. In order to preserve the right to seek class certification later, this brief does not currently request a complementary ruling entering judgment, on the same grounds, in Plaintiffs' favor.

## I. Plaintiffs have stated plausible, viable claims for both Business Income and Civil Authority coverage, and Society's motion to dismiss those claims should be denied.

The complaint in this case seeks insurance coverage under three different provisions of Society's standard coverage form (No. TBP 05-15) for business owners' commercial property insurance: (1) Business Income coverage, (2) Civil Authority coverage, and (3) Contamination coverage. This section of this brief addresses the first two coverages: Business Income and Civil Authority. Contamination coverage will be addressed in the next section (Roman II).

### A. The primary term and condition of coverage for both Business Income and Civil Authority Coverage is the same—"direct physical loss of or damage to property"; that condition is ambiguously worded; and, therefore, it must be construed against Society and in favor of coverage.

Most of this case (and the other cases consolidated into this MDL) turns on the interpretation of just eight words in Society's policies. Those eight words are "direct physical

loss of or damage to property." They define a condition of coverage under both the Business Income and Civil Authority coverage parts of Society's standard-form property insurance policy for business owners. And those words are at the heart of this case because Society contends that, as a "pure issue of law," the coronavirus does not cause "direct 'physical' loss or damage" to property. Society's Brief at 1, 6.

Distilled to their essence, most of Society's arguments rest on the word "physical." And from that one word, Society has managed to conjure a congeries of implied conditions of coverage, *none* of which are actually stated in its policy, and based exclusively on its policies' use of the word "physical."

According to Society, absent an order from this court, the company will never provide coverage for any coronavirus claim under the Business Income or the Civil Authority coverage provisions of its policies— because virus claims are "not the result of *'physical'* loss or damage." Brief at 6 (emphasis added). And why isn't the loss and damage caused by the coronavirus "physical"? Because, according to Society:

(a) The virus does not "cause a tangible change to the physical characteristics of … property";

(b) The virus is not "incorporated into the structure of the property";

(c) The virus does not "require the physical alteration of the building for [its] removal"; and

(d) The virus does not render property "unsafe, unusable, or uninhabitable."

Brief at 8. That's a lot to squeeze out of the word "physical," and Society's arguments ignore the ambiguity of the phrase "direct physical loss or damage to property."

As this brief explains, there are at least three sources of significant ambiguity in the phrase "direct physical loss of or damage to property," and they affect and defeat almost every argument that Society makes in its motion.

Given the centrality of this issue to this case, and the significant space that Plaintiffs devoted to it in their complaint—see Complaint ¶¶ 34, 34(a)-(3), 35, 54(a), and 62(a)—it is surprising that no portion of Society's 23-page brief grapples with the issue of ambiguity.

The law on ambiguity is clear. "Under Illinois law, an insurance policy that is ambiguous or susceptible to at least two reasonable interpretations must be construed in favor of the insured. *Even assuming* that [an insurance company's] proposed interpretation … is a reasonable one, we *must* construe the policy language in favor of [the policyholder], who has advanced a reasonable alternative reading." *Ins. Co. of Pa.*, 2013 U.S. Dist. LEXIS 41836, at *20-21 (N.D. Ill. Mar. 26, 2013) (Chang, J.) (emphasis added). This rule, furthermore, applies with special force here—where an insurer has failed "to use apt words to exclude a known risk." *Pan American World Airway, Inc. v. Aetna Cas. & Surety Co.*, 505 F.3d 989, 1000 (2d Cir. 1974). *See also* Restatement of the Law of Liability Insurance § 4, Comment k (in considering ambiguous policy language, it is appropriate to consider the ease with which the insurer could have drafted more clearly).

The requirement that ambiguities are construed against an insurer has been called "the first," the "most prominent," and the "most frequently employed" principle of insurance policy interpretation.[8] It provides both the correct and the most direct, comprehensive basis for resolving the cases in this MDL.

---

[8] M. Radhert, *Reasonable Expectations Reconsidered,* 18 CONN. L. REV. 323, 327-28 (1986); Kenneth S. Abraham, *A Theory Of Insurance Policy Interpretation*, 95 Mich. L. Rev. 531 (1996); Kenneth S.

1. ***The phrase "direct physical loss of or damage to property" suffers from at least three significant ambiguities.***

There are at least three sources of significant ambiguity in the operative phrase "direct physical loss of or damage to property," each of them separately and independently bearing on the question of coverage in this case. A declaration that the phrase is ambiguous on any one of these three bases would drive the resolution of this case.

