**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION**

| | |
|---|---|
| IN RE: SOCIETY INSURANCE COMPANY ) <br> COVID-19 BUSINESS INTERRUPTION ) <br> PROTECTION INSURANCE LITIGATION ) <br> _____ ) <br> This document relates to: ) <br> ) <br> Big Onion Tavern Group, LLC v. Society ) <br> Insurance, No. 1:20-CV-02005 ) <br> _____ ) | MDL No. 2964 <br><br> Master Docket No. 1:20-cv-05965 <br><br> Hon. Edmond Chang |

**DEFENDANT SOCIETY INSURANCE'S RESPONSE
TO PLAINTIFFS' LOCAL RULE 56.1(b)(3)(C) STATEMENT OF ADDITIONAL
MATERIAL FACTS THAT REQUIRE DENIAL OF SUMMARY JUDGMENT**

NOW COMES, Defendant, SOCIETY INSURANCE ("Society"), by and through its attorneys Thomas B. Underwood, Michael D. Sanders, Michelle A. Miner and Amy E. Frantz of PURCELL & WARDROPE, CHTD., and for its Response to Plaintiffs' Statement of Additional Facts, hereby states as follows:

1. Over 8,000 Illinois residents and over 180,000 Americans have died of COVID-19 and there have been over 250,000 confirmed COVID-19 cases in Illinois and over 6 million confirmed cases in the United States as of the date of this filing, according to Centers for Disease Control and Prevention ("CDC") data. *See* "United States COVID-19 Cases and Deaths by State," Centers for Disease Control and Prevention ("CDC"), *available at* https://covid.cdc.gov/covid-data-tracker/#cases (data as of Sept. 10, 2020) (Ex. 44); "Coronavirus Disease 2019 (COVID-19)," Illinois Department of Public Health ("IDPH"), *available at* http://www.dph.illinois.gov/covid19 (data as of Sept. 10, 2020) (Ex. 45).

**RESPONSE:. Society objects to this Paragraph as immaterial to the question of whether Plaintiffs suffered a direct physical loss of or damage to their insured property, as it does not establish that the virus physically alters property. Society does not**

> dispute that the documents reflect the information found in the documents attached as Exhibits 44 and 45.

2. According to the CDC, the novel coronavirus that causes COVID-19 can spread by respiratory droplets when an infected person coughs, sneezes, or talks. A person can become infected from respiratory droplets or potentially by touching a surface or object that has the virus on it and then by touching the mouth, nose, or eyes. *See* "What you should know about COVID-19 to protect yourself and others," CDC (June 1, 2020), *available at* https://www.cdc.gov/coronavirus/2019-ncov/downloads/2019-ncov-factsheet.pdf ("CDC Fact Sheet"). (Ex. 46).

**RESPONSE:** **Undisputed that the document attached as Exhibit 46 reflects the statements contained in Paragraph 2. Society objects to this Paragraph as immaterial to the question of whether Plaintiffs suffered a direct physical loss of or damage to their insured property, as it does not establish that the virus physically alters property.**

3. Research led by scientists from the National institute of Health ("NIH") National Institute of Allergy and Infectious Diseases ("NIAID") indicated the virus can live on surfaces for several days and in the air for several hours. *See* "Study suggests new coronavirus may remain on surfaces for days," NIH (Mar. 24, 2020), *available at* https://www.nih.gov/news-events/nih-research-matters/study-suggests-new-coronavirus-may-remain-surfaces-days. (Ex. 47).

**RESPONSE:** **Society disputes the statements in paragraph 3 fully or accurately reflect the statements in Exhibit 47. Answering further, the article Plaintiffs have attached as Exhibit 47 found that the longest a virus could survive in the air was 3 hours and 2-3 days on surfaces. (Dkt. No. 123-5 at p. 3.) The article states that the virus "is believed to mostly spread from person-to-person through respiratory droplets produced when an infected person coughs or sneeze. (*Id.* at p. 2.) Society objects to this paragraph and the exhibit as immaterial to the question of whether Plaintiffs suffered a direct physical loss of or damage to their insured property, as it does not establish the virus physically alters property.**

4. Research published in The New England Journal of Medicine ("NEJM") also indicates the virus can survive in the air for several hours. *See* "Droplets and Aerosels in the

Transmission of SARS-CoV-2," NEJM (May 21, 2020), *available at* https://www.nejm.org/doi/full/10.1056/NEJMc2009324. (Ex. 48).

