UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: SOCIETY INSURANCE CO. | ) | |
| COVID-19 BUSINESS | ) | MDL No. 2964 |
| INTERRUPTION PROTECTION | ) | |
| INSURANCE LITIGATION | ) | Master Docket No. 20 C 5965 |
| | ) | |
| | ) | Judge Edmond E. Chang |
| | ) | |
| | ) | Magistrate Judge Jeffrey I. Cummings |
| This Document Relates to the | ) | |
| Following Cases: | ) | |
| | ) | |
| VALLEY LODGE CORP., | ) | |
| Plaintiff, | ) | No. 20 C 02813 |
| | ) | |
| v. | ) | |
| | ) | |
| SOCIETY INSURANCE, | ) | |
| a Mutual Company, | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| RISING DOUGH, INC. (d/b/a | ) | |
| MADISON SOURDOUGH), *et al.* | ) | |
| individually and on behalf of all | ) | |
| others similarly situated, | ) | |
| Plaintiffs, | ) | No. 20 C 05981 |
| | ) | |
| v. | ) | |
| | ) | |
| SOCIETY INSURANCE, | ) | |
| Defendant. | ) | |
| | ) | |
| BIG ONION TAVERN | ) | |
| GROUP, LLC, *et al.*, | ) | |
| Plaintiffs, | ) | No. 20 C 02005 |
| | ) | |
| v. | ) | |
| | ) | |
| SOCIETY INSURANCE, INC., | ) | |
| Defendant. | ) | |

1

### MEMORANDUM OPINION AND ORDER

This multi-district litigation addresses Society Insurance's broad-based denials of business-interruption coverage for a variety of restaurants and other businesses in the hospitality industry whose operations have been affected by the COVID-19 pandemic.

This Opinion decides dispositive motions in each of the three bellwether cases selected by the Court. R. 69. Those cases are: *Big Onion Tavern Group, LLC, et al. v. Society Insurance*, No. 1:20-cv-02005; *Valley Lodge Corp. v. Society Insurance*, No. 1:20-cv-02813; and *Rising Dough, Inc., et al. v. Society Insurance*, No. 1:20-cv-05981. Society has filed a motion to dismiss for failure to state a claim in the *Rising Dough* action, R. 20, No. 20 C 05981, Society's Br. in Support of Mot. to Dismiss; and a motion to dismiss for failure to state a claim or, in the alternative, for summary judgment in the *Big Onion* and *Valley Lodge* actions. R. 113, No. 20 C 2005, Society Mem. of Law; R. 17, No. 20 C 02813, Society Mem. of Law.

As detailed in this Opinion, Society's motions to dismiss and summary judgment motions are denied to the extent that they target the claims for business-interruption coverage. Those claims do survive. Also, the Section 155 claims survive in *Big Onion* and *Valley Lodge*. But the summary judgment motions in the *Big Onion* and *Valley Lodge* actions are granted as to the coverage theories under the Civil Authority and the Contamination provisions, and in the *Rising Dough* case as to the Sue and Labor clause.

## I. Background

As readers of this Opinion know all too well, the novel coronavirus has generated a global pandemic lasting almost an entire year. Many government agencies around the world have responded by closing (at least in part) businesses of all kinds and by restricting activities, particularly group gatherings.

At issue here are the impacts of those closures on the plaintiffs in those three cases: specifically, businesses in the hospitality industry in Illinois (the *Big Onion* and *Valley Lodge* plaintiffs), and Wisconsin, Minnesota, and Tennessee (the *Rising Dough* plaintiffs). All have been forced to modify their normal business operations due to the pandemic—for example, suspending in-person dining and relying only on take-out orders—and all allege that they have lost significant revenue as a result. R. 1, 20 C 2813, *Valley Lodge* Compl. ¶¶ 3-4, 33-42; R. 14, 20 C 5981, *Rising Dough* Am. Class Action Compl. ¶¶ 50–80; R. 29, No. 20 C 2005, *Big Onion* First Am. Compl. ¶¶ 6, 97–108. All plaintiffs—indeed, all the plaintiffs in all the cases within this MDL, by definition—are insured by Society Insurance against certain interruptions to their business. The fundamental questions at stake in this litigation are how properly to classify the interruption that has happened here, and whether this particular interruption is covered under the policy. Beyond following state and local government orders and guidance, the *Rising Dough* plaintiffs also allege that the losses to their businesses occurred as a direct result of the actual presence of the coronavirus itself on the premises. R. 26, 20 C 5981, *Rising Dough* Pls.' Resp. at 8; R. 14, 20 C 5981, Am. Class Action Compl. ¶ 80 ("As a result of the presence of COVID-19 *and* the

Closure Orders, Plaintiffs and the other Class members lost Business Income and incurred Extra Expense.") (emphasis added). The *Big Onion* plaintiffs have similarly alleged that the "continuous presence of the coronavirus on or around Plaintiffs' premises has created a dangerous condition and rendered their premises unsafe and unfit for their intended use and therefore caused physical property damage or loss under the Policies." R. 29 ¶ 100.

For its part, Society counters that these losses, whether caused by the coronavirus directly or by the government orders, simply do not fall within the plain language of the policy invoked by the Plaintiffs. In particular, the Plaintiffs allege that coverage applies under the following policy provisions, common to all plaintiffs (although each group of plaintiffs has sought recovery under different subsets of these provisions)[1]:

- Business Income coverage, on the Businessowners Special Property Coverage Form, section 5, Additional Coverages:

   **g. Business Income**

      (1) Business Income

         (a) We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your "operations" during the "period of restoration." The suspension must be caused by direct physical loss of or damage to covered property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss….