The first significant source of ambiguity arises from the positioning of the word "physical" in the phrase "direct physical loss of or damage to property." Society's motion assumes that "physical" modifies both "loss" and "damage." But if that is a reasonable interpretation, it is not the only one. "Physical" is adjacent to "loss," not to "damage." And "physical loss" is also separated from "damage" by the disjunctive "or." The policy says, "physical loss *or* damage." It does not say "physical loss *and* damage" (nor, more clearly, "physical loss *or physical* damage" or "physical loss *and physical* damage"). In addition, under standard canons of construction, two words cannot have the same meaning, rendering one superfluous. *Lapham-Hickey Steel Corp. v. Prot. Mut. Ins. Co.*, 166 Ill. 2d 520, 532-33 (1995). Differentiating between "loss," which must be "physical," and "damage" that need not be avoids surplusage. And if "physical" modifies only "loss" and does not modify damage, as the syntax suggests, then Society's arguments that the coronavirus does not result in "physical" damage fall away: it is irrelevant whether the coronavirus causes "physical" damage. "Damage" need not be "physical."[9]

---

Abraham, ENVIRONMENTAL LIABILITY INSURANCE LAW 27 (1991); Kenneth S. Abraham INSURANCE LAW AND REGULATION 37 (5th ed. 2010).

[9] To any extent that Society has intended to suggest that *Eljer* resolves that "physical" modifies both "loss" and "damage" (*see*, *e.g*., Society Brief at 6), that is wrong. *Eljer* did not construe, or address, the phrase "physical loss of or damage to property." That phrase, on which so much this case turns, was not in any of the policies in *Eljer*.

The second source of significant ambiguity in the policy language arises from whether "physical" describes the *cause* or the *consequences* of property loss or damage. As case law shows, there are well-known categories of property claims where the cause of a loss or damage is physical (including, for example, carbon monoxide, odors, a storm, asbestos fibers, or, now, the coronavirus) but where there is debate about whether the resulting loss or damage is "physical." *See Manpower, Inc. v. Insurance. Co.*, No. 08 C 0085, 2009 U.S. Dist. LEXIS 108626, at **18-22 (E.D. Wisc., Nov. 3, 2009) (rejecting the argument "that a peril must physically damage property in order to cause a covered loss"; a loss may also be "'physical, in that it was caused by a physical event" that prevents using the property for its intended purposes); *Dundee Mut. Ins. Co. v. Marifjeren*, 587 N.W.2d 191, 194 (N.D. 1998) (storm that downed power lines, disrupting electrical power at a storage facility, caused "direct physical loss" by preventing the storage facility from functioning, even if it caused no "physical" damage to the facility). If Society meant to rule out coverage for these cases, it was incumbent on the company to clearly say that. At a minimum, the policy is ambiguous on this point.

The third and related source of ambiguity arises from Society's failure to define what kinds of "loss" or "damage" count as "physical" loss or damage. Society postulates that "physical" loss or damage is limited to alterations to the "physical characteristics" of property (changes to the "appearance, shape, color, or another material dimension" of property). Society's Brief at 6, 8. But there are other reasonable interpretations. In particular, several courts have held that the term "physical" is reasonably susceptible of an interpretation that includes the loss or damage that physical perils cause when they limit the use of property, public access to it, or its functionality—without otherwise altering its physical characteristics.[10] Another reasonable

---

[10] See *Dundee,* 587 N.W.2d 191 (storm that disrupted electrical power caused "damage" to storage facility

reading of the word "physical," in this context, is that is intended to negate coverage for purely consequential or intangible losses, rather than, as Society suggests, to require a *physical change* in the condition of the property. The New Hampshire Supreme Court has another reasonable interpretation: "physical," in the phrase "physical loss," is "broadly defined and refers, in relevant part, to things '[of] or pertaining to matter, or the world as perceived by the sense; material as [opposed] to mental or spiritual.'" *Mellin v. N. Sec. Ins. Co.*, 167 N.H. 544, 548 (2015) (quoting the Oxford English Dictionary). In short, in the phrase "physical loss or damage," the term "physical" is ambiguous. *See Matzner v. Seaco Ins. Co.*, 1998 Mass. Super. LEXIS 407, at *9-10 (Aug. 26, 1998) ("I find and rule that the phrase 'direct physical loss or damage' is ambiguous in that it is susceptible of two different interpretations. One includes only tangible damage to the structure of insured property. The second includes a wider array of losses.").