**RESPONSE:** **Disputed. Exhibit 48 does not contain published research; it is a letter to the editor and its conclusions are not peer-reviewed. Moreover, the letter does not state that the virus can survive in the air for several hours, but in tissue culture assays. Additionally, the author does not conclude that indoor spaces are physically altered, damage, or unsafe. Rather, the author "suggests the advisability of wearing a suitable mask whenever it is thought that infected persons may be nearby and of providing adequate ventilation." (Dkt. No. 123-6 at p. 3.) Society objects to the statement in this paragraph and the letter to the editor attached as Exhibit 48 as being inadmissible hearsay and not subject to judicial notice. Society objects to this Paragraph as immaterial to the question of whether Plaintiffs suffered a direct physical loss of or damage to their insured property, as it does not establish that the virus physically alters property.**

5. Research also indicates that aerosols from persons infected with COVID-19 may pose an inhalation threat even at considerable distances and in enclosed spaces. *Id.*

**RESPONSE:** **Disputed. Exhibit 48 does not contain published research; it is a letter to the editor and its conclusions were not peer-reviewed. Undisputed that the letter states: "Aerosols from infected persons may therefore pose an inhalation threat even at considerable distances and in enclosed spaces, particularly if there is poor ventilation." *Id.* Society objects to this Paragraph as immaterial to the question of whether Plaintiffs suffered a direct physical loss of or damage to their insured property, as it does not establish that the virus physically alters property.**

6. COVID-19 may be spread when an infected person coughs, sneezes, or talks, particularly when in close contact with other people. *See* CDC Fact Sheet (Ex. 46).

**RESPONSE:** **Undisputed that the CDC Fact Sheet attached as Exhibit 46 reflects the statement in paragraph 6. Society objects to this Paragraph as immaterial to the question of whether Plaintiffs suffered a direct physical loss of or damage to their insured property, as it does not establish that the virus physically alters property.**

7 According to the CDC, it is unknown how long the air inside a room occupied by someone with confirmed COVID-19 remains potentially infectious, and facilities need to consider factors such as the size of the room and the ventilation system design (including location of supply

and exhaust vents) when deciding how long to close off rooms or areas used by ill persons before beginning disinfection. Taking measures to improve ventilation in an area or room where someone was ill or suspected to be ill with COVID-19 will help shorten the time it takes respiratory droplets to be removed from the air. *See* "Cleaning and Disinfection for Households," CDC (updated July 10, 2020), *available at* https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cleaning-disinfection.html. (Ex. 49).

**RESPONSE: Undisputed that the CDC document attached as Exhibit 49 reflects the statements in paragraph 7. However, the attached document "provides recommendations on the cleaning and disinfection of households where persons under investigation (PUI) or those with confirmed COVID-19 reside." (Dkt. No. 123-7 at p. 3) Answering further, Exhibit 49 states that "transmission of the novel coronavirus to persons from surfaces contaminated with the virus <u>has not been documented</u>" and "[c]leaning of visibly dirty surfaces followed by disinfection is a best practice measure for prevention of COVID-19 and other viral respiratory illnesses in households and community setting." (*Id.* at p. 2 (emphasis added).) Society objects to this Paragraph as immaterial to the question of whether Plaintiffs suffered a direct physical loss of or damage to their insured property, as it does not establish that the virus physically alters property.**

8. According to the CDC, the more an individual interacts with others, and the longer that interaction, the higher the risk of COVID-19 spread. *See* "Considerations for Restaurants and Bars," (updated Sept. 6, 2020), *available at*

https://www.cdc.gov/coronavirus/2019ncov/community/organizations/business-employers/bars-restaurants.html. (Ex. 50).

**RESPONSE: Undisputed that the CDC document attached as Exhibit 50 reflects the statements in paragraph 8. Society objects to this Paragraph as immaterial to the question of whether Plaintiffs suffered a direct physical loss of or damage to their insured property, as it does not establish that the virus physically alters property.**

9. CDC guidance for restaurants and bars states that the risk of COVID-19 spread increases in a restaurant or bar settings with on-site dining. On-site dining where seating capacity is reduced to allow tables to be spaced at least 6 feet apart poses a "high" risk of infection. On-site dining

where seating capacity is not reduced and tables are not spaced at least 6 feet apart poses the "highest risk" of infection. *Id. See also* Sarah Toy and Daniela Hernandez, "What Makes Bars and Restaurants Potential Covid-19 Hot Spots," The Wall Street Journal, (July 3, 2020), *available at* https://www.wsj.com/articles/what-makes-bars-and-restaurants-potential-covid-19-hot-spots-11593768600. (Ex. 51).