---

[1]The contested policy language is identical to all plaintiffs, and thus will be cited according to the policy's own labeling of sections and subsections. Full copies of the policies can be found, *e.g.*, at R. 14, 20 C 5981, Exh. A; R. 1, 20 C 2813, Exh. B; R. 29, 20 C 2005, Exh. D.

(b) We will only pay for loss of Business Income that you sustain during the "period of restoration" and that occurs within 12 consecutive months after the date of direct physical loss or damage.

- Civil Authority coverage, on the Businessowners Special Property Coverage Form, section 5, Additional Coverages:

### k. Civil Authority

When a Covered Cause of Loss causes damage to property other than property at the described premises, we will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises, provided that both of the following apply:

(1) Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the described premises are within the area; and

(2) The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

Civil Authority coverage for Business Income will begin immediately after the time of the first action of civil authority that prohibits access to the described premises and will apply for a period of up to four consecutive weeks from the date on which such coverage begins.

Civil Authority coverage for necessary Extra Expense will begin immediately after the time of first action of civil authority that prohibits access to the described premises and will end:

(1) Four consecutive weeks after the time of that action; or

(2) When your Civil Authority coverage for Business Income ends; whichever is later.

The definitions of Business Income and Extra Expense contained in the Business Income and Extra Expense Additional Coverages also apply to this Civil Authority Additional Coverage. The Civil Authority Additional Coverage is not subject to the Limits of Insurance.

5

- Contamination coverage, on the Businessowners Special Property Coverage Form, section 5, Additional Coverages:

**m. Contamination**

If your "operations" are suspended due to "contamination":

(1) We will pay for your costs to clean and sanitize your premises, machinery and equipment, and expenses you incur to withdraw or recall products or merchandise from the market. We will not pay for the cost or value of the product.

The most we will pay for any loss or damage under this Additional Coverage arising out of the sum of all such expenses occurring during each separate policy period is $5,000; and

(2) We will also pay for the actual loss of Business Income and Extra Expense you sustain caused by

(a) "Contamination" that results in an action by a public health or other governmental authority that prohibits access to the described premises or production of your product.

(b) "Contamination threat"

(c) "Publicity" resulting from the discovery or suspicion of "contamination."

Coverage for the actual loss of Business Income under this section will begin immediately upon the suspension of your business operations and will continue for a period not to exceed a total of three consecutive weeks after coverage begins.

Coverage for necessary Extra Expense under this section will likewise begin immediately upon the suspension of your business operations and will continue only for a total of three consecutive weeks after coverage begins, or until the loss of Business Income coverage ends, whichever is longer. The coverages under this section may not be extended nor repeated. The definitions of Business Income and Extra Expense, contained in the Business Income and Extra Expense Additional Coverages section shall also apply to the additional coverages under this section.

6

(3) Contamination Exclusions

All exclusions and limitations apply except Exclusions **B.2.j.(2)** and **B.2.j.(5)**

(4) Additional Definitions:

(a) "Contamination" means a defect, deficiency, inadequacy or dangerous condition in your products, merchandise or premises.

(b) "Contamination threat" means a threat made by a third party against you to commit a "malicious contamination" unless the third party's demand for money or other consideration is met.

(c) "Malicious contamination" means an intentional, malicious and illegal altercation or adulteration of your products.

(d) "Publicity" means a publication or broadcast by the media, of the discovery or suspicion of "contamination" at a described premise.

- Extra Expense coverage, on the Businessowners Special Property Coverage Form, section 5, Additional Coverages:

**h. Extra Expense**

(1) We will pay necessary Extra Expense you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to covered property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss….

(4) We will only pay for Extra Expense that occurs within 12 consecutive months after the date of direct physical loss or damage. This Additional Coverage is not subject to the Limits of Insurance.

- the Sue and Labor provision, on the Businessowners Special Property Coverage Form, part E, Property Loss Conditions:

**3. Duties in the Event of Loss or Damage**

7

a. You must see that the following are done in the event of loss or damage to Covered Property: …

(4) Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

It is worth pausing here to note that the policy does *not* contain a specific exclusion of coverage for losses due to a virus or pandemic, which is now—the Plaintiffs allege—a standard exclusion in the insurance industry. *See, e.g.*, R. 124-1, 20 C 2005, *Big Onion* Pls.' Resp. at 23-24.

Society denied the Plaintiffs' claims for coverage in several ways. First, it did so preemptively and *en masse*, circulating a memorandum, on March 16, 2020, to its insurance agency partners, observing that "a quarantine of any size, or brought about by a governmental action without a Covered Cause of Loss, would likely not trigger Business Income or Extra Expense coverages under our policies"; "A widespread governmental imposed shutdown due to COVID-19 (coronavirus) would likely not trigger the additional coverage of Civil Authority"; COVID-19 "would be unlikely to trigger" Contamination coverage because it "is spread through human contact and is not seen as a foodborne illness"; and "Any alleged COVID-19 (coronavirus) exposures or spoilage from the extended shelf life of a product is not a Spoilage Covered Cause of Loss." R. 29-1, 20 C 2005, Exh. A, Email from Society CEO Rick Parks re: COVID-19 &

Insurance Coverage, at 2-3. Nonetheless, the memorandum "encourage[d] any poli-cyholder or third-party claimant who wishes to present a claim to do so." *Id.* at 2.

Second, Society denied individual claims that various Plaintiffs filed. For ex-ample, in a letter to Plaintiff Legacy Hospitality LLC (which does business as The Vig), Society asserted that "A slowdown in business due to the public's fear of the coronavirus or a suspension of business because a governmental authority (i.e. the governor or the mayor) has ordered or recommended all or certain types of businesses to close is not a direct physical loss. In addition, the actual or alleged presence of the coronavirus is not a Covered Cause of Loss." R. 29-2, 20 C 2005, Exh. B, Letter from Society to Legacy Hospitality LLC, at 3.