2. ***The variations in how courts have construed the phrase "direct physical loss of or damage to property," underscores its ambiguity.***

In light of the evident ambiguities in the phrase "direct physical loss of or damage to property," it is not surprising that, since long before COVID-19, courts addressing the meaning and scope of that phrase have reached differing results. Some courts have construed the term "physical" broadly and others have construed it narrowly. As a result, with no consensus about

---

by preventing its functioning, even if it caused no "physical" harm to building); *Essex Ins. Co. v. BloomSouth Flooring Corp.*, 562 F.3d 399, 406 (1st Cir. 2009) ("[A]llegations that an unwanted odor permeated the building and resulted in a loss of use of the building are reasonably susceptible to an interpretation that physical injury to property has been claimed."); *Gregory Packaging, Inc. v. Travelers Prop. Cas. Co. of Am.*, 2014 U.S. Dist. LEXIS 165232 * 13 (D.N.J. Nov. 25, 2014) ("While structural alteration provides the most obvious sign of physical damage …, property can sustain physical loss or damage without experiencing structural alteration.") (ammonia vapors); *Manpower, Inc. v. Ins. Co.*, 2009 U.S. Dist. LEXIS 108626, at **18-22 (E.D. Wisc., Nov. 3, 2009) (rejecting the argument "that a peril must physically damage property in order to cause a covered loss"; a loss may be "'physical, in that it was caused by a physical event" that prevents using the property for its intended purposes).

what "physical" means in this context, courts have disagreed about coverage for a host of

perils—including odors and vapors,[11] asbestos,[12] lead,[13] mold,[14] and the loss of electronic data.[15]

Under Illinois law, the variation in these opinions is itself evidence of ambiguity. *O'Rourke*

*v. Prudential Ins. Co.*, 294 Ill. App. 30, 33 (1st Dist. 1938) ("We think it clear that the language

in the policy in the instant case is ambiguous, as demonstrated by the contrariety of the opinions

of the courts where language in the policies involved is almost identical with the language in the

policy before us. And under the rule of law we must construe the policy in terms most favorable

to the insured and against the company.").

---

[11] *Compare Universal Image Productions, Inc. v. Chubb Corp.*, 703 F. Supp. 2d 705 (E.D. Mich. 2010) (odor; no coverage) *with Western Fire Ins. v. First Presbyterian Church*, 165 Colo. 34 (1968) (odor; covered).

[12] *Compare Great N. Ins. v. Benjamin Franklin Fed. Sav. & Loan, Ass'n*, 1992 U.S. App. LEXIS 1593 (9th Cir. 1992) (asbestos; no coverage) *with United States Fidelity & Guaranty Co. v. Wilkin Insulation*, 144 Ill.2d 64 (1991) (asbestos; coverage).

[13] *Compare Widder v. La. Citizens Prop. Ins. Corp.*, 82 So.3d 294 (La. App. 2011) (lead-based paint claims; coverage) *with Pirie v. Federal Ins. Co.*, 696 N.E.2d 553 (Mass. Ct. App. 1998) (lead-based paint, no coverage).

[14] *Compare Sullivan v. Std. Fire Ins. Co.*, 2008 Del. LEXIS 66, 956 A.2d 643 (Del. 2008) (mold; coverage) *with Mastellone v. Lightning Rod Mut. Ins. Co.*, 884 N.E.2d 1130 (0hio 2008) (mold; no coverage).

[15] *Compare Ward Gen. Servs., Inc. v. Emp'rs Fire Ins. Co.*, 7 Cal. Rptr. 3d 844 (Ct. App. 2003) (loss of electronic data; not covered) *with Am. Guar. & Liab. Ins. Co. v. Ingram Micro, Inc.*, 2000 U.S. Dist. LEXIS 7299 (D. Ariz. Apr. 18, 2000) (electronic data loss; covered).

3. ***The insurance industry has tacitly acknowledged the ambiguity of business income and civil authority coverage as applied to viruses, unless a policy form contains an express virus exclusion.***

The Insurance Services Office (ISO) is an advisory organization that drafts and provides standard-form policy language and coverage forms to insurers and reinsurers. Complaint ¶ 2. And the insurance policies it drafts are prototypical contracts of adhesion—policy language is drafted by the ISO, provided to insurers nationwide, and then included in policies generally on a take-it-or-leave-it basis. Notably, the Society policies here consist exclusively of ISO forms.