**RESPONSE:** **Disputed, the document attached as Exhibit 51 does not state that on-site dining where seating capacity is reduced to allow tables to be spaced at least 6 feet apart poses a "high" risk of infection. Society objects to the statement in this paragraph and the newspaper article attached as Exhibit 51 as being inadmissible hearsay and not subject to judicial notice. Society objects to this Paragraph as immaterial to the question of whether Plaintiffs suffered a direct physical loss of or damage to their insured property, as it does not establish that the virus physically alters property.**

10. Indoor dining has been reported to be particularly dangerous in crowded settings where ventilation and air infiltration are poor because viral particles can build up in the air. *Id.*

**RESPONSE:** **Undisputed that the Wall Street Journal article attached as Exhibit 51 makes this claim. Society objects to the statement in this paragraph and the newspaper article attached as Exhibit 51 as being inadmissible hearsay and not subject to judicial notice. Society objects to this Paragraph as immaterial to the question of whether Plaintiffs suffered a direct physical loss of or damage to their insured property, as it does not establish that the virus physically alters property.**

11. Early studies "found that SARS-CoV-2 can survive on surfaces for two or three days," but "as epidemiologists watched the pandemic unfold, evidence emerged about the disease spreading in crowded rooms – especially at bars, restaurants and churches – suggesting that airborne virus particles were the main cause of transmission." Hal Dardick, "Silent spreaders and long haulers. Aerosols and protocols. 10 things science has learned about COVID-19 in less than a year," The Chicago Tribune, (September 10, 2020), *available at* https://www.chicagotribune.com/coronavirus/ct-coronavirus-things-we-have-learned-about-covid-20200910-7omc6p4a2bf6pee2ymkyok6hvi-

[story.html?utm_source=onesignal&utm_medium=notification&utm_campaign=2020-09-10-COVID-19-What-w](). (Ex. 52).

**RESPONSE:** **Disputed. Exhibit 52 does not contain published research; it is a news article and its conclusions were not peer-reviewed. Undisputed that the article contains the statements quoted in paragraph 11.** *Id.* **Further answering, Exhibit 52 states that "While hand-washing and cleaning surfaces are still good practices, the primary focus has shifted to mask-wearing and maintaining social distance." Society objects to the statement in this paragraph and the newspaper article attached as Exhibit 52 as being inadmissible hearsay and not subject to judicial notice.**

12. The State of Illinois recognizes the "propensity [of COVID-19] to physically impact surfaces and personal property." Ex. 6, Section 2, ¶ 12 (l).

**RESPONSE:** **Undisputed that Exhibit 6 contains the phrase "propensity of the virus to physically impact surfaces and personal property." Society objects to this Paragraph as immaterial to the question of whether Plaintiffs suffered a direct physical loss of or damage to their insured property, as it does not establish that the virus physically alters property.**

13. The Food & Drug Administration ("FDA") has published a document entitled Best Practices for Restaurants and Bars (the "FDA Restaurant Guidance"), *available at* [https://www.fda.gov/food/food-safety-during-emergencies/best-practices-retail-food-stores-restaurants-and-food-pick-updelivery-services-during-covid-19]() (last visited Sept. 11, 2020). (Ex. 53). While the FDA Restaurant Guidance contemplates best practices for food preparation and take-out and delivery services, it does not provide guidance on how to prevent the spread of coronavirus when serving customers inside a dining room, bar, or theater, and in fact includes recommendations like "[d]iscontinu[e] operations, such as salad bars, buffets, and beverage service stations that require customers to use common utensils or dispensers." *Id.*

**RESPONSE:** **Undisputed that the Food and Drug Administration published a document entitled "Best Practices for Retail Food Stores, Restaurants, and Food Pick-Up/Delivery Services During the COVID-19 Pandemic", which is available at the web address specified and that Plaintiffs have attached a copy as Exhibit 53.**