Third, Society issued another memorandum on March 27, 2020, this time to all of its policyholders, entitled "A Message From our CEO on Pandemic Crisis." That memorandum does not explicitly say that Society has denied or will deny all claims resulting from pandemic-related shutdowns, but Society asserted that "pandemic events" are generally excluded from insurance coverage:

> Insurance has always identified and excluded coverage for loss events that are so large, or are so unpredictable, that they outstrip the capacity of the industry to fund losses, or even price the exposure accurately. Exclusions for acts of war, nuclear incidents and flood are part of insurance policies for these reasons. These are the same reasons that coverages for pandemic events are excluded. The insurance industry combined does not have enough assets to fund these losses and still be able to meet past and future obligations. Only government has the financial power to respond to these types of events.

R. 29-3, 20 C 2005, Exh. C, Mem. from Society CEO Rick Parks, at 2. Certainly, at this point in the litigation, all parties agree that Society has not paid, and does not

intend to pay, the Plaintiffs' pandemic-related claims. *See* R. 29, 20 C 2005, *Big Onion* First Am. Compl., ¶ 19; R. 113, 20 C 2005, Society's Mem. of Law at 3.

The Plaintiffs filed these lawsuits shortly after these denials of coverage. Valley Lodge and the *Big Onion* plaintiffs filed their complaints in the Northern District of Illinois. R. 1, 20 C 2813; R. 1, 20 C 2005. The *Rising Dough* plaintiffs filed in the Eastern District of Wisconsin. R. 1, 20 C 5981. In October 2020, the Judicial Panel on Multidistrict Litigation issued a transfer order centralizing all pandemic-related litigation against Society Insurance in this Court. R. 1. After appointing counsel to lead the litigation on the Plaintiffs' behalf, and after conferring with the parties on which motions to use as bellwethers, the Court picked these three cases. R. 69. To repeat, Society has filed a motion to dismiss for failure to state a claim in the *Rising Dough* action, and a motion to dismiss or, in the alternative, for summary judgment in the *Big Onion* and *Valley Lodge* actions. R. 20, 20 C 5981; R. 113, 20 C 2005; R. 17, 20 C 2813. Because the key interpretive question that cuts across all of the motions is primarily a question of law, the Court first will address that issue, and then discuss the remainder of the dismissal motions and the summary judgment motions.

## II. Standards of Review

### A. Motion to Dismiss

Under Federal Rule of Civil Procedure 8(a)(2), a complaint generally need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This short and plain statement must "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Bell*

*Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (internal quotation marks and citation omitted). The Seventh Circuit has explained that this rule "reflects a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on technicalities that might keep plaintiffs out of court." *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002)).

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 678-79.

### B. Summary Judgment Motion

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences

in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

### III. Analysis

### A. Elements of a Coverage Claim

Before getting to the big-ticket dispute over the coverage provision, it is worth noting that the Plaintiffs have otherwise adequately stated a claim for coverage under the policy. First, each plaintiff has sought a declaratory judgment from this Court pursuant to 28 U.S.C. § 2201. R. 1, 20 C 2813, *Valley Lodge* Compl., ¶¶ 43-48; R. 14, 20 C 5981, *Rising Dough* Am. Compl., ¶¶ 144-178; R. 29, 20 C 2005, *Big Onion* First Am. Compl., ¶¶ 109-114. The appropriate substantive body of law in the *Big Onion* and *Valley Lodge* actions is Illinois state law. Under Illinois law, the "essential elements of a breach of contract claim are: (1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4)

resultant injury to the plaintiff." *Pepper Const. Co. v. Palmolive Tower Condominiums, LLC*, 59 N.E.3d 41, 66 (Ill. App. 1st 2016). Both the *Big Onion* and *Valley Lodge* plaintiffs have alleged—and Society does not contest—that the insurance policies that the Plaintiffs held are valid and enforceable contracts; the Plaintiffs have performed their obligations under those contracts by paying premiums; the Plaintiffs have suffered losses of business income and sought payment from Society under the policies; and Society has denied coverage. R. 29, 20 C 2005, *Big Onion* First Am. Compl., ¶¶ 116-119; R. 1, 20 C 2813, *Valley Lodge* Compl., ¶¶ 49-53.

In the *Rising Dough* action, the laws of Wisconsin, Minnesota, and Tennessee govern (depending on the particular Plaintiff), although the analysis is nearly identical. R. 14, 20 C 5981, *Rising Dough* Am. Compl., ¶¶ 99–178. Again, setting aside the coverage question itself, these claims otherwise adequately state a claim for relief. "The complaint pleads a contract (duty), a breach of that contract and damages flowing reasonably from that breach and that totally states a cause of action." *Northwestern Motor Car, Inc. v. Pope*, 187 N.W.2d 200, 203 (Wis. 1971); *accord Lyon Financial Services, Inc. v. Illinois Paper and Copier Co.*, 848 N.W.2d 539, 543 (Minn. 2014) ("The elements of a breach of contract claim are (1) formation of a contract, (2) performance by plaintiff of any conditions precedent to his right to demand performance by the defendant, and (3) breach of the contract by defendant.") (cleaned up)[2]; *Federal Ins. Co. v. Winters*, 354 S.W.3d 287, 291 (Tenn. 2011) ("In a breach of contract action,

---

[2]This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

claimants must prove the existence of a valid and enforceable contract, a deficiency in the performance amounting to a breach, and damages caused by the breach."). To repeat, here the Plaintiffs have pleaded, and Society does not contest, that the insurance policies constitute a valid and enforceable contract, and that Society has not paid on the Plaintiffs' requests for coverage. It is time to move on to the key interpretive question of coverage.