In the wake of the deadly SARS-CoV outbreak, in 2006, ISO sprung into action. It drafted and introduced a new virus exclusion. And it explained the rationale for the exclusion: (a) existing coverage forms addressed contamination broadly, but not viruses specifically; (b) existing exclusions might be susceptible of a narrow interpretation and had been at times narrowly applied by certain courts; (c) an allegation of property damage may be a point of disagreement in cases involving viruses or bacteria; and (d) in light of these concerns, a new and specific exclusion for viruses and bacteria "appear[s] to warrant particular attention." ECF Doc. 1-1 at PageID 36.

A virus exclusion would not have been needed if existing policy language had already excluded coverage for virus-related losses.

4. ***No Illinois case rescues the operative language here—"direct physical loss of or damage to property"—from its inherent ambiguity.***

Society cites only two Illinois cases—*Traveler's Ins. Co. v. Eljer Mfg.*, 197 Ill.2d 278 (2001), and *Mutlu v. State Farm Fire and Cas.*, 337 Ill. App. 3d 420 (1st Dist. 2003)—as support for its theory that, as a matter of "pure law," disease-causing agents like the coronavirus do not cause "physical" loss or damage to property. Neither case is relevant here.

First, in both *Eljer* and *Mutlu,* the policy language was different than the language in Society's policies. In both cases, the trigger of coverage was "property damage," rather than "direct physical loss of or damage to property," as in Society's policies. More fundamentally, in both cases, the policies also required either "physical injury" (*Eljer*) or "physical damage" (*Mutlu*) to "tangible" property, which are also terms that do not appear in Society's policies. Different policy language leads to different results.

Second, in both *Eljer* and *Mutlu*, the policies at issue were comprehensive general liability (or "CGL") policies. By contrast, Society's policies are property casualty forms. The Illinois Supreme Court has repeatedly advised, including in *Eljer* itself, that policy interpretation must "take into account the type of insurance purchased." *Eljer*, 197 Ill.2d at 292; *Am. States Ins. Co. v. Koloms*, 177 Ill. 2d 473, 479 (1997); *Nicor, Inc. v. Associated Elec. & Gas Ins. Servs*., 223 Ill. 2d 407, 416 (2006).

Third, and most importantly, the risks and harms for which insurance coverage were sought both in *Eljer* and *Mutlu* were entirely different than here. It is almost comical to analogize those cases to this one. In *Eljer*, the policyholder tried to claim coverage for installation of a faulty plumbing system, which posed an approximately 5% risk that it might fail at some indeterminate point in the future. In rejecting coverage for that claim, the court pointed out that an insurance policy is not a performance bond. 197 Ill.2d at 313. In *Mutlu,* the policyholder filed an insurance claim coverage after a condominium association had sued him for causing hot water shortages throughout the building by continually running the hot water in his unit. 337 Ill. App. 3d at 425. *Eljer* and *Mutlu* cases are not helpful precedents for this case.

There is one Illinois coronavirus case. After Society filed its brief in this case, Judge Gettleman issued an opinion in *Sandy Point Dental, PC v. Cincinnati Ins. Co.*, 2020 U.S. Dist.

LEXIS 171979 (N.D. Ill. Sept. 21, 2020), dismissing the complaint in that case (which had been filed by a dentist office, seeking both Business Income and Civil Authority coverage). At least two factors distinguish that case from this one. First, Judge Gettleman was not presented with, and his short opinion does not address, the ambiguity arguments developed in this brief. Second, the policy language in that case was materially different. The trigger of coverage was "direct physical loss to property." Unlike Society's policy, the *Sandy Point Dental* policy did not promise coverage for "damage" separate from "physical loss."

**B. The policies' inclusion of a "period of restoration," to establish the duration of coverage, provides no evidence that "physical" loss or damage requires a "change in the physical characteristics of property."**

In an insurance claim for business interruption, there is inevitably a question about when applicable coverage begins and ends. Under some first-party property policies, including Society's, that period of coverage is referred to as the "period of restoration." In other policies, it might be referred to as the "period of indemnity" or "period of recovery." However it is labelled, the clause serves to define the length of time during which a business owner is entitled to recover lost business income. The clause simply defines the *duration* of coverage. By contrast, it does not, as Society misleadingly suggests, create any additional conditions or triggers of coverage— which explains Society's failure to cite a relevant single case in support of this argument. *See* Society's Brief at 13-14.