**Disputed that Exhibit 53 does not provide guidance on how to prevent the**

6

**spread of coronavirus when serving customers inside a dining room, bar, or theater, as it contains a section titled "Managing Operations in a Foodservice Establishment or Retail Food Store" which addresses infection control while customers are inside such premises.**

14. The CDC has published research finding: "Adults with positive SARS-CoV-2 test results were approximately twice as likely to have reported dining at a restaurant than were those with negative SARS-CoV-2 test results." Fisher KA, Tenforde MW, Feldstein LR, et al., "Community and Close Contact Exposures Associated with COVID-19 Among Symptomatic Adults ≥ 18 Years in 11 Outpatient Health Care Facilities – Untied States, July 2020," MMWR Morb Mortal Wkly Rep 2020;69:1258-1264 (Sept. 11, 2020), *available at* https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6936a5-H.pdf. (Ex. 54). This research also states: "Reports of exposures in restaurants have been linked to air circulation. Direction, ventilation, and intensity of airflow might affect virus transmission, even if social distancing measures and mask use are implemented according to current guidance. Masks cannot be effectively worn while eating and drinking, whereas shopping and numerous other indoor activities do not preclude mask use."

**RESPONSE:** **Undisputed that the paper identified in Paragraph 14 is available at the web address specified, and that Plaintiffs have attached a copy of the paper found at the web address as Exhibit 54. Undisputed that Plaintiffs have accurately quoted sentences that appear in Exhibit 54. Society objects to this Paragraph as immaterial to the question of whether Plaintiffs suffered a direct physical loss of or damage to their insured property, as it does not establish that the virus physically alters property.**

## THE BUSINESS INTERRUPTION ORDERS WERE ISSUED IN RESPONSE TO THE DANGEROUS CONDITIONS IN AND AROUND PLAINTIFFS' PREMISES

15. The March 16, 2020 Business Interruption Order was issued because, among other things: (a) COVID-19 is a novel severe acute respiratory illness that can spread among people through respiratory transmissions; (b) Current testing availability has identified spread of

7

confirmed cases throughout the State of Illinois, and it is expected that increased testing capacity would demonstrate that COVID-19 is circulating in communities across Illinois that currently have not identified a confirmed case; (c) The number of suspected COVID-19 cases in Illinois is increasing exponentially and across more locations in Illinois; and (d) The ongoing spread of COVID-19 and the danger the virus poses to the public's health and wellness require the reduction of on-premises consumption of food and beverages. (Ex. 2).

**RESPONSE:** **Undisputed that the recital in the March 16, 2020 Order contains substantially the same language in 15 (a-d) above. Defendant disputes the March 16, 2020 Order was entitled "Business Interruption Order."**

16. The March 16, 2020 Business Interruption Order applied to "all businesses in the State of Illinois that offer food or beverages for on-premises consumption, including restaurants, bars, grocery stores, and food halls," and prohibited customers from entering the premises of these businesses other than for carry-out and then immediately leave upon receiving the food. *Id.* (Ex. 8).

**RESPONSE:** **Undisputed that the March 16, 2020 executive order allowed customers to enter and access the premises of businesses that offer food or beverages. Defendant disputes the March 16, 2020 Order was entitled "Business Interruption Order."**

17. The March 16, 2020 Business Interruption Order to any public or private gathering spaces, including "venues such as fitness centers/health clubs, bowling alleys, private clubs, and theatres." (Ex. 3).

**RESPONSE:** **Undisputed that the March 16 Order contains the quoted language; however, Plaintiffs' quotation is misleading. The next sentence states the order does not apply to "venues that provide essential goods or services such as grocery stores, hospitals, pharmacies, gas stations, banks/credit unions, and shelters." (Ex. 2.) Defendant disputes the March 16, 2020 Order was entitled "Business Interruption Order."**

18. The March 20, 2020 Business Interruption Order was issued because "in a short period of time, COVID-19 has rapidly spread throughout Illinois, necessitating updated and more stringent guidance from federal, state, and local public health officials." *Id.*

**RESPONSE:** **Undisputed that Plaintiffs accurately quoted a portion of the recital of the March 20, 2020 Order. The Order also states:**

> **WHEREAS, for the preservation of public health and safety throughout the entire State of Illinois, and to ensure that our healthcare delivery system is capable of serving those who are sick, I find it necessary to take additional measures consistent with public health guidance to slow and stop the spread of COVID-19.**