### B. "Caused" by "Direct Physical Loss"

As a threshold matter, generally speaking "the interpretation of an insurance policy and the respective rights and obligations of the insurer and the insured [are] questions of law that the court may resolve summarily." *Roman Catholic Diocese of Springfield in Ill. v. Maryland Cas. Co.*, 139 F.3d 561, 565 (7th Cir. 1998) (applying Illinois law). The Court proceeds first by "examin[ing] the facts of the insured's claim to determine whether the policy's insuring agreement makes an initial grant of coverage." *American Family Mut. Ins. Co. v. American Girl, Inc.*, 673 N.W.2d 65, 73 (Wis. 2004). If coverage applies, then the Court "next examine[s] the various exclusions to see whether any of them preclude coverage of the present claim. Exclusions are narrowly or strictly construed against the insurer if their effect is uncertain." *Id.*; *accord Blaine Const. Corp. v. Insurance Co. of North America*, 171 F.3d 343, 349 (6th Cir. 1999) (applying Tennessee law); *Travelers Indem. Co. v. Bloomington Steel & Supply Co.*, 718 N.W.2d 888, 894 (Minn. 2006). Having said all that, although "contract interpretation is often a question of law well suited for disposition on summary judgment … the trier of fact, not [the] court, must resolve the conflicting interpretations

14

of the agreement" "when a contract contains ambiguities that the parties must explain through extrinsic evidence." *Zemco Mfg., Inc. v. Navistar Intern. Transp. Corp.*, 270 F.3d 1117, 1127 (7th Cir. 2001). Just so here.[3]

The key text setting forth the business-interruption coverage requires that the loss in business be caused by "direct physical loss" of covered property:

> We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your "operations' during the "period of restoration." The suspension *must be caused by direct physical loss of or damage to covered property* at the described premises. The loss or damage *must be caused by or result from a Covered Cause of Loss.*

Businessowners Special Property Coverage Form, A.3 (emphasis added). In turn, the policy defines a "Covered Cause of Loss" as a "Direct Physical Loss unless the loss is excluded or limited under this coverage form." *Id.* The parties dispute whether the coronavirus itself, the pandemic, or the government shutdown orders (or some combination of those three things) trigger coverage under this provision.

### 1. Causation

To start untangling the policy's text: first, the policy requires that the business suspension must be *caused by* direct physical loss of (or damage to) covered property. So far, simple enough: the insured must be able to point to a direct physical loss of property as the cause of the business's suspension. But then the policy goes on to say

---

[3]Strictly speaking, Society has only moved for summary judgment in the *Big Onion* and *Valley Lodge* actions. But the parties have treated Society's motion to dismiss the *Rising Dough* action under Federal Rule of Civil Procedure 12(b)(6) more like a Rule 12(c) motion for judgment on the pleadings. Because Society's motions for summary judgment rely, and the Court has decided them on, legal rather than factual arguments, the Court has also addressed the relevant legal standards under the controlling state law in the *Rising Dough* case.

that the loss of property that is the cause of the suspension must, in turn, be caused by or result from a *Covered Cause of Loss*. One would expect that, in defining what is a Covered *Cause* of Loss, the policy would set forth a definition that describes a *cause* of loss—not the loss itself. Instead, the policy turns back on itself and defines Covered Cause of Loss only as a "Direct Physical Loss." Businessowners Special Property Coverage Form, A.3. So putting the coverage text together with the definition, a covered business suspension must be caused by direct physical loss of covered property—and then the loss itself must be caused by or result from a direct physical loss.

In resisting coverage, Society first argues that the Plaintiffs' businesses have been interrupted by the various state and local shutdown orders—not by the coronavirus itself. *See, e.g.*, R. 113, 20 C 2005, Society's Mem. of Law at 9. To Society's way of thinking, even if the coronavirus and the resulting pandemic could qualify as a "direct physical loss," it is really the governmental *orders* that caused the suspensions of business, and those orders—as the superseding cause of the suspensions—do not qualify as a "direct physical loss" under the policy. *Id.* at 10-11.

But Society's characterization of the cause of the business interruptions is not supported by the governing law of the pertinent States, none of which impose such a strict causation requirement. *See, e.g.*, *Manpower, Inc. v. Ins. Co. of the State of Pennsylvania*, No. 08-C-0085, 2009 WL 3738099, at *6 (E.D. Wis. Nov. 3, 2009) (Wisconsin law); *Phillips v. Parmelee*, 840 N.W.2d 713, 717-19 (Wis. 2013); *Fandrey ex rel. Connell v. American Family Mut. Ins. Co.*, 680 N.W.2d 345 (Wis. 2004); *Friedberg v. Chubb & Son, Inc.*, 691 F.3d 948, 952-53 (8th Cir. 2012) (Minnesota law); *State Bank*

16

*of Bellingham v. BancInsure, Inc.*, 823 F.3d 456, 461 (8th Cir. 2016) (Minnesota law); *Capitol Indemnity Corp. v. Braxton*, 24 Fed. Appx. 434, 440-41 (6th Cir. 2001) (Tennessee law); *Planet Rock, Inc. v. Regis Ins. Co.*, 6 S.W.3d 484, 491-92 (C. App. Tenn. 1999); *For Senior Help, LLC v. Westchester Fire Ins. Co.*, 451 F. Supp. 3d 837 (M.D. Tenn. Mar. 31, 2020) (Tennessee law); *see also Clark v. Sputniks, LLC*, 368 S.W.3d 431, 440-41 (Tenn. 2012). Indeed, during the oral argument on January 14, 2021, R. 118, both sides seemed to agree that a proximate-causation standard applies under Illinois, Wisconsin, and Minnesota law, and implied as applicable under Tennessee law (which has a somewhat different concurrent-causation analysis).