**C. The fact that governmental closure orders have resulted in partial or temporary, rather than absolute or permanent limitations, on Plaintiffs' operations and their use of their properties is irrelevant to Civil Authority (or any other) coverage.**

Society contends that. because "Plaintiffs are allowed to access and use their premises to fulfill take-out and delivery orders," and Plaintiffs and their employees "may access the[ ] premises," coverage has not been triggered. Brief at 15. But there is no requirement in Society's

policies (or law or logic) that would condition coverage on a total shutdown of a policyholder's operations. Indeed, the opposite is true: Society's policies explicitly promise coverage for lost business income during a "suspension" of operations, which, in turn, is defined as "a *partial* slowdown *or* complete cessation of your business activities." ECF No. 1-2 at PageID 119 (emphasis added).

Likewise, there is also nothing in the policies that would condition Civil Authority coverage on a governmental order prohibiting *all* access to a property. The policies do not define how much access must be "prohibited." And it is indisputable that access has been prohibited: customers were prohibited from consuming food and beverages on the premises.

### D. For purposes of Civil Authority coverage, Plaintiffs have alleged damage to property "other than" their own property.

Under Society's policies, Civil Authority coverage is conditioned, in part, on damage to property "other than" the policyholder's own property, which prohibits access, however, to the policyholder's property. ECF 1-3 at PageID 254-55. Society contends that this condition cannot be met here. But that is not accurate. Plaintiffs have pled and will prove, damage to property "other than" their own, resulting in a blanket closure order prohibiting access, except on specific terms, to all bars, taverns, and restaurants, "regardless of social distancing." Complaint ¶ 38.

**II. Plaintiffs have stated plausible, viable claims for coverage under the Contamination Coverage Part; Society's motion to dismiss these claims should be denied.**

In addition to Business Income and Civil Authority Coverage, Society's policies also promise a separate, shorter-term form of coverage for losses caused by publicity "resulting from the discovery *or suspicion* of contamination" at "*a* described premise." The policies define "contamination" broadly, to include a "dangerous condition." Complaint ¶ 39.

Society contends that this coverage is unavailable here, arguing that it "would only be triggered .... if there had been a media publication or broadcast regarding the actual or suspected presence of the virus that causes COVID-19" specifically at Plaintiffs' properties. Society's Brief at 19.

The actual policy language does not support Society's (mis)construction of it. It does not condition coverage on contamination at a policyholder's own property. Rather, it conditions coverage on publicity about contamination at *"a* described premis*e"*—a phrase that appears only in the policy's contamination provision. By contrast, when Society's policy form refers instead to an insured's premises, which it does repeatedly, it refers to the insured's premises as *"the* described premis*es"*—not *"a* described premis*e."* It is far from clear, therefore, that *"a* described premis*e"* refers to the insureds' premises, as Society proposes. Instead, an alternative, reasonable understanding is that coverage is triggered, for example, if a media account describes contamination at a class of premises, one of which is plaintiff's premises.

Last March, there were numerous media reports about risk of COVID-19 at bars, taverns, and food establishments like Plaintiffs'. These reports of risk (at "a described premise," although not specifically at Plaintiffs' locations) discouraged customers from frequenting Plaintiffs' venues, and those facts plausibly support a claim for Contamination coverage. The resulting

ambiguity undercuts Society's contention that publicity must have addressed actual or suspected contamination specifically at *Plaintiffs'* premises and named those premises.

In short, Society's contention that publicity must have addressed actual or suspected contamination specifically at Plaintiffs' premises is not supported by the actual language of the policy. Rather, the policy language either contradicts Society's contention or, at a minimum, is ambiguous on this point. And ambiguity, of course, must be resolved in favor of coverage. *Ins. Co. of Pa.,* 2013 U.S. Dist. LEXIS 41836, at *20-21.