**(Ex. 3.) Defendant disputes the March 20, 2020 Order was entitled "Business Interruption Order."**

19. The March 20, 2020 Business Interruption Order prohibited "all public and private gatherings of any number of people occurring outside a single household or living unit," and closed to the public "all places of public amusement, whether indoors or outdoors, including but not limited to, locations with amusement rides, carnivals, amusement parks, water parks, aquariums, zoos, museums, arcades, fairs, children's play centers, playgrounds, funplexes, theme parks, bowling alleys, movie and other theaters, concert and music halls, and country clubs or social clubs." *Id.*

**RESPONSE:** **Undisputed that Plaintiffs have quoted a portion of the March 20 Order; however, Society objects to this Paragraph as immaterial to the question of whether Plaintiffs suffered a direct physical loss of or damage to their insured property. Defendant disputes the March 20, 2020 Order was entitled "Business Interruption Order."**

20. The April 1, 2020 Business Interruption Order was issued including because: (a) Current testing availability has identified further spread of confirmed cases throughout the State of Illinois, and it is expected that increased testing capacity would demonstrate that COVID-19 is circulating in communities across Illinois that currently have not identified a confirmed case; and

9

(b) The number of suspected COVID-19 cases in Illinois is increasing exponentially and across more locations in Illinois. (Ex. 4).

**RESPONSE: Disputed as Plaintiff's have paraphrased rather than quoted the recited section of the April 1 Order and because Plaintiffs' restatement of this language is misleading, as the recitals also state:**

**Whereas, social distancing, which requires maintaining at least a six-foot distance between people, is a paramount strategy for minimizing the spread of COVID-19 in our communities; and**

**\* \* \***

**Whereas, the number of suspected COVID-19 cases in Illinois is increasing exponentially and across more locations in Illinois, <u>indicating that drastic social distancing measures are needed, even in communities where confirmed cases have not yet been identified,</u> to reduce the number of people who become sick at any given time and the possibilities of exhausting our health care resources**

**(Ex. 4 (emphasis added).) Defendant disputes the April 1, 2020 Order was entitled "Business Interruption Order."**

21. Under the Illinois "Restore Illinois" reopening plan, in Phases 1-3, access to bars and restaurants is limited to delivery, pickup and drive-through only, and in Phase 4, bars and restaurants may open but with capacity limits. (Ex. 9).

**RESPONSE: Disputed that during phase 3 business operations of bars and restaurants were limited to delivery, pickup, and drive-through only. Under Phase 3, Illinois allowed eating and drinking establishments to open for "outdoor dining," which included indoor space where 50% or more of a wall can be removed via the opening of windows, doors, or panels, provided that dining tables are within 8-ft from such opening. *See* https://www.illinoisrestaurants.org/page/StateILPhase3Reopening. The remainder of the paragraph is undisputed.**

22. Illinois did not enter Phase 4 until June 26, 2020, and thereafter continued to limit access and restricted indoor dining to groups of 10 or less, with tables spaced 6-feet apart in seated areas and with standing areas at no more than 25% of capacity. *See* "Gov. Pritzker Releases Guidelines to Safety Reopen Additional Businesses and Industries as State Advances to Next Phase of Restore Illinois," Illinois Department of Commerce and Economic Opportunity, (June

22, 2020), *available at* www2.illinois.gov/dceo/Media/PressReleases/Pages?PR06222020.aspx. (Ex. 55).

**RESPONSE:** **Disputed that Illinois limited access to restaurants at any point in time. Undisputed that Illinois entered Phase 4 on June 26, 2020, and that indoor dining was allowed in Phase 4 for groups of 10 or less, with tables spaced 6-feet apart, and with standing areas at 25% capacity.**

23. On July 15, 2020, Illinois released an update to Restore Illinois regarding "Actions to Combat a Resurgence of COVID-19," which provided for a "menu of mitigation options organized by risk level." "Actions to Combat a Resurgence of COVID-19," Restore Illinois, *available at* https://www2.illinois.gov/IISNews/21818-Actions_to_Combat_a_Resurgence_of_COVID-19.pdf (July 15, 2020). (Ex. 56).