The State most up for debate on this point is Illinois. At least some cases disavow a proximate-cause standard under Illinois law in deciding insurance-policy coverage questions. *See, e.g.*, *Sports Arena Mgmt., Inc. v. Great Am. Ins. Group*, No. 06 C 788, 2007 WL 684003, at *3 (N.D. Ill. Mar. 1, 2007) (citing *Transamerica Ins. Co. v. South*, 125 F.3d 392, 398 (7th Cir. 1997)). But more recent Illinois cases (or cases interpreting Illinois law) appear to endorse the proximate-cause analysis, or at least view it as available if the policy language so specifies. *See, e.g.*, *Parker v. Allstate Indemnity Co.*, 427 F. Supp. 3d 1006, 1011 (S.D. Ill. Dec. 16, 2019) (citing *Heuer v. N.W. Nat'l Ins. Co.*, 33 N.E. 411, 412 (Ill. 1893)); *Bozek v. Erie Ins. Group*, 46 N.E.3d 362, 367–69 (Ill. App. Ct. 2015) (explaining the need for anti-concurrent causation provisions because "it appears that Illinois favors the efficient-or-dominant-proximate-cause rule in the absence of contrary language"); *Moda Furniture, LLC v. Chicago Title Land Trust Co.*, 35 N.E.3d 1139, 1147, 1154–55 (Ill. App. Ct. 2015). Indeed,

in Illinois insurance-coverage cases, the proximate-cause standard traces back over a century to *Heuer v. N.W. National Insurance*. In that case, an unlucky storeowner bought an insurance policy covering loss or damage caused by fire. 33 N.E. at 411. But the policy excluded coverage for any loss caused by an explosion. *Id*. In the basement of the store, a lit match sparked an explosion of illuminating gas; the explosion in turn caused the floor of the store to collapse, and the goods were damaged in the collapse. *Id*. Although the Illinois Supreme Court refused to characterize the fire as the cause of the damage, *Heuer* applied a proximate-cause standard: "It is a well-settled principle in the law of insurance that the *proximate*, and not the remote, cause of the loss must be regarded, in order to ascertain whether the loss is covered by the policy or not." *Id*. at 412 (emphasis added). The goods had not been damaged or burned by any fire, but instead were damaged by the floor's collapse. *Id*. So, although the storeowner lost the coverage claim there, the key point is that the Illinois Supreme Court applied the proximate-cause standard to determine the cause of the loss.

Here, the Society policy does not purport to alter the proximate-cause standard—or at least a reasonable jury could so find. The policy does *not* say that the business suspension must be *directly* caused by a Covered Cause of Loss; the text simply says that the business suspension must be "caused by" a Covered Cause of Loss. Businessowners Special Property Coverage Form, A.3. It is true that Covered Cause of Loss is defined as "direct physical loss," but that definition does not purport to impose a stricter causation standard than proximate cause. Instead, the proximate-causation standard applies both to the adjective "direct" in the term "direct physical loss," and

to the "caused by" and "caused by or result from" language preceding the loss and damage terms and definitions. As to "caused by" and "result from," these are precisely the kinds of open-ended causal terms that imply the default causal standard under State law, without further constraint by any other language in the policy.

With proximate cause as the governing causation standard, a reasonable jury could find (at least on the factual record so far) that the novel coronavirus and the resulting pandemic proximately caused the business interruptions. "A proximate cause is one that produces an injury through a natural and continuous sequence of events unbroken by any effective intervening cause." *Cleveland v. Rotman*, 297 F.3d 569, 573 (7th Cir. 2002). Even if the government shutdown orders (and not the pandemic itself) played a causal role in the Plaintiffs' losses, and even if those orders cannot be construed as a "direct physical loss," the shutdown orders were proximately caused by the pandemic. At least a reasonable jury could so find given the policy's ambiguity, in which case the policy language must be construed in favor of the Plaintiffs. *See Berg v. N.Y. Life Ins. Co.*, 831 F.3d 426, 429 (7th Cir. 2016); *Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 607 N.E.2d 1204, 1212 (Ill. 1992).

### 2. Direct Physical Loss

This leaves the question of whether the Plaintiffs' loss is "physical" in nature—whether it is caused by the coronavirus itself, the coronavirus pandemic, or government shutdown orders.[4] Remember here that the operative text is "direct physical

---

[4]Contrary to Society's arguments, the Plaintiffs have in fact pleaded that their losses were caused by the virus, the pandemic, and the shutdown orders—not only the shutdown orders. *See* R. 29, 20 C 2005, *Big Onion* First Am. Compl. ¶ 6; R. 14, 20 C 5981, *Rising Dough* Am. Compl., ¶ 12; R. 1, 20 C 2813, *Valley Lodge* Compl. ¶¶ 36, 40.

loss of or damage to covered property." The disjunctive "or" in that phrase means that "physical loss" must cover something different from "physical damage." "[I]t is axiomatic that courts interpret contracts so as to give effect to all of their provisions." *In re Airadigm Communications, Inc.*, 616 F.3d 642, 657 (7th Cir. 2010). That interpretive principle refuses Society's first argument: that the coronavirus could not constitute "direct physical loss of or damage to" the covered property because the virus "does not cause a tangible change to the physical characteristics of property." *See* R. 113, 20 C 2005, Society's Mem. of Law at 5-6.[5] It would be one thing if coverage were limited to direct physical "damage." But coverage extends to direct physical "loss of" property as well. So the Plaintiffs need not plead or show a change to the property's physical characteristics.