### III. Plaintiffs' claims for coverage are not defeated by the Ordinance or Law exclusion.

One of the more mysterious provisions in a commercial property policy, such as Society's, is the "Ordinance or Law" provision, which purports to exclude coverage for the costs of "enforcement or compliance with any ordinance or law." Society bears the burden of proving that that or any other exclusion applies, *Santa's Best Craft, LLC v. St. Paul Fire & Marine Ins. Co.*, 611 F.3d 339, 347 (7th Cir. 2010), and Society has not met that burden here. Society's brief, for example, nowhere establishes the meaning of "ordinance" or "law" or explains why an executive order mandating closures should be construed as an "ordinance" or "law." Ordinances and laws are enactments by a legislative body. "Importantly, a policy provision that purports to exclude or limit coverage will be read narrowly and will be applied only where its terms are clear, definite, and specific." *Gillen v. State Farm Mut. Auto. Ins. Co.*, 215 Ill. 2d 381, 393 (2005). Society's ordinance or law exclusion is neither clear, nor definite, nor specific, particularly as applied to executive orders, and it must be construed narrowly. *Gillen v. State Farm Mut. Auto. Ins. Co.*, 215 Ill. 2d 381, 393 (2005).

Separately and independently, the policies' Ordinance or Law exclusion also cannot mean what Society says it says: if it did, it would conflict with Civil Authority coverage, rendering that

coverage illusory.

One federal court has persuasively noted that "[t]he only sensible interpretation" of an ordinance or law exclusion "is that it serves to eliminate" coverage for the costs required to bring reconstructed property up to code, when that would give the policyholder a more structurally valuable building than he had before, resulting in a windfall. *SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props. LLC*, 2006 U.S. Dist. LEXIS 79326, at *41 (S.D.N.Y. Oct. 31, 2006). That situation is not applicable here, and neither is the exclusion.

## IV. Plaintiffs' bad faith claim should be decided by a jury, after discovery.

Society's motion for to dismiss Count V of the complaint, which pleads a claim for statutory bad faith, 215 ILCS 5/155, should be denied.

Plaintiffs' complaint pleads that Society (1) did not investigate Plaintiffs' claims before denying them (Complaint ¶¶ 10, 49); and (2) tried to discourage claims. Complaint ¶ 26. These allegations, plausible in themselves, are made even more plausible by facts, arising from the same set of circumstances, pled by other Plaintiffs in these MDL proceedings, particularly the Plaintiffs in *Big Onion*, that, in addition, Society tried to mislead policyholders and issued sham claim notifications. *See* ECF No. 29 in Case No. 20-cv-02005 (First Amended Complaint), ¶¶ 7, 16-17, 122-123. This claim involves factual questions, which would be developed through discovery, and cannot be resolved now on motions.

## CONCLUSION

For all the reasons stated above, the Court should deny, in its entirety Society's motion to dismiss under rule 12(b)(6) or in the alternative for summary judgment.

Date: October 19, 2020

Respectfully submitted,

/s/  Joshua Karsh

Gary M. Klinger
gklinger@masonllp.com
MASON LIETZ & KLINGER LLP
227 West Monroe St., Ste. 2100
Chicago, IL 60606
Tel.: 312-283-3814

Gary E. Mason
gmason@masonllp.com
Danielle L. Perry
dperry@masonllp.com
MASON LIETZ & KLINGER LLP
5101 Wisconsin Ave., NW Ste. 305
Washington, DC 20016
Tel.: 202-429-2290
Fax.: 202-429-2294

Jonathan Shub
jshub@shublawyers.com
Kevin Laukaitis, Esq.
Klaukaitis@shublawyers.com
SHUB LAW FIRM LLC
134 Kings Hwy. E.
2nd Floor
Haddonfield, New Jersey 08033
Tel.: 856-772-7200

Jay Angoff
jangoff@findjustice.com
Cyrus Mehri
cmehri@findjustice.com
Joshua Karsh
jkarsh@findjustice.com
Ezra Bronstein
ebronstein@findjustice.com
MEHRI & SKALET, LLC
1250 Connecticut Ave NW, Suite 300
Washington, DC 20036
Tel.: (202) 822-5100
Fax: (202) 822-4997

Joel R. Rhine
jrr@rhinelawfirm.com
Martin A. Ramey
mjr@rhinelawfirm.com
Rhine Law Firm, P.C.
1612 Military Cutoff Road, Suite 300
Wilmington, North Carolina 28403
Tel: (910) 772-9960
Fax: (910) 772-9062

**CERTIFICATE OF SERVICE**

I certify that, on October 19, 2020, I filed and caused to be served on all counsel of record the foregoing PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS UNDER RULE 12(b)(6) OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT through the Northern District of Illinois' CM/ECF system.

By: */s/ Joshua Karsh*