**RESPONSE:** **Disputed that the document attached as Exhibit 56 can be found at the web address identified in Paragraph 23. Undisputed that Plaintiffs have attached a document that purports to be a Restore Illinois document titled "Actions to Combat a Resurgence of COVID-19."**

24. Multiple regions within Illinois have been subject to mitigation efforts to prevent uncontrollable spread, including Region 7, which includes Will and Kankakee Counties just to the south of the City of Chicago—which mitigation efforts include the prohibition of indoor service at bars and restaurants. "Resurgence Mitigations for Region 7," Restore Illinois, *available at* https://dceocovid19resources.com/assets/Restore-Illinois/Resurgence-Migitations-Region-7.pdf (effective Aug. 26, 2020). (Ex. 57).

**RESPONSE:** **Undisputed; however, Society objects to this Paragraph as immaterial to the question of whether Plaintiffs suffered a direct physical loss of or damage to their insured property.**

**THE SOCIETY POLICIES DO NOT INCLUDE PANDEMIC OR VIRUS
EXCLUSIONS COMMON IN THE MARKET**

25. Society assessed premiums for business interruption coverage based on the gross sales each policyholder earned from serving customers inside their taverns or dining rooms. FAC Ex. D (Dkt. 29-4), PageID #:336-339 ("Renewal Declaration").

**RESPONSE:** **Society disputes that the statement in paragraph 25 is supported by the document cited and further disputes that the assessment of premiums is based solely on gross sales earned from serving customers inside their taverns or dining rooms. The assessment of premiums is based on a number of factors. Society objects to this Paragraph as immaterial to the question of whether Plaintiffs suffered a direct physical loss of or damage to their insured property.**

26. There is an exclusion offered by commercial property insurers for "communicable disease" which states: "[T]his policy does not insure any loss, damage, claim, cost, expense or other sum, directly or indirectly arising out of, attributable to, or occurring concurrently or in any sequence with a Communicable Disease or the fear or threat (whether actual or perceived) of a Communicable Disease." Under this exclusion, "Communicable Disease" means "any disease which can be transmitted by means of any substance or agent from any organism to another organism where: (1) the substance or agent includes, but is not limited to, a virus, bacterium, parasite or other organism or any variation thereof, whether deemed living or not, and (2) the method of transmission, whether direct or indirect, includes but is not limited to, airborne transmission, bodily fluid transmission, transmission from or to any surface or object, solid, liquid or gas or between organisms, and (3) the disease, substance or agent can cause or threaten damage to human health or human welfare or can cause or threaten damage to, deterioration of, loss of value of, marketability of or loss of use of property insured hereunder." *See* Communicable Disease Endorsement (LMA5393). (Ex. 58).

**RESPONSE:** **Undisputed that the document Plaintiffs have attached as Exhibit 58 contains the language quoted above. Society disputes the remainder of Paragraph 26, including the authenticity of the document attached as Exhibit 58 as it does not appear to be a publicly available document. Society further disputes that this document is relevant to the litigation and objects to it on the basis that it is**

> inadmissible under Federal Rules of Evidence 401 and 402 as improper extrinsic evidence that cannot be used to construe the relevant provisions of the Society Policy.

27. The Insurance Services Office ("ISO"), an insurance advisory organization that drafts standard policy forms and endorsements, developed a form exclusion (BP 06 01 01 07) for its Businessowners policy titled "Exclusion of Loss Due to Virus or Bacteria," which states: "We will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease." *See* "Exclusion of Loss Due to Virus or Bacteria," BusinessOwners Coverage Form, (2006), *available at* https://www.uuinsurance.com/ShowPDF.php?number=BP+06+01+01+07. (Ex. 59).

**RESPONSE:** **Undisputed; however, disputes that this document is relevant to the litigation and objects to it on the basis that it is inadmissible under Federal Rules of Evidence 401 and 402 as improper extrinsic evidence that cannot be used to construe the relevant provisions of the Society Policy.**

28. ISO developed this exclusion after the SARS epidemic in 2003 "to address exclusion of loss due to disease-causing agents such as viruses and bacteria." *See* Larry Podoshen "New Endorsements Filed to Address Exclusion of Loss Due to Virus or Bacteria," ISO Circular, (July 6, 2006) *available a t*https://www.propertyinsurancecoveragelaw.com/files/2020/03/ISO-Circular-LI-CF-2006-175-Virus.pdf.(Ex. 60).