The more challenging interpretive question is whether the restrictions imposed on the Plaintiffs' use of their premises count as *physical* loss. Society observes, and the Plaintiffs do not contest, that most of the restaurants have been able to use their kitchens and thus continue to operate on a take-out and delivery order basis during much (if not all) of the pandemic period. *See, e.g.*, R. 114, 20 C 2005, Def.'s LR

---

[5]The Plaintiffs dispute that there has been no physical "damage" to their property. According to the Plaintiffs, the coronavirus particles themselves have in fact rendered, or could render, physical harm to their property given that the virus lingers on surfaces and remains in the air even after decontamination efforts. *See, e.g.*, R. 32, 20 C 2813, Pls.' Resp. at 2–3. In particular, Valley Lodge has introduced evidence as to the coronavirus' persistence on surfaces, arguing that the virus physically interacts with surfaces in restaurants, such as tables and chairs, so as to qualify as "direct physical loss or damage" under the policy. *See* R. 34-1, 20 C 2813, Decl. of Erik Dubberke. Society disputes these facts. *See* R. 47, Def.'s Resp. to Pls.' St. of Additional Facts. At this stage of the case, there is no need to definitively decide that issue because, at least in the context of this dispute, "loss of" property provides for a broader scope of coverage.

56.1 St. of Undisputed Mat. Facts, ¶¶ 39–78. But the Plaintiffs have not been able to use their premises as they did for indoor, sit-down service before the pandemic. Depending on the particulars of applicable shutdown orders and the Plaintiffs' premises, some have not been able to offer on-site service at all, while others have only been able to do so at limited capacity. *See, e.g.*, R. 125, 20 C 2005, Pls.' Resp. and Obj. to Def.'s LR 56.1 St. of Undisputed Mat. Facts, ¶¶ 39–78. These on-site service restrictions have caused most of the Plaintiffs' losses for which they seek business-interruption coverage. According to Society, these losses are not "physical" because tables and chairs, walls and floors, stovetops and sinks remain in good working order; indeed, the Plaintiffs have been able to use the premises to conduct some amount of business. R. 113, 20 C 2005, Society's Mot. at 9–10.

But a reasonable jury can find that the Plaintiffs did suffer a direct "physical" loss of property on their premises. First, viewed in the light most favorable to the Plaintiffs, the pandemic-caused shutdown orders do impose a *physical* limit: the restaurants are limited from using much of their physical space. It is not as if the shutdown orders imposed a *financial* limit on the restaurants by, for example, capping the dollar-amount of daily sales that each restaurant could make. No, instead the Plaintiffs cannot use (or cannot fully use) the physical space. Indeed, the policy defines "covered property" to include buildings at the premises, not just personal property or movable items. Businessowners Special Property Coverage Form, A.1.

Another way to understand the physical nature of the loss inflicted by the shutdown orders is to consider how a restaurant might mitigate against the suspension

of operations caused by, say, a 25%-capacity limitation on the number of guests inside the restaurant. If the restaurant could expand its *physical* space, then the restaurant could serve more guests and the loss would be mitigated (at least in part). The loss is physical—or at the very least, a reasonable jury can make that finding.

Against this, Society also argues that the Court should "construe the policy as a whole," R. 20, 20 C 5981, Society's Br. in Support of Mot. to Dismiss, at 17, and read the coverage provision in light of the later definition of the "Period of Restoration." Remember that Society promised to pay only for loss of business income during the "period of restoration" (with a cap of 12 months after the date of direct physical loss). Businessowners Special Property Coverage Form, A.5.g(1)(b); H.12. The definition of "Period of Restoration" says that coverage for loss of business income "ends on the earlier of" "the date when the property at the described premises should be *repaired, rebuilt[,] or replaced* with reasonable speed and similar quality; or the date when business is resumed at a new permanent location." *Id.* (emphasis added). In Society's view, "repaired, rebuilt[,] or replaced" implies that covered "physical loss or damage" is necessarily tangible, requiring a physical injury to the covered property rather than mere loss of use.

This argument did give the Court some pause; after all, it is generally true that the policy language must be considered as a whole so that all of its parts fit together. But too many textual clues point the other way. First and foremost, the "Period of Restoration" describes a *time* period during which loss of business income will be covered, rather than an explicit definition of coverage. Instead, the explicit definition of

22

coverage is that direct physical "loss of" property is covered—not just "damage to" property, as explained earlier. Second, the limit on the Period of Restoration does include the words "repaired" and "replaced," that is, the restoration period ends when the property at the premises is "repaired" or "replaced." There is nothing inherent in the meanings of those words that would be inconsistent with characterizing the Plaintiffs' loss of their space due to the shutdown orders as a physical loss. If, for example, the coronavirus risk could be minimized by the installation of partitions and a particular ventilation system, then the restaurants would be expected to "repair" the space by installing those safety features. As another example, if a restaurant could mitigate the loss caused by a percentage-capacity limit by "replacing" some of its dining-room space by opening its adjacent banquet-hall room to increase the number of guests it could serve, then the restaurant would be expected to "replace" the loss of space by doing so. So the definition of the Period of Restoration is consistent with interpreting direct physical loss of property to include the loss of physical use of the covered property imposed by the shutdown orders.

Here, the scope of the term "direct physical loss" is genuinely in dispute. A reasonable jury could find for either side based on the arguments and factual record presented so far in the litigation. The Court's "function [at summary judgment] is not to weigh the evidence but merely to determine if there is a genuine issue for trial." *Zemco Mfg.*, 270 F.3d at 1122–23 (cleaned up). "[R]easonable people could come to different conclusions" on the coverage provision and "resort to extrinsic evidence will

be appropriate." *See id.* at 1127.[6] Society's motion for summary judgment is denied as to the policy's business-interruption coverage.

### C. Civil Authority Coverage & Contamination Coverage

Although the business-interruption coverage is sufficient, at this stage of the litigation, for the coverage cases to move forward, it is worth addressing the other coverage theories advanced by the Plaintiffs. A decision now makes sense because, as it turns out, the other coverage theories can be decided on the current record and because it is worth streamlining discovery upfront and eliminating discovery disputes now rather than later.