**RESPONSE:** **Society does not dispute that ISO introduced this exclusion, or that Exhibit 60 contains the quoted language. Society lacks sufficient information and knowledge to form a belief as to the truth of whether the ISO introduced this endorsement in response to the SARS outbreak. Society objects to the ISO Circular on the basis that it is inadmissible under Federal Rules of Evidence 401 and 402 as improper extrinsic evidence that cannot be used to construe the relevant provisions of the Society Policy.**

29. In a memorandum dated July 6, 2006 explaining the basis for the new virus exclusion, ISO states:

Disease-causing agents may render a product impure (change its quality or substance), or enable the spread of disease by their presence on interior building surfaces or the surfaces of personal property. When disease-causing viral or bacterial contamination occurs, potential claims involve the cost of replacement of property (for example, the milk), cost of decontamination (for example, interior building surfaces), and business interruption (time element) losses. *Id.*

**RESPONSE:** **Society does not dispute that the ISO Circular contains the quoted language but does dispute that Plaintiff's selective quotation of it accurately represents the content of the ISO Circular. Answering further, Society states that the ISO Circular states:**

While property policies have not been a source of recovery for losses involving contamination by disease-causing agents, the specter of pandemic or hitherto unorthodox transmission of infectious material *raises the concern that insurers employing such policies may face claims in which there are efforts to expand coverage and to create sources of recovery for such losses, contrary to policy intent.*

**(Dkt. No. 123-18 at p. 2 (emphasis added).) Society objects to the ISO Circular on the basis that it is inadmissible under Federal Rules of Evidence 401 and 402 as improper extrinsic evidence that cannot be used to construe the relevant provisions of the Society Policy.**

30. On June 22, 2020, Society sent an email to counsel for one of its restaurant clients in Nashville, Onion Division-Nashville Enterprises LLC ("Onion Nashville"), responding to Onion Nashville's claim for coverage for business interruption losses arising out of the COVID-19 pandemic. *See* Email from Daniel Mason to Joseph Englert dated June 22, 2020. (Ex. 61).

**RESPONSE:** **Undisputed; however, Society objects to this Paragraph as immaterial to the question of whether Plaintiffs suffered a direct physical loss of or damage to their insured property.**

31. In this letter, Society stated:

   a. "The purpose of this email is to request clarification and additional information regarding the details of the claims being presented by your client so that we may complete our analysis and review of the claims brought by …Onion Nashville"

   b. "Please advise why Onion Nashville completely shut down as opposed to offering curbside, take-out, and/or delivery as allowed by executive orders and/or if they have provided any carry out services since March 15, 2020."

14

  c. "Did Onion Nashville have any employee that has exhibited symptoms and/or have been confirmed to have had COVID-19 please provide the following additional details: How and when did Onion Nashville receive notice of the symptoms? Once the notice was received, what actions were taken and when? What are the responsibilities of the employee(s)? When was the employee(s) last on site and what portions of the premises did they have access to or come into contact with? How long where they on the premises? Who did they have contact with while on the premises? Were they wearing any type of protective equipment? What actions were taken once the information was known? What is the last date the employee(s) was on site and if they have returned when did they return? Is there any documentation regarding a confirmed diagnosis of COVID-19?"

**RESPONSE:** **Undisputed that Plaintiff has quoted a portion of Exhibit 61; however, Society objects to this Paragraph as immaterial to the question of whether Plaintiffs suffered a direct physical loss of or damage to their insured property.**

### COVID-19 PARTICULATES WERE ON PLAINTIFFS' PREMISES DUE TO THE PRESENCE OF INFECTED EMPLOYEES AND PATRONS

32. Roadhouse 66 Gas N Grill, a bar owned and operated by Plaintiff 3478 N Clark Street Inc., has had three confirmed cases of employees with COVID-19 that were working at the site shortly before they tested positive for COVID-19. One of these employees worked on March 14, 2020 (shortly before the initial March 16 Business Interruption Order went into effect), before testing positive less than a week later. One of these employees worked on June 29, 2020 before testing positive on July 5, 2020. One of these employees worked on July 3, 2020 before testing positive on July 7, 2020. (Ex. 62).

**RESPONSE:** **Undisputed that Exhibit 62 purports to be a declaration attesting to the statements in Paragraph 32. However, Society objects to this Paragraph as immaterial to the question of whether Plaintiffs suffered a direct physical loss of or damage to their insured property.**

33. The Barrelman Tavern, a bar owned and operated by Plaintiff The Barrelman Tavern Inc., has had three confirmed cases of guests with COVID-19 that visited its bar on March

13 or March 14, 2020 (shortly before the initial March 16 Business Interruption Order went into effect) shortly before they tested positive for COVID-19. (Ex. 63).