First, Society has moved for summary judgment against the Plaintiffs' claims brought under the policy's Civil Authority coverage. The Civil Authority coverage pays for loss of income caused by action of a civil authority that "prohibits access" to the insured's premises and to the "area immediately surrounding" the property:

> When a Covered Cause of Loss causes damage to property other than property at the described premises, we will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority *that prohibits access to the described premises*, provided that both of the following apply:
>
> > (1) *Access* to the area immediately surrounding the damaged property is *prohibited* by civil authority as a result of the damage, and the described premises are within the area; and

---

[6]On the issue of extrinsic evidence, it is worth noting that the parties dispute the implication of the absence of a virus or pandemic exclusion in the policy. According to the Plaintiffs, those exclusions have been common in the insurance industry since the SARS epidemic of 2003. R. 118. The Plaintiffs say that this fact alone, given that Society would or should have known of this industry best practice, implies that the policy necessarily encompasses business interruption due to viruses and pandemics. R. 124, 20 C 2005, Pls.' Resp. at 7–8. No doubt that this issue will be the proper subject of discovery, both factual and perhaps expert.

> (2) The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

Businessowners Special Property Coverage Form, 5.k (emphases added). The Plaintiffs argue that, in essence, the government shutdown orders in their various jurisdictions count as a covered "action of civil authority." *See, e.g.*, R. 124, 20 C 2005, Pls. Resp. to Society's Mot. to Dismiss or Alt. for Summary Judgment, at 18-20. But even if that were right, the problem for the Plaintiffs is that the action of the civil authority must "prohibit[] access" to the premises and the surrounding area. Specifically, the policy's text requires that the civil authority "prohibit[] access to the described premises," *and* that "[a]ccess to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the described premises are within the area." Businessowners Special Property Coverage Form, 5.k. As Society correctly observes, even if the general public is prohibited from congregating in the covered premises, there is no allegation that employees are outright prohibited from accessing the premises—or from accessing the immediately surrounding areas, for that matter. Indeed, for some of the Plaintiffs, take-out customers and in-room dining guests may access the premises (and the immediately surrounding areas). The Civil Authority coverage is not triggered by mere "loss of" property; there must be "prohibited" "access." The Plaintiffs' claims for coverage under this provision must be dismissed.

The analysis of the Contamination coverage provision is much the same. The Plaintiffs present two theories of coverage under the Contamination provision. First, the policy provides for cleaning and sanitizing the premises, machinery, and equipment due to contamination:

> If your "operations" are suspended due to "contamination":
>
>> (1) We will pay for your costs to clean and sanitize your premises, machinery and equipment, and expenses you incur to withdraw or recall products or merchandise from the market. We will not pay for the cost or value of the product.

Businessowners Special Property Coverage Form, 5.m. The text of this coverage provision requires, first and foremost, that the Plaintiffs' "operations" be "suspended" due to "contamination." *Id.* "Contamination" is defined as "a defect, deficiency, inadequacy, or dangerous condition in your products, merchandise[,] or premises." *Id.* § 5.m(4)(a). As Society notes, the Plaintiffs have maintained operations during the pandemic, and the suspensions of business have not been caused by contamination of the premises, machinery, or equipment *themselves*. R. 114, 20 C 2005, Def.'s LR 56.1 St. of Undisputed Mat. Facts, ¶¶ 39-78. And the Plaintiffs have not made a particularized factual argument that one or more of them has been closed due to actual COVID-19 contamination of the premises, machinery, or equipment. R. 125, 20 C 2005, Pls.' Resp. to Def.'s LR 56.1 St. of Facts, ¶¶ 39-78.

The Plaintiffs also rely on a second subsection of Contamination coverage, but again, that coverage requires the suspension of operations due to contamination:

> If your "operations" are suspended due to "contamination":
>
>> …

(2) We will also pay for the actual loss of Business Income and Extra Expense you sustain caused by

(a) "Contamination" that results in an action by a public health or other governmental authority that prohibits access to the described premises or production of your product.

(b) "Contamination threat[.]"

(c) "Publicity" resulting from the discovery or suspicion of "contamination."

Businessowners Special Property Coverage Form, 5.m. Again, the text of this coverage provision requires that the Plaintiffs' "operations" be "suspended" due to "contamination." *Id.* And again, the suspensions of business have not been caused by contamination of the premises, machinery, or equipment themselves. What's more, the listed causes in this second subsection impose additional requirements that are not met here. Like the flaw in the Civil Authority coverage theory, there has been no "action by a public health or other governmental authority that *prohibits* access to the described premises or production of your product." (emphasis added). *Id.* § 5.m(2)(a). The Plaintiffs have not been prohibited from accessing the premises, and many have continued to produce food for take-out and delivery purposes. R. 114, 20 C 2005, Def.'s LR 56.1 St. of Facts, ¶¶ 39–78; R. 125, 20 C 2005, Pls.' Resp. to Def.'s LR 56.1 St. of. Facts, ¶¶ 39–78. And given the definition of "contamination," there is no loss of income due to "contamination threat" or "publicity" from contamination, Businessowners Special Property Coverage Form, 5.m(2)(b), (c), because it is not the premises, machinery, or equipment themselves that have been contaminated. For

27

these reasons, neither the Civil Authority nor the Contamination provisions are viable theories of coverage under the policy.[7]

### D. Sue and Labor Provision

The final coverage theory is advanced only by the *Rising Dough* plaintiffs. Those plaintiffs have pleaded that their losses are covered under the policy's Sue and Labor clause, *see* R. 14, 20 C 05981, *Rising Dough* Am. Compl. ¶¶ 16, 48, 49, 136–143, 172–178. Society seeks to dismiss this claim on the grounds that the Sue and Labor clause is "not a coverage grant," but rather "a Condition that the Insured is required to comply with." R. 20, 20 C 05981, Society's Mot. to Dismiss, at 24–25.