**RESPONSE:** **Undisputed that Exhibit 63 purports to be a declaration attesting to the statements in Paragraph 33. However, Society objects to this Paragraph as immaterial to the question of whether Plaintiffs suffered a direct physical loss of or damage to their insured property.**

34. Plaintiffs McBrides Aurora Inc., McBride's Pub Inc., and McBride's on 52 Inc. (collectively "McBride's") own and operate several McBride's Pub & Grille locations. McBride's has had two employees test positive for COVID-19 shortly after working at one of its restaurants. One of these employees worked on April 4, 2020 before testing positive for COVID-19 on April 10, 2020. One of these employees worked on August 12, 2020 before testing positive for COVID-19 on August 16, 2020. (Ex. 64).

**RESPONSE:** **Undisputed that Exhibit 64 purports to be a declaration attesting to the statements in Paragraph 34. However, Society objects to this Paragraph as immaterial to the question of whether Plaintiffs suffered a direct physical loss of or damage to their insured property.**

### PLAINTIFFS' LEASE AGREEMENTS CONFIRM THE INTENDED USE OF THE INSURED PREMISES WAS INDOOR FOOD & BEVERAGE SERVICE

35. Plaintiff The Vig Chicago LLC entered into a long term lease for the property located at 1527 N. Wells Street in Chicago ("Vig Chicago Lease") for the "Purposes" of operating "Bar/Restaurant." (Ex. 65).

**RESPONSE:** **Undisputed that Exhibit 65 purports to be a declaration and lease. However, Society objects to this Paragraph as immaterial to the question of whether Plaintiffs suffered a direct physical loss of or damage to their insured property.**

36. Exhibit A to the Vig Chicago lease contains a plan for the use of the indoor property it leased. As illustrated in that floor plan, the majority of the space Plaintiff The Vig Chicago LLC leased was intended to function as a bar and indoor dining room. *Id*.

**RESPONSE:** **Undisputed that Exhibit 65 includes a document that purports to be a floor plan for the leased premises. However, Society objects to this Paragraph as immaterial to the question of whether Plaintiffs suffered a direct physical loss of or damage to their insured property.**

37. Plaintiff The Whale Chicago, LLC leased property located at 2427 N. Milwaukee in Chicago for, among other "permitted uses" operating a "full service restaurant and bar with the incidental sale of alcohol." *Id.*

**RESPONSE:** **Undisputed that Exhibit 65 contains a document that purports to be a lease entered into by The Whale Chicago, LLC. Society disputes that Plaintiff has accurately quoted the "permitted uses" section, which states:**

> **A full service restaurant and bar with the incidental sale of alcohol, <u>carry-out food service and off-premises catering, and ancillary office uses</u>, provided that in no event shall Tenant be permitted to secure a tavern license.**

**(Dkt. No. 123-23 at p.5 (emphasis added).) However, Society objects to this Paragraph as immaterial to the question of whether Plaintiffs suffered a direct physical loss of or damage to their insured property.**

## BARS AND TAVERNS WITHOUT A RETAIL FOOD LICENSE IN THE CITY OF CHICAGO CANNOT SERVE CUSTOMERS INDOORS

38. As of July 24, 2020, bars, taverns, breweries and other establishments that serve alcohol for on-site consumption without a Retail Food license in the City of Chicago will no longer be able to serve customers indoors. (Ex. 66).

**RESPONSE:** **Undisputed. However, Society objects to this Paragraph as immaterial to the question of whether Plaintiffs suffered a direct physical loss of or damage to their insured property.**

Date:   October 21, 2020                                   Respectfully submitted,

                                                           Society Insurance

Thomas B. Underwood (#3122933)
Michael D. Sanders (##6230187)                             By:   /s/ Thomas B. Underwood
Michelle A. Miner (#6299524)                                       Counsel for Defendant
Amy E. Frantz (#6312526)
PURCELL & WARDROPE, CHTD.
10 South LaSalle Street, Suite 1200
Chicago, IL 60603
(312) 427-3900
(312) 427-3944 (facsimile)
TBU@pw-law.com
MDS@pw-law.com
MMiner@pw-law.com
AFrantz@pw-law.com