Society is right: the Sue and Labor clause does not independently describe coverage, but instead sets forth what the insured must do *if* there is coverage. Specifically, the clause is found in Section E.3(a)(4) of the Businessowners Special Property Coverage Form and explains to the insured what steps it must take to mitigate the loss and keep track of expenses: "in the event of loss or damage to Covered Property," the insured must "[t]ake all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of a claim." § E.3(a)(4). Nothing about the clause sets forth a duty to pay on Society's part. Indeed, Section E of the policy is entitled, "Property Loss Conditions," and is thus distinct from Section A, "Coverage," which actually contains the grants of coverage. On this issue, the plain language of

---

[7]If the Plaintiffs' wish to revive the coverage claims under the Civil Authority or the Contamination provisions, then they will need to file a motion seeking leave to do so, explaining how they can plead around this rationale.

the policy is unambiguous: the Sue and Labor clause does not provide coverage. The counts invoking this clause in the *Rising Dough* complaint (Counts 5 and 10) are dismissed. This dismissal is with prejudice because there is no conceivable way of fixing this particular claim.

### E. Section 155 (Illinois)

Lastly, Society targets the Illinois Insurance Code claims, 215 ILCS 5/155, advanced by the *Big Onion* and *Valley Lodge* plaintiffs, alleging that Society denied coverage in bad faith. Section 155 provides for fee-shifting and potential penalties against insurers if they are "vexatious and unreasonable" in denying a claim or in delaying the settlement of a claim. 215 ILCS 5/155(1). Section 154.6 sets forth a list of "improper" claims practices, and the Plaintiffs in the Illinois bellwether actions have each alleged a modestly different set of specific violations of that section. *See* R. 29, 20 C 2005, *Big Onion* First Am. Compl., ¶¶ 120–128; R. 1, 20 C 2813, *Valley Lodge* Compl., ¶¶ 54–61. But all of the allegations are anchored by the same fundamental set of facts. Specifically, according to the Plaintiffs, the March 16 and March 27, 2020 memoranda issued by Society, which denied coverage across-the-board, allegedly misrepresented the true scope of the insurance policies; Society failed to investigate individual claims, as required, and instead issued hasty denials not based on individual claims; and Society's actions have caused an improper and lengthy delay in receiving payment.

Society argues that, as a matter of law, claims under Section 155 must be dismissed if there is a bona-fide dispute over coverage. R. 17, 20 C 2813, Society's Mem.

of Law at 17; R. 113, 20 C 2005, Society's Mem. of Law at 19. In support of this contention, Society primarily relies on two Illinois cases as examples of a bona-fide dispute over coverage as fatally undermining Section 155 claims. *Uhlich Children's Adv. Network v. Nat'l Union Fire Ins. Co.*, 929 N.E.2d 531, 543 (Ill. App. Ct. 2010); *Am. Family Mut. Ins. Co. v. Fisher Dev., Inc.*, 909 N.E.2d 274, 284 (Ill. App. Ct. 2009). But in those cases, the decisions on the Section 155 theories were made only after a definitive finding on the coverage question. For example, the insured in *Uhlich Children's Advantage Network* alleged that the insurer had unreasonably refused to fulfill its duty to defend the insured. 929 N.E.2d at 543. The Illinois Appellate Court reversed the trial court, holding that the insurer did indeed have a duty to defend. *Id.* at 542–53. Only then did the appellate court also hold that there was a genuine dispute over the duty to defend, so the Section 155 theory was not viable. *Id.* at 543–54. Similarly, in *Fisher Development*, the insured contended that the insurer breached its duty to defend; when the insurer definitively won on that point, the appellate court affirmed—in one sentence—the dismissal of the Section 155 claim too. 909 N.E.2d at 284. In the specific factual settings of each those cases, there was no reason to opine on whether an ultimate finding that there is no coverage always means that there can be no viable Section 155 claim. And, more importantly for purposes of this case, the cases had reached the ultimate conclusion on the underlying coverage dispute.

Here, it might very well be that, ultimately, no reasonable jury could help but find that there is a bona-fide dispute over coverage. But no discovery has taken place and the case is, for purposes of this issue, at the pleading stage. To be sure, there

might be cases in which a coverage-dispute complaint sets forth allegations that make it crystal clear that there is a bona-fide dispute over coverage, thus precluding a Section 155 claim. Here, however, the need for more factual development prevents a pleading-stage dismissal of the claim.

## IV. Conclusion

Society's motions to dismiss and summary judgment motions are denied to the extent that they target the claims for business-interruption coverage. Those claims survive. Also, the Section 155 claims survive in *Big Onion* and *Valley Lodge*. But the summary judgment motions in the *Big Onion* and *Valley Lodge* actions are granted as to the coverage theories under the Civil Authority and the Contamination provisions, and in the *Rising Dough* case as to the Sue and Labor clause.

To give the parties time to confer over the proposed next steps of the case, including an efficient and speedy discovery schedule, the status hearing of February 24, 2021, is reset to March 9, 2021, at 11 a.m. The Co-Lead Counsel team and Society shall confer and file a Joint Scheduling Report on March 5, 2021, setting forth the areas of agreement and any competing proposals.[8]

ENTERED:

s/Edmond E. Chang

Honorable Edmond E. Chang
United States District Judge

DATE: February 22, 2021

---

[8]One topic of consideration is whether certification for interlocutory appeal under 28 U.S.C. § 1292(b) is warranted, although the fact-bound nature of the key interpretive issue might prevent the propriety of certification.