# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| IN RE: SOCIETY INSURANCE CO. COVID-19 BUSINESS INTERRUPTION PROTECTION INSURANCE LITIGATION | MDL No. 2964 |
| | Master Docket No. 20 C 5965 |
| | Judge Edmond E. Chang |
| This Document Relates to All Cases | Magistrate Judge Jeffrey I. Cummings |

## <u>MASTER CONSOLIDATED AMENDED COMPLAINT</u>

Adam J. Levitt
**DiCELLO LEVITT GUTZLER LLC**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
Telephone: 312-214-7900
alevitt@dicellolevitt.com

Shannon M. McNulty
**CLIFFORD LAW OFFICES, P.C.**
120 North LaSalle Street, #3100
Chicago, Illinois 60602
Telephone: 312-899-9090
smm@cliffordlaw.com

Timothy W. Burns
**BURNS BOWEN BAIR LLP**
One South Pinckney Street, Suite 930
Madison, Wisconsin 53703
Telephone: 608-286-2302
tburns@bbblawllp.com

W. Mark Lanier
**THE LANIER LAW FIRM PC**
10940 West Sam Houston Parkway North
Suite 100
Houston, Texas 77064
Telephone: 713-659-5200
WML@lanierlawfirm.com

*Plaintiffs' MDL Co-Lead Counsel and Counsel for
the Class Plaintiffs and the Proposed Classes*

Shelby S. Guilbert, Jr.
**MCGUIREWOODS LLP**
1230 Peachtree Street, NE, Suite 2100
Atlanta, Georgia 30309
Telephone: 404-443-5723
sguilbert@mcguirewoods.com

*Plaintiffs' MDL Co-Lead Counsel and Counsel for the Individual Plaintiffs*

Dated: April 2, 2021

## <u>TABLE OF CONTENTS</u>

I.  PREAMBLE ........................................................................................................ 1

II.  INTRODUCTION AND NATURE OF THE ACTION ..................................... 2

III.  THE PARTIES.................................................................................................... 4

IV.  JURISDICTION AND VENUE ...................................................................... 11

V.  FACTUAL BACKGROUND ........................................................................... 12

    A.  Society's Comprehensive Business Insurance Policies for Small
        Businesses .............................................................................................. 12

    B.  The Pandemic........................................................................................ 15

    C.  The Governmental Closure Orders ....................................................... 17

    D.  The Impact of COVID-19 and the Closure Orders on Plaintiffs' Business
        Operations .............................................................................................. 24

    E.  Society's Response to the Pandemic and Denial of Requests for Insurance
        Benefits ................................................................................................. 26

VI.  CLASS ACTION ALLEGATIONS ................................................................ 29

VII.  CLASS CLAIMS FOR RELIEF...................................................................... 37

VIII.  REQUEST FOR RELIEF ................................................................................ 53

IX.  JURY DEMAND .............................................................................................. 54

X.  CLASS CLAIMS PRESERVED FOR PURPOSES OF APPEAL ................. 55

XI.  INDIVIDUAL PLAINTIFFS' CLAIMS FOR RELIEF................................. 65

## I.     <u>PREAMBLE</u>

Pursuant to Case Management Order No. 6 [Dkt. No. 139], the below Plaintiffs hereby file this Master Consolidated Amended Complaint ("Master Complaint") against Defendant Society Insurance, Inc. As alleged herein, this Master Complaint includes: (1) claims brought by Plaintiffs on behalf of themselves and the proposed classes described below (the "Class Plaintiffs"); and (2) claims brought by Plaintiffs as individuals and not on behalf of any proposed class (the "Individual Plaintiffs"). For purposes of efficiency and to streamline discovery in this time-sensitive matter, the Individual Plaintiffs listed herein are a subset of Individual Plaintiffs who have already filed individual actions and intend to proceed with their claims individually and not on behalf of any proposed class. The fact that a particular Plaintiff is not expressly listed as an Individual Plaintiff does not waive that Plaintiff's right to proceed with its individual claims on a parallel track notwithstanding any class(es) which may be certified pursuant to Fed. R. Civ. P. 23 in the future. To the extent this Master Complaint reasserts allegations and claims dismissed by this Court's February 22, 2021 Memorandum Opinion and Order [Dkt. No. 131], Plaintiffs include those allegations and claims solely to preserve them for appeal. Finally, Plaintiffs note that this Master Complaint is directly filed in this Court and is intended to serve as Class Plaintiffs' complaint proceeding through trial. Class Plaintiffs and Individual Plaintiffs believe that all claims should proceed before this Court for all purposes and all such parties consent to venue and personal jurisdiction in this Court. Notwithstanding the foregoing, certain claims or issues for certain parties may, consistent with 28 U.S.C. § 1407 and the case law thereunder, be matters for determination on remand by transferor courts.

Plaintiffs Rising Dough, Inc.; Willy McCoys of Albertville LLC; Willy McCoys of Andover LLC; Willy McCoys of Chaska LLC; Willy McCoys of Shakopee LLC; Whiskey Jacks of Ramsey, LLC; Green Hills Grille LLC; Cash-McKeown Futures LLC; Valley Lodge Corp.; The

Bag Tavern, LLC; Crosstown Pub and Grill Inc.; The Barn Investment LLC; Ambrosia Indy LLC; Tolon LLC; JL Holdings Inc.; One Louder, LLC; Sunda Nashville, LLC; JPM Hospitality Group, LLC; and SAC Corp. (collectively, the "Class Plaintiffs"), individually and on behalf of the other members of the below-defined nationwide and state classes (collectively, the "Class" or the "Classes"), and Plaintiffs Big Onion Tavern Group, LLC; McBrides Aurora Inc.; Homeslyce Is Where The Heart Is LLC; 108 Kinzie LLC; Sancerre Hospitality I LLC; 806 W Randolph LLC; and Niche Restaurant Group LLC (collectively, the "Individual Plaintiffs," and, with the Class Plaintiffs, the "Plaintiffs"), bring this Master Consolidated Amended Complaint against Defendant Society Insurance ("Society Insurance" or "Society").

## II.     INTRODUCTION AND NATURE OF THE ACTION

1.     Plaintiffs are small business owners that operate restaurants, bars, and other establishments that rely on the ability to provide indoor service to customers. To protect their businesses in the event that they suddenly had to suspend operations for reasons outside of their control, Plaintiffs purchased all-risk insurance policies from Society, including "Business Income" coverage, as set forth in Society's Businessowner's Special Property Coverage Form (Form TBP2 05-15) ("Special Property Coverage Form").

2.     Society markets itself as offering broad "best-in-class" coverage to businesses in the hospitality industry, and insurance brokers selling policies to potential Society policyholders touted Society as offering broader coverage than its competitors. Indeed, unlike many policies that provide Business Income (also referred to as "business interruption") coverage, Society's Special Property Coverage Form does not include, and is not subject to, any exclusion for losses caused by viruses or communicable diseases.

3.     Since March 2020, Plaintiffs' ordinary business operations have been interrupted by the spread of the novel coronavirus, the ensuing COVID-19 pandemic, and the resulting public

2

health orders announced by state and local governments. These interruptions present an existential threat to these small businesses.

4. Despite Society's express promise in its policies to cover the Plaintiffs' Business Income losses when they lose the use of their property for ordinary business operations due to conditions beyond their control, Society has not done so. Instead, Society looked at its potential exposure and made an internal decision, before coronavirus was widely detected in the United States, that it would refuse to pay any claim that it could link to the pandemic that public health officials feared was coming.

5. Society did not simply implement a corporate policy of issuing blanket denials to Plaintiffs for any Business Income losses related to COVID-19—although it did do that, often issuing denial letters within hours of receiving policyholders' claims without conducting a reasonable investigation based on all available information, as required under the law. Society affirmatively wrote to policyholders to discourage them from filing claims and enlisted its broker-agents in a scheme to submit claims on behalf of policyholders—without policyholders' knowledge or consent—that Society could rapidly deny.

6. In blatant breach of the insurance obligations that Society voluntarily undertook in exchange for Plaintiffs' premium payments, Society has denied Plaintiffs' business interruption claims arising from COVID-19, in most cases prior to conducting any meaningful coverage investigation whatsoever.

7. Indeed, Society has, on a wide-scale basis with many if not all of its insureds, refused to provide Business Income, Extra Expense, Civil Authority, Contamination or Sue and Labor coverage for losses caused by the COVID-19 pandemic and the resultant executive orders by state and local governments that have required the suspension of business.

8.     As a result of Society's wrongful denial of coverage, the Class Plaintiffs and Individual Plaintiffs file this Master Consolidated Amended Complaint for a declaratory judgment establishing that they are entitled to receive the benefit of the insurance coverage they purchased, for indemnification of the business income losses they have sustained, for breach of contract, and for bad faith claims handling under the laws of the jurisdictions in which the Plaintiffs operate.

## III.     THE PARTIES

*Class Plaintiffs*

9.     Plaintiff Rising Dough, Inc. ("Rising Dough") is a Wisconsin corporation with its principal place of business in Madison, Wisconsin. Rising Dough operates the restaurant Madison Sourdough in Madison, Wisconsin. Rising Dough has a Businessowners Policy from Society Insurance, Policy No. TRM54814711.

10.     Plaintiff Willy McCoys of Albertville LLC ("Willy McCoys Albertville") is a Minnesota limited liability company with its principal place of business in Albertville, Minnesota. Willy McCoys Albertville operates a Willy McCoys restaurant in Albertville, Minnesota. Willy McCoys Albertville has a Businessowners Policy from Society Insurance, Policy No. BP19022033-0.

11.     Plaintiff Willy McCoys of Andover LLC ("Willy McCoys Andover") is a Minnesota limited liability company with its principal place of business in Andover, Minnesota. Willy McCoys Andover operates a Willy McCoys restaurant in Andover, Minnesota. Willy McCoys Andover has a Businessowners Policy from Society Insurance, Policy No. BP19013654-0.

12.     Plaintiff Willy McCoys of Chaska LLC ("Willy McCoys Chaska") is a Minnesota limited liability company with its principal place of business in Chaska, Minnesota. Willy McCoys

Chaska operates a Willy McCoys restaurant in Chaska, Minnesota. Willy McCoys Chaska has a Businessowners Policy from Society Insurance, Policy No. BP19022056-0.

13.     Plaintiff Willy McCoys of Shakopee LLC ("Willy McCoys Shakopee") is a Minnesota limited liability company with its principal place of business in Shakopee, Minnesota. Willy McCoys Shakopee operates the restaurant McCoys Copper Pint in Shakopee, Minnesota. Willy McCoys Shakopee has a Businessowners Policy from Society Insurance, Policy No. BP19019803-0.

14.     Plaintiff Whiskey Jacks of Ramsey, LLC ("Whiskey Jacks") is a Minnesota limited liability company with its principal place of business in Ramsey, Minnesota. Whiskey Jacks operates a Willy McCoys restaurant in Ramsey, Minnesota. Whiskey Jacks has a Businessowners Policy from Society Insurance, Policy No. BP19022048-0.

15.     Plaintiff Green Hills Grille, LLC ("Green Hills Grille") is a Tennessee limited liability company with its principal place of business in Nashville, Tennessee. Green Hills Grille operates the restaurant Green Hills Grille in Nashville Tennessee. Green Hills Grille has a Businessowners Policy from Society Insurance, Policy No. BP19006528-0.

16.     Plaintiff Cash-McKeown Futures LLC ("Cash-McKeown") is a Tennessee limited liability company with its principal place of business in Brentwood, Tennessee. Cash-McKeown operates the restaurant Mere Bulles in Brentwood Tennessee. Cash-McKeown has a Businessowners Policy from Society Insurance, Policy No. BP16039015-3

17.     Plaintiff Valley Lodge Corp. ("Valley Lodge") is an Illinois corporation with its principal place of business in Glenview, Illinois. Valley Lodge operates the restaurant The Valley Lodge in Glenview, Illinois. Valley Lodge has a Businessowners Policy from Society Insurance, Policy No. BP19017098-0.

18.     Plaintiff The Bag Tavern, LLC ("Bag Tavern") is an Illinois limited liability company with its principal place of business in Wilmette, Illinois. Bag Tavern operates the restaurant The Valley Lodge Tavern in Wilmette, Illinois. Bag Tavern has a Businessowners Policy from Society Insurance, Policy No. BP19017038-0.

19.     Plaintiff Crosstown Pub and Grill Inc. ("Crosstown") is an Illinois corporation with its principal place of business in Naperville, Illinois. Crosstown operates the restaurant Crosstown Pub & Grill Naperville in Naperville, Illinois. Crosstown has a Businessowners Policy from Society Insurance, Policy No. BP18030334-1, which provides coverage for Crosstown Pub & Grill Naperville and also for Crosstown Pub & Grill in Batavia.

20.     Plaintiff The Barn Investment LLC ("The Barn") is an Illinois limited liability company with its principal place of business in Evanston, Illinois. The Barn operates the restaurant The Barn Steakhouse in Evanston, Illinois. The Barn has a Businessowners Policy from Society Insurance, Policy No. BP16023488-3.

21.     Plaintiff Ambrosia Indy LLC ("Ambrosia") is an Indiana limited liability company with its principal place of business in Indianapolis, Indiana. Ambrosia operates the restaurant Ambrosia in Indianapolis, Indiana. Ambrosia has a Businessowners Policy from Society Insurance, Policy No. BP18044498.

22.     Plaintiff Tolon LLC ("Tolon") is an Indiana limited liability company with its principal place of business in Fort Wayne, Indiana. Tolon operates the restaurant Tolon in Fort Wayne, Indiana. Tolon has a Businessowners Policy from Society Insurance, Policy No. BP18005470-2.

23.     Plaintiff JL Holdings Inc. ("JL Holdings") is an Iowa corporation with its principal place of business in Cascade, Iowa. JL Holdings operates the restaurant Kalmes Club 528 in

Cascade, Iowa. JL Holdings has a Businessowners Policy from Society Insurance, Policy No. ROP 541338-8.

24.     Plaintiff One Louder, LLC ("One Louder") is an Iowa limited liability company, with its principal place of business in Iowa City, Iowa. One Louder operates the restaurant Micky's Irish Pub in Iowa City, Iowa. One Louder has a Businessowners Policy from Society Insurance, Policy No. BP17013872-2.

25.     Plaintiff Sunda Nashville, LLC ("Sunda Nashville") is a Tennessee limited liability company with its principal place of business in Nashville, Tennessee. Sunda Nashville operates the restaurant Sunda in Nashville, Tennessee. Sunda Nashville is a named insured on a Businessowners Policy issued by Society Insurance to Rockit Ranch Productions, Inc., Policy No. BP18032886-1.

26.     Plaintiff JPM Hospitality Group, LLC ("JPM") is a Wisconsin limited liability company with its principal place of business in Racine, Wisconsin. JPM operates the restaurant Reefpoint Brew House in Racine, Wisconsin. JPM has a Businessowners Policy from Society Insurance, Policy No. BP18040323-1.

27.     Plaintiff SAC Corp. ("SAC") is a is a Wisconsin corporation with its principal place of business in Hartford, Wisconsin. SAC operates the restaurant MJ Stevens in Hartford, Wisconsin. SAC has a Businessowners Policy from Society Insurance, Policy No. BP17020472-2.

***Individual Plaintiffs***

28.     Plaintiff Big Onion Tavern Group LLC ("Big Onion") is an Illinois limited liability company, with its principal place of business in Chicago, Illinois. Big Onion's sole member is Erik Baylis, a citizen of Illinois. Big Onion operates the following restaurants in Chicago: Fatpour Tap Works – Wicker Park, Fatpour Tap Works – McCormick Place, Hopsmith, Woodie's Flat, The

7

Irish Oak, Brunch, and Centre Street Kitchen. Big Onion has a Businessowners Policy from Society Insurance, Policy No. BP18003904-1, which covered losses for occurrences at each of Big Onion's restaurants.

29.     Plaintiff McBrides Aurora Inc. ("McBrides Aurora") is an Illinois corporation with its principal place of business in Illinois. McBrides Aurora operates the pub McBride's North in Aurora, Illinois. McBrides Aurora has a Businessowners Policy from Society Insurance, Policy No. TRM 591971-4.

30.     Plaintiff Homeslyce Is Where the Heart Is LLC ("Homeslyce") is an Illinois limited liability company. The members of Homeslyce are:

    a.   Illinois citizens Clay Hamilton, Josh Iachelli, Scott Behrens, Greg Boyle, Mark Posner, Edward McLoughlin, Troy Schira, Steven Troy Schira, Glenn Hughes, Lance Lauderdale;

    b.   Oregon citizens Curt Bennett, Jason Miller, Stephen Harper, Kenneth MacDonald, Linda MacDonald;

    c.   Colorado citizens Jarka Durba and Stephen Kern;

    d.   The Jacobs Family Trust. The trustee of The Jacobs Family Trust is Jay Jacobs, a citizen of Montana;

    e.   North Carolina citizen Michael Kutcher;

    f.   Washington citizen Benjamin Wallace;

    g.   Stem Ltd Partnership. The partners of Stem Ltd Partnership are Florida citizen Ed McLoughlin and Illinois citizens Tim McLoughlin and Megan Horwath; and

    h.   In Your Eye LLC. The members of In Your Eye LLC are Illinois citizens Tim

          Callahan, Peter Forker, Fred Gonzalez, Anita Rambhajan, Ernest Brown,

          Todd Baraniak, Aaron Baum, Maureen Callahan, and Glen Keefer.

Homeslyce operates Homeslice Restaurant in Chicago. Homeslyce has a Businessowners Policy

from Society Insurance, Policy No. BP17001670.

31.    Plaintiff 108 Kinzie, LLC ("108 Kinzie") is an Illinois limited liability company.

The members of 108 Kinzie are:

    a.   Illinois citizens Derrel McDavid, William McDavid, Linda Matthew, Richard

          Goodman, Lilly Goodman, Daniel Goodman, Jordan Goodman, Steve

          Sandler, and John Mays;

    b.   New York citizens Christine Maguire, David Vargas, Mark Goldsmith, Robert

          Levine, John Pizzuto, Todd Reale, Joseph Schueller, George Hindy, James

          Maguire, Steve Maguire, and Tom Maguire;

    c.   New Jersey citizen Todd Reale;

    d.   Florida citizens Robert Reale and Erni Valez;

    e.   Mercan Corporation, a New York corporation with its principal place of

          business in New York;

    f.   Third Stone Partners, a limited liability company. The sole member of Third

          Stone Partners is Dave Karrow, a citizen of Illinois;

    g.   JT & C, LLC, a limited liability company. The sole member of JT & C, LLC

          is Jack Cayre, a citizen of New York;

    h.   Skor LLC, a limited liability company. The sole member of Skor LLC is Scott

          Skorobohaty, a citizen of New York;

      i.    The Michael Andrew Maguire Irrevocable Trust. The trustee of The Michael Andrew Maguire Irrevocable Trust is Tom Maguire Sr., a citizen of New York;

      j.    The Thomas J. Maguire Jr. Irrevocable Trust. The trustee of the Thomas J. Maguire Jr. Irrevocable Trust is Tom Maguire Sr., a citizen of New York; and

      k.    JLC Merc LLC, a limited liability company. The sole member of JLC Merc LLC is John Manning, a citizen of New York.

108 Kinzie operates the restaurant Mercadito in Chicago's River North neighborhood. 108 Kinzie has a Businessowners Policy from Society Insurance, Policy No. BP16019733-3.

32.     Plaintiff 806 W Randolph LLC ("806 W Randolph") is an Illinois limited liability company. The members of 806 W Randolph LLC are Illinois citizens Ben Pritzker, Ben Lurie, Matt Eisler, Kevin Heisner, and Nick Floyd. 806 W Randolph operates the bar and restaurant Lone Wolf in Chicago's West Loop neighborhood. 806 W Randolph has a Businessowners Policy from Society Insurance, Policy No. TRM 587111-6.

33.     Plaintiff Sancerre Hospitality I LLC ("Sancerre Hospitality") is an Illinois limited liability company. The members of Sancerre Hospitality are Illinois citizens Frank Callero, Kara Callero, and Steven Zaleski. Sancerre Hospitality operates the restaurant BLVD in Chicago's West Loop neighborhood. Sancerre Hospitality has a Businessowners Policy with Society Insurance, Policy No. BP17018107.

34.     Plaintiff Niche Restaurant Group LLC ("Niche") is an Illinois limited liability company. The sole member of Niche is Andrea Redmond, a citizen of Illinois. Niche operates the bar and restaurant Niche in Geneva, Illinois. Niche has a Businessowners Policy with Society Insurance, Policy No. ROP 514325.

35.     The Individual Plaintiffs' claims share common factual issues with the claims asserted by the other Individual Plaintiffs who are pursuing individual claims in this multi-district litigation, including but not limited to all of the Individual Plaintiffs identified in Case No. 1:30-cv-02005, Dkt. 29.

**Defendant**

36.     Society is a mutual insurance company organized under the laws of the State of Wisconsin, with its principal place of business in Fond du Lac, Wisconsin. It is authorized to write, sell, and issue insurance policies providing property and business income coverage. At all times material hereto, Society conducted and transacted business through the selling and issuing of insurance policies within, among other states, Colorado, Illinois, Indiana, Iowa, Minnesota, Tennessee, and Wisconsin, including, but not limited to, selling and issuing property coverage to Plaintiffs.

## IV.     JURISDICTION AND VENUE

37.     This Court has subject matter jurisdiction over the Class Plaintiffs' claims under 28 U.S.C. § 1332(d) because the Class Plaintiffs bring this action under Federal Rule of Civil Procedure 23 (a) on behalf of a putative class that consists of at least 100 members, (b) the amount in controversy exceeds $5,000,000 exclusive of interest and costs, and (c) no relevant exceptions apply to this claim.

38.     This Court has subject matter jurisdiction over the Individual Plaintiffs' claims under 28 U.S.C. § 1332 because there is complete diversity between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

39.     This Court has personal jurisdiction over the claims brought by Plaintiffs pursuant to the Illinois "long arm statute," 735 ILCS 5/2-209, because Society Insurance has submitted to jurisdiction in this state by: (a) transacting business in Illinois; (b) contracting to insure a person,

property or risk located within Illinois at the time of contracting; and (c) making a contract substantially connected with Illinois. See 735 ILCS 5/2-209(1), (4), (7). In addition, Society Insurance exercises substantial, systematic and continuous contacts with Illinois by doing business in Illinois, serving insureds in Illinois, and seeking additional business in Illinois.

40.     Venue is proper in this District under 28 U.S.C. § 1391 because Defendant resides in this district, a substantial portion of the acts and conduct giving rise to the claims occurred within the District, and because the Judicial Panel on Multidistrict Litigation has transferred all cases filed in federal court against Society alleging business income losses resulting from COVID-19 to this Court for pre-trial purposes.

## V.     FACTUAL BACKGROUND

### A.     Society's Comprehensive Business Insurance Policies for Small Businesses

41.     Society advertises itself as a specialty insurer for small business in a few industries:

Society Insurance doesn't try to be all things for every business. **But for a few choice industries, we're just that.**

We specialize in select business niches, focusing on the small details that make the biggest difference. **No business insurance company matches our extensive knowledge for protecting restaurants**, bars, grocery stores, convenience stores, medical clinics and artisan contractors.

Over the years, we've sat down with real owners like you **to make sure our coverage meets your unique challenges.** The tools, tips and resources we provide allow you to proactively strengthen your business and prevent accidents from happening.

And if disaster strikes, you can rest easy knowing your Society Insurance policy has you covered.

The way we do business has earned Society the long-standing endorsements of some of the Midwest's leading trade associations. **It's a nod to how we handle the intricacies of these industries and always look ahead to meet emerging business needs.**

Your business is your livelihood, and it's our job to do all we can to help you protect it. By choosing Society, you're not only getting one of the most comprehensive

plans for your business, but a partner dedicated to your company's continued success.[1]

42.     In many parts of the world, property insurance is sold on a specific peril basis. Such policies cover a risk of loss if that risk of loss is specifically listed (*e.g.*, hurricane, earthquake, H1N1, etc.). Most property policies sold in the United States, however, including those sold by Society, are all-risk policies, meaning that the policies cover all risks of loss except for risks that are expressly and specifically excluded. In the Special Property Coverage Form provided to Plaintiffs, under the heading "Covered Causes of Loss," Society agreed to "pay for direct physical loss or damage to Covered Property" "unless the loss is excluded or limited by" the Special Property Coverage Form.

43.     In the Special Property Coverage Form, Society did not exclude or limit coverage for losses from viruses, infectious or communicable diseases, pandemics, or public health countermeasures that might be used to combat the same.

44.     Thus, losses due to COVID-19 are a Covered Cause of Loss under the Society policies with the Special Property Coverage Form.

45.     In the Special Property Coverage Form, Society agreed to pay for its insureds' actual loss of Business Income sustained due to the necessary suspension of its operations during the "period of restoration" caused by direct physical loss or damage. A "partial slowdown or complete cessation" of business activities at the Covered Property is a "suspension" under the policy, for which Society agreed to pay for loss of Business Income during the "period of restoration" "that occurs within 12 consecutive months after the date of direct physical loss or damage."

---

[1] *See* https://www.societyinsurance.com/about_us.aspx (emphasis added) (last visited March 28, 2021).

46.     "Business Income" means net income (or loss) before tax that Plaintiffs would have earned "if no physical loss or damage had occurred."

47.     In the Special Property Coverage Form, Society also agreed to pay necessary Extra Expense that its insureds incur during the "period of restoration" that the insureds would not have incurred if there had been no direct physical loss or damage to the Covered Property.

48.     "Extra Expense" means expenses "to avoid or minimize the suspension of business and to continue 'operations,'" and to repair or replace property.

49.     Society also agreed to "pay for the actual loss of Business Income" that Plaintiffs sustain "and any Extra Expense caused by action of civil authority that prohibits access to" the Covered Property when a Covered Cause of Loss causes damage to property other than the Covered Property and the civil authority prohibits access to the property and its surrounding area and takes such action "in response to dangerous physical conditions."

50.     Society's Special Property Coverage Form provides "Contamination" coverage that pays for the actual loss of Business Income and Extra Expense caused by "'Contamination' that results in an action by a public health or other governmental authority that prohibits access to the described premises or production of your product." The Special Property Coverage Form broadly defines a covered loss due to "Contamination" as occurring in a variety of circumstances, including the following: (a) "Contamination" that results in an action by a public health or other governmental authority that prohibits access to the described premises or production of your product; (b) a "Contamination threat", or (c) "publicity" resulting from the discovery or suspicion of "Contamination." The Special Property Coverage Form defines "Contamination" as "a defect, deficiency, inadequacy or dangerous condition in your products, merchandise or premises."

51.     Society's Special Property Coverage Form, under a section entitled "Duties in the Event of Loss or Damage" mandates that Society's insured "must see that the following are done

14

in the event of loss or damage to Covered Property . . . [t]ake all reasonable steps to protect the Covered Property from further damage and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim." This type of coverage has historically been known as "sue and labor" coverage or a "sue and labor" provision, and property policies have long provided coverage for these types of expenses.

52.     Plaintiffs each purchased a comprehensive, all-risk business insurance policy that conforms to the conventions described in Paragraphs 42 to 51 above. The Businessowners Special Property Coverage Form that is part of these policies includes identical Business Income, Civil Authority, Contamination, Extra Expense, and Sue and Labor. Plaintiffs have each performed all of their obligations under the policy, including the payment of premiums.

53.     As explained below, losses caused by COVID-19 and the related orders issued by state and local governments triggered the Business Income and Extra Expense, Civil Authority, Contamination, and Sue and Labor provisions of these Society policies.

**B.     *The Pandemic***

54.     In January 2020, early media reports documented an outbreak of a novel strain of coronavirus—COVID-19—in Wuhan, China. By late January, it was generally understood in the scientific and public health communities that COVID-19 was spreading through human-to-human transmission and could be transmitted by asymptomatic carriers.

55.     On January 30, 2020, reports of the spread of COVID-19 outside China prompted the World Health Organization to declare the COVID-19 outbreak a "Public Health Emergency of International Concern."

56.     On March 11, the World Health Organization declared COVID-19 a global health pandemic based on existing and projected infection and death rates and concerns about the speed of transmission and ultimate reach of this virus.

57.     Public health officials have recognized for decades that non-pharmaceutical interventions (NPIs) can slow and stop the transmission of certain diseases. Among these are screening and testing of potentially infected persons; contact tracing and quarantining infected persons; personal protection and prevention; and social distancing. Social distancing is the maintenance of physical space between people. Social distancing can be limited—*e.g.*, reducing certain types of conduct or activities like hand-shaking—or large-scale—*e.g.*, restricting the movements of the total population.

58.     By mid-March 2020, large-scale social distancing measures were being implemented by state and local governments across the United States, largely through executive orders (referred to below as "Closure Orders") issued by governors, health departments, and mayors.

59.     Infected persons, whether they are or are not symptomatic, release infectious viral particles when breathing, talking, sneezing, and coughing. These particles may be in small respiratory droplets that remain suspended in the air or in larger droplets that may land on surfaces; regardless the infectious particles may persist for hours or days and present infection risks. Developing science has revealed that the risk of surface transmission exists, but that the greatest risks are in close contact and airborne transmission where people are indoors, in close proximity, and without masks covering their mouths and noses.

60.     The risks of transmission rise dramatically as the prevalence of the virus in the community rises. In a population with significant infection rates, the statistical risk of one infected person passing through a location increases significantly with a relatively small rise in attendance or traffic.

61.     Masking and distancing are ways to moderate group size risk. Larger group sizes are riskier, particularly when activities make masking impossible, such as eating or drinking.

16

Complicating the control of the virus is the simple fact that one infected person, in particular circumstances, can infect many people.

## C.    *The Governmental Closure Orders*

62.    The presence of COVID-19 has caused state and local governments to issue Closure Orders requiring the suspension of business at a wide range of establishments, including Plaintiffs' businesses.

### **The Colorado Closure Orders**

63.    Authorities in Colorado have issued several Closure Orders with a variety of restrictions impacting the business activities of Plaintiffs within their jurisdiction, including the following:

64.    On March 19, 2020, the Colorado Department of Public Health & Environment ("CDPHE") issued Public Health Order 20-22, which closed restaurants and bars, and closed or restricted other businesses.

65.    On August 21, 2020, the CDPHE issued Public Health Order 20-28, which established a phased reopening plan for regions of the state but maintained closures or restrictions of many businesses. Restaurants and bars were permitted to reopen subject to CDPHE guidance, which required six-feet spacing of tables, limited table sizes to eight diners, and capacity limited to 50% of normal capacity.

66.    On October 27, 2020, the CDPHE issued Public Health Order 20-35, which maintained restrictions on restaurants and bars, including six-feet spacing of tables, limited table sizes to ten diners, and capacity limited to 50% of normal capacity, as well as restricting other businesses.

67.     On March 23, 2021, the CDPHE issued Public Health Order 20-36, which maintained restrictions on restaurants and bars, including six-feet spacing of tables and limited table sizes to ten diners, as well as restricting other businesses.

**The Illinois Closure Orders**

68.     Authorities in Illinois have issued several Closure Orders with a variety of restrictions impacting the business activities of Plaintiffs within their jurisdiction, including the following:

69.     Effective March 16, 2020, Illinois Governor JB Pritzker issued Executive Order 2020-07 (COVID-19 Executive Order No. 5), which closed restaurants and bars for onsite consumption, and which closed or restricted other businesses.

70.     On March 20, 2020, Governor Pritzker issued Executive Order 2020-10 (COVID-19 Executive Order No. 8), which kept restaurants and bars closed for onsite consumption, and which continued the closure or restriction of other businesses.

71.     On April 1, 2020, Governor Pritzker issued Executive Order 2020-18 (COVID-19 Executive Order No. 16), which kept restaurants and bars closed for onsite consumption, and which continued the closure or restriction of other businesses.

72.     On April 30, 2020, Governor Pritzker issued Executive Order 2020-32 (COVID-19 Executive Order No. 30), which kept restaurants and bars closed for onsite consumption, and which continued the closure or restriction of other businesses.

73.     On May 29, 2020, Governor Pritzker issued Executive Order 2020-38 (COVID-19 Executive No. 36), which kept restaurants and bars closed for indoor onsite consumption, permitted outdoor onsite consumption with COVID-19 protocols, and continued the closure or restriction of other businesses.

74.     One June 26, 2020, Governor Pritzker issued Executive Order 2020-43 (COVID-19 Executive Order No. 41), which established a phased reopening plan for regions of the state. Restaurants and bars were permitted to reopen subject to Department of Commerce and Economic Opportunity ("DCEO") guidance, which required six-feet spacing of tables, limited table sizes to ten diners, and capacity-limited standing areas to 25% of normal capacity.

**The Indiana Closure Orders**

75.     Authorities in Indiana have issued several Closure Orders with a variety of restrictions impacting the business activities of Plaintiffs within their jurisdiction, including the following:

76.     Effective March 16, 2020, Indiana Governor Eric J. Holcomb issued Executive Order 20-04, which closed restaurants and bars for onsite consumption, and which closed or restricted other businesses.

77.     On March 31, 2020, Governor Holcomb issued Executive Order 20-14, which kept restaurants and bars closed for onsite consumption, and which continued the closure or restriction of other businesses. The Executive Order also clarified that the ban on onsite consumption extends to patios, other outdoor seating, and parking lots.

78.     On April 6, 2020, Governor Holcomb issued Executive Order 20-18, which kept restaurants and bars closed for onsite consumption, and which continued the closure or restriction of other businesses.

79.     On April 20, 2020, Governor Holcomb issued Executive Order 20-22, which kept restaurants and bars closed for onsite consumption, and which continued the closure or restriction of other businesses.

80.     On May 1, 2020, Governor Holcomb issued Executive Order 20-26, which established staged reopening of businesses. Restaurants were capacity-limited to 50% of seating

capacity; table sizes were limited to six diners; salad bars and other self-service food or beverage stations were prohibited; bar areas were kept closed; live music was banned; and other COVID-19 protocols were required. Bars were kept closed for onsite consumption.

**The Iowa Closure Orders**

81.     Authorities in Iowa have issued several Closure Orders with a variety of restrictions impacting the business activities of Plaintiffs within their jurisdiction, including the following:

82.     Effective March 17, 2020, Iowa Governor Kimberly K. Reynolds issued a Proclamation of Disaster Emergency ("Proclamation"), which closed restaurants and bars for onsite consumption, and which closed or restricted other businesses.

83.     On March 26, 2020, Governor Reynolds issued a Proclamation that kept restaurants and bars closed for onsite consumption, and which continued the closure or restriction of other businesses.

84.     On April 2, 2020, Governor Reynolds issued a Proclamation that kept restaurants and bars closed for onsite consumption, and which continued the closure or restriction of other businesses.

85.     On April 27, 2020, Governor Reynolds issued a Proclamation that began to reopen some businesses and establishments subject to COVID-19 protocols, in counties with relatively smaller population sizes, but not including, for example, Black Hawk, Johnson, Linn, Polk, Scott, or Woodbury Counties. In counties where restaurants were permitted to reopen for onsite consumption, restaurants were capacity-limited for indoor and outdoor spaces to 50% of normal operating capacity; table sizes were limited to six diners; buffets, salad bars and other self-service food or beverage stations were prohibited; and other COVID-19 protocols were required. Bars were kept closed for onsite consumption statewide.

86.     On May 13, 2020, Governor Reynolds issued a Proclamation that began to reopen some businesses statewide subject to COVID-19 protocols. Restaurants not already allowed to do so were permitted to reopen for onsite consumption; restaurants were capacity-limited for indoor and outdoor spaces to 50% of normal operating capacity; table sizes were limited to six diners; buffets, salad bars and other self-service food or beverage stations were prohibited; and other COVID-19 protocols were required. Bars were kept closed for onsite consumption statewide.

**The Minnesota Closure Orders**

87.     Authorities in Minnesota have issued several Closure orders with a variety of restrictions impacting the business activities of Plaintiffs within their jurisdiction, including:

88.     Effective March 17, 2020, Minnesota Governor Tim Walz issued Emergency Executive Order 20-04, which closed restaurants and bars for onsite consumption, and which closed or restricted other businesses.

89.     On March 25, 2020, Governor Walz issued Emergency Executive Order 20-18, which kept restaurants and bars closed for onsite consumption, and which continued the closure or restriction of other businesses.

90.     On April 8, 2020, Governor Walz issued Emergency Executive Order 20-33, which kept restaurants and bars closed for onsite consumption, and which continued the closure or restriction of other businesses.

91.     On April 30, 2020, Governor Walz issued Emergency Executive Order 20-48, which kept restaurants and bars closed for onsite consumption, and which continued the closure or restriction of other businesses.

92.     On May 13, 2020, Governor Walz issued Emergency Executive Order No. 20-56, which kept restaurants and bars closed for onsite consumption, and which continued the closure or restriction of other businesses. Emergency Executive Order No. 20-56 also directed the

Commissioners of Health, Employment and Economic Development, and Labor and Industry to develop a phased plan to reopen bars, restaurants, and other businesses.

93.     On May 27, 2020, Governor Walz issued Emergency Executive Order No. 20-63, which kept restaurants and bars closed for indoor onsite consumption, and permitted outdoor onsite consumption with COVID-19 protocols.

94.     On June 5, 2020, Governor Walz issued Emergency Executive Order No. 20-74, which allowed restaurants and bars to resume capacity-limited indoor dining, with COVID-19 protocols. Emergency Executive Order No. 20-74 closed 50% of the capacity of a restaurant or bar, and capped occupancy in a single self-contained space at 250 people. Emergency Executive Order No. 20-74 also required six-feet spacing between outdoor tables, and capped outdoor occupancy at 250 people.

### The Nashville and Tennessee Closure Orders

95.     Authorities in Tennessee have issued several Closure Orders with a variety of restrictions impacting the business activities of Plaintiffs within their jurisdiction, including the following:

96.     Effective March 20, 2002, the Nashville Metro Public Health Department issued Amended and Restated Order 1, which closed restaurants from onsite consumption, and which closed all bars.

97.     Effective March 23, 2020, Tennessee Governor Bill Lee issued Executive Order No. 17, which closed restaurants and bars for onsite consumption, and which closed or restricted other businesses. Executive Order 17 found that "restaurants have been uniquely damaged by the COVID-19 outbreak."

98. On March 30, 2020, Governor Lee issued Executive Order No. 21, which kept restaurants and bars closed for onsite consumption, and which continued the closure or restriction of other businesses.

99. On April 13, 2020, Governor Lee issued Executive Order No. 27, which kept restaurants and bars closed for onsite consumption, and which continued the closure or restriction of other businesses.

100. On April 24, 2020, Governor Lee issued Executive Order No. 29, which kept limited service restaurants (*i.e.*, establishments where revenue from the sale of prepared food is 50% or less of total revenue) and bars closed for onsite consumption. Other restaurants were allowed to reopen, subject to COVID-19 measures. Restaurants subject to the jurisdiction of the Nashville Metro Public Health Department remained closed for onsite consumption.

**The Wisconsin Closure Orders**

101. Authorities in Wisconsin have issued several Closure Orders with a variety of restrictions impacting the business activities of Plaintiffs within their jurisdiction, including the following:

102. On March 17, 2020, Wisconsin Governor Tony Evers issued Emergency Order 5, which closed restaurants and restaurants for onsite consumption, and which closed or restricted other businesses.

103. On March 20, 2020, Governor Evers issued Emergency Order 8, which kept restaurants and bars closed for onsite consumption, and which continued the closure or restriction of other businesses.

104. On March 24, 2020, Governor Evers issued Emergency Order 12, which kept restaurants and bars closed for onsite consumption, and which continued the closure or restriction of other businesses.

105.    On April 16, 2020, Governor Evers issued Emergency Order 28, which kept restaurants and bars closed for onsite consumption, and which continued the closure or restriction of other businesses.

**Closure Order Modifications**

106.    The Closure Orders confirmed the presence of COVID-19 in Illinois, Indiana, Iowa, Minnesota, Tennessee, and Wisconsin, and were issued due to the presence of COVID-19. As Closure Orders were issued, Plaintiffs closed, closed for onsite consumption, closed for indoor consumption, operated in capacity-limited configurations, operated with six-feet spacing requirements, and otherwise experienced business interruption as a result of COVID-19 and the Closure Orders.

107.    Civil authorities have modified the Closure Orders after the time periods discussed above, *e.g.*, by reopening businesses in phases, reclosing businesses, lifting and reimposing capacity limits, and mandating early closing times. All Plaintiffs have been impacted by these Closure Orders, many for more than a year, with the prospect for ongoing impact. Plaintiffs are still operating under significant restrictions, including restrictions on indoor seated dining, limiting seating capacity levels and requiring physical distancing between patrons.

**D.    The Impact of COVID-19 and the Closure Orders on Plaintiffs' Business Operations**

108.    Plaintiffs' businesses rely on the ability to serve customers indoors. Regardless of whether they operate restaurants, bars, cafes, theaters, or other businesses, Plaintiffs are patronized or their ability to provide services indoors in a communal space.

109.    Plaintiffs have complied with all applicable orders of state and local authorities. Compliance with those orders and the presence of the virus in the community has caused direct physical loss of Plaintiffs' insured property, in that the businesses and their real property, floorspace, indoor environment, equipment, furnishings, and other business personal property have

24

been made unavailable, inoperable, useless, and/or uninhabitable; and the functionality of the property has been severely reduced when not completely or nearly eliminated. These physical losses have resulted in corresponding losses of business income.

110.    Since March 2020, Plaintiffs have adapted to conform to the restrictions set forth in the Closure Orders and compensate for their physical loss of property as follows:

a.    Significant Changes to Business Model: Plaintiffs have sold meal kits and groceries; created to-go menus, which are simpler, smaller versions of their regular menus; added delivery service options and joined several online platforms to try to build as much to-go business as possible. Plaintiffs have also purchased all of the additional supplies necessary to make to-go orders safely transportable and appealing including plastic and foil containers in many sizes, souffle cups, bags, and disposable utensils.

b.    Physical Alterations to Insured Premises: Plaintiffs have changed the layout of their dining rooms, bars, reception areas, and outdoor spaces; removed furniture and spaced tables to distance diners; installed sanitizing stations; installed signage throughout the restaurants to advise patrons to wear masks when using the restrooms and observe distancing requirements.

c.    Supplies Needed for Safe In-person Dining: Plaintiffs have purchased many supplies in large quantities to comply with governmental orders: disposable gloves and face masks for staff; infrared thermometers to scan employees upon arrival to work; printed, disposable menus; bags for silverware; more expensive and powerful sanitizers; masks for patrons who do not bring their own.

111.    The presence of COVID-19 and the Closure Orders referenced in Paragraphs 62 to 107, above, caused "direct physical loss of or damage to" each "Covered Property" under the Plaintiffs' policies, and the other Class members' policies, by denying use of and damaging the

Covered Property, and by causing a necessary suspension of operations during a period of restoration.

112.    As a result of the presence of COVID-19 and the Closure Orders, Plaintiffs and the other Class members lost Business Income and incurred Extra Expense.

**E.    Society's Response to the Pandemic and Denial of Requests for Insurance Benefits**

113.    On March 16, 2020, before many of the Plaintiffs had noticed their claims, Rick Parks, Society's CEO, circulated a memorandum to its "agency partners," acknowledging that states, such as Illinois, had "taken steps to limit operations of certain businesses," but prospectively concluding that Society's policies would likely not provide coverage for losses due to a "governmental imposed shutdown due to COVID-19 (coronavirus)." A copy of that memorandum is attached here as Exhibit A.

114.    On information and belief, Society went on, in the following weeks and months, to deny every claim for business income losses connected to coronavirus and government Closure Orders.

115.    To the extent Society has provided any reason to policyholders for its categorical assertion that such losses are not covered, it appears to be based on the assertion that the "actual or alleged presence of the coronavirus," which prevented policyholders from engaging in ordinary business operations, does not constitute "direct physical loss." *See* March 23 Letter attached here as Exhibit B.

116.    Society's conclusory statement that the actual or alleged presence of a substance like COVID-19 does not result in "direct physical" is contrary to the law. For example, Illinois courts have consistently held that the presence of a dangerous substance in a property constitutes "physical loss or damage." *See, e.g., Bd. of Educ. of Twp. High Sch. Dist. No. 211 v. Int'l Ins. Co.*, 720 N.E.2d 622, 625–26 (Ill. Ct. App. 1999), as modified on denial of reh'g (Dec. 3, 1999).

117. If Society had wanted to exclude pandemic-related losses under Plaintiffs' policies—as some insurers have attempted to do in other policies—it easily could have done so with a clear exclusion. Instead, Society waited until after it collected Plaintiffs' premiums, and after a pandemic and the resulting Business Interruption Orders caused catastrophic business losses to Plaintiffs, to limit its exposure by imposing an erroneous interpretation of its policies on policyholders: that the presence of the coronavirus is not "physical loss" and, therefore, is not a covered cause of loss under its policies.

118. The fact that the insurance industry has created specific exclusions for virus-related losses under similar commercial property policies undermines Society's assertion that the presence of a virus, like the coronavirus, does not cause "physical loss or damage" to property. If a virus could never result in a "physical loss" to property, there would be no need for such an exclusion.[2]

119. Without any actual policy language to rely upon, Society's CEO, Rick Parks, sent a memo to all Society policyholders entitled, "A Message From our CEO on Pandemic Crisis." A copy of that memo, dated March 27, 2020 is attached here as Exhibit C. In the memo, Parks knowingly misrepresented the coverages available under Society policies by citing pandemic event exclusions *that do not exist in Society's policies*. As Parks put it: "Insurance has always identified and excluded coverage for loss events that are so large, or are so unpredictable, that they outstrip the capacity of the industry to fund losses, or even price the exposure accurately. Exclusion for acts of war, nuclear incidents and flood are part of insurance policies for these reasons. ***These are***

---

[2] Whether these purported "virus exclusions" were legitimately promulgated and can properly be interpreted to deny coverage for pandemics and related public health countermeasures is a contested issue in numerous courts at this time.

*the same reasons that coverages for pandemic events are excluded.*" (emphasis added). But there are no such exclusions for pandemic events in Society's policies.

120.    Upon information and belief, Society sent this memo in furtherance of a corporate strategy designed to intentionally mislead Society's policyholders about the relevant coverage terms in their policies and discourage policyholders from filing claims for losses arising from COVID-19 business interruption orders.

121.    Moreover, some Plaintiffs had claims submitted by Society's insurance agents— who were not working on behalf of Plaintiffs—without Plaintiffs' knowledge or consent, simply so that Society could issue prospective denials.

122.    Each of the named Plaintiffs filed a timely notice of loss and received a cursory denial letter that reflected no investigation of the insured's facts or claims.

123.    Parks' March 27, 2020 memo also made clear that Society was not making coverage determinations based on the facts of the claim and the language of the policies that Society issued, but, rather, based upon the financial impact that the pandemic would have upon the insurance industry if Society covered losses as required by the language of its own policies. Park asserted in his memo: "The insurance industry combined does not have enough assets to fund these losses and still be able to meet past and future obligations." This assertion ignores the fact that Society has reported to the Wisconsin Insurance Commissioner that it maintains substantial reinsurance to protect itself against the paying large numbers of claims in any particular year.

124.    Notwithstanding its strong financial position and its access to global reinsurance markets and other sources of capital, in multiple communications with Society policyholders, Society has stated that instead of providing coverage in accordance with the terms of the policies it issued, it thinks that a "government bailout" should occur to assist Society's policyholders.

Simply put, Society has put its own financial interests ahead of the interests of its policyholders (and taxpayers).

125.    Accordingly, Society's wholesale, cursory coverage denials are arbitrary and unreasonable, and inconsistent with the facts and plain language of the policies it issued. These denials appear to be driven by Society's desire to limit its own financial exposure to the economic fallout resulting from the COVID-19 crisis, rather than to initiate, as Society is obligated to do, a full and fair investigation of the claims and a careful review of the policies they sold to Plaintiffs in exchange for valuable premiums, and to pay valid claims that are owed under the Policies.

## VI.    CLASS ACTION ALLEGATIONS

126.    The Class Plaintiffs bring the Class Claims (as defined herein) pursuant to Rules 23(a), 23(b)(1), 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure, individually and on behalf of all others similarly situated.[3]

127.    Herein, the "Illinois Class Plaintiffs" are Valley Lodge, Bag Tavern, Crosstown, and The Barn.

128.    Herein, the "Indiana Class Plaintiffs" are Ambrosia and Tolon.

129.    Herein, the "Iowa Class Plaintiffs" are Kalmes Club 528 and Micky's Irish Pub.

130.    Herein, the "Minnesota Class Plaintiffs" are Willy McCoys Alberville, Willy McCoys Andover, Willy McCoys Chaska, Willy McCoys Shakopee, and Willy McCoys Ramsey.

131.    Herein, the "Tennessee Class Plaintiffs" are Green Hills Grille, Mere Bulles, and Sunda Nashville.

132.    Herein, the "Wisconsin Class Plaintiffs" are Madison Sourdough, Reefpoint Brew House, and MJ Stevens.

---

[3] The Class Plaintiffs exclude the Individual Plaintiffs.

133. All Class Plaintiffs seek to represent a nationwide class defined as:

All persons and entities that: (a) had Business Income coverage under a property insurance policy issued by Society; (b) suffered a suspension of business related to COVID-19, at the premises covered by their Society property insurance policy; and (c) were denied Business Income coverage by Society for the suspension of business resulting from the presence or threat of COVID-19 (the "Nationwide Business Income Breach Class").

134. The Illinois Class Plaintiffs seek to represent an Illinois statewide class defined as:

All persons and entities that: (a) had Business Income coverage under a property insurance policy issued by Society in Illinois; (b) suffered a suspension of business related to COVID-19, at the premises covered by their Society property insurance policy; and (c) were denied Business Income coverage by Society for the suspension of business resulting from the presence or threat of COVID-19 (the "Illinois Business Income Breach Class").

135. The Indiana Class Plaintiffs seek to represent an Indiana statewide class defined as:

All persons and entities that: (a) had Business Income coverage under a property insurance policy issued by Society in Indiana; (b) suffered a suspension of business related to COVID-19, at the premises covered by their Society property insurance policy; and (c) were denied Business Income coverage by Society for the suspension of business resulting from the presence or threat of COVID-19 (the "Indiana Business Income Breach Class").

136. The Iowa Class Plaintiffs seek to represent an Iowa statewide class defined as:

All persons and entities that: (a) had Business Income coverage under a property insurance policy issued by Society in Iowa; (b) suffered a suspension of business related to COVID-19, at the premises covered by their Society property insurance policy; and (c) were denied Business Income coverage by Society for the suspension of business resulting from the presence or threat of COVID-19 (the "Iowa Business Income Breach Class").

137. The Minnesota Class Plaintiffs seek to represent a Minnesota statewide class defined as:

All persons and entities that: (a) had Business Income coverage under a property insurance policy issued by Society in Minnesota; (b) suffered a suspension of business related to COVID-19, at the premises covered by their Society property insurance policy; and (c) were denied Business Income coverage by Society for the suspension of business resulting from the presence or threat of COVID-19 (the "Minnesota Business Income Breach Class").

138.    The Tennessee Class Plaintiffs seek to represent a Tennessee statewide class defined as:

> All persons and entities that: (a) had Business Income coverage under a property insurance policy issued by Society in Tennessee; (b) suffered a suspension of business related to COVID-19, at the premises covered by their Society property insurance policy; and (c) were denied Business Income coverage by Society for the suspension of business resulting from the presence or threat of COVID-19 (the "Tennessee Business Income Breach Class").

139.    The Wisconsin Class Plaintiffs seek to represent a Wisconsin statewide class defined as:

> All persons and entities that: (a) had Business Income coverage under a property insurance policy issued by Society in Wisconsin; (b) suffered a suspension of business related to COVID-19, at the premises covered by their Society property insurance policy; and (c) were denied Business Income coverage by Society for the suspension of business resulting from the presence or threat of COVID-19 (the "Wisconsin Business Income Breach Class").

140.    All Class Plaintiffs seek to represent a nationwide class defined as:

> All persons and entities that: (a) had Extra Expense coverage under a property insurance policy issued by Society; (b) sought to minimize the suspension of business in connection with COVID-19 at the premises covered by their Society property insurance policy; and (c) were denied Extra Expense coverage by Society despite their efforts to minimize the suspension of business caused by COVID-19 (the "Nationwide Extra Expense Breach Class").

141.    The Illinois Class Plaintiffs seek to represent an Illinois statewide class defined as:

> All persons and entities that: (a) had Extra Expense coverage under a property insurance policy issued by Society in Illinois; (b) sought to minimize the suspension of business in connection with COVID-19 at the premises covered by their Society property insurance policy; and (c) were denied Extra Expense coverage by Society despite their efforts to minimize the suspension of business caused by COVID-19 (the "Illinois Extra Expense Breach Class").

142.    The Indiana Class Plaintiffs seek to represent an Indiana statewide class defined as:

> All persons and entities that: (a) had Extra Expense coverage under a property insurance policy issued by Society in Indiana; (b) sought to minimize the suspension of business in connection with COVID-19 at the premises covered by their Society property insurance policy; and (c) were denied Extra Expense coverage by Society despite their efforts to minimize the suspension of business caused by COVID-19 (the "Indiana Extra Expense Breach Class").

31

143.    The Iowa Class Plaintiffs seek to represent an Iowa statewide class defined as:

All persons and entities that: (a) had Extra Expense coverage under a property insurance policy issued by Society in Iowa; (b) sought to minimize the suspension of business in connection with COVID-19 at the premises covered by their Society property insurance policy; and (c) were denied Extra Expense coverage by Society despite their efforts to minimize the suspension of business caused by COVID-19 (the "Iowa Extra Expense Breach Class").

144.    The Minnesota Class Plaintiffs seek to represent a Minnesota statewide class defined as:

All persons and entities that: (a) had Extra Expense coverage under a property insurance policy issued by Society in Minnesota; (b) sought to minimize the suspension of business in connection with COVID-19 at the premises covered by their Society property insurance policy; and (c) were denied Extra Expense coverage by Society despite their efforts to minimize the suspension of business caused by COVID-19 (the "Minnesota Extra Expense Breach Class").

145.    The Tennessee Class Plaintiffs seek to represent a Tennessee statewide class defined as:

All persons and entities that: (a) had Extra Expense coverage under a property insurance policy issued by Society in Tennessee; (b) sought to minimize the suspension of business in connection with COVID-19 at the premises covered by their Society property insurance policy; and (c) were denied Extra Expense coverage by Society despite their efforts to minimize the suspension of business caused by COVID-19 (the "Tennessee Extra Expense Breach Class").

146.    The Wisconsin Class Plaintiffs seek to represent a Wisconsin statewide class defined as:

All persons and entities that: (a) had Extra Expense coverage under a property insurance policy issued by Society in Wisconsin; (b) sought to minimize the suspension of business in connection with COVID-19 at the premises covered by their Society property insurance policy; and (c) were denied Extra Expense coverage by Society despite their efforts to minimize the suspension of business caused by COVID-19 (the "Wisconsin Extra Expense Breach Class").

147.    All Class Plaintiffs seek to represent a nationwide class defined as:

All persons and entities with Business Income coverage under a property insurance policy issued by Society that suffered a suspension of business due to COVID-19 at the premises covered by the business income coverage (the "Business Income Declaratory Judgment Class").

148.    All Class Plaintiffs seek to represent a nationwide class defined as:

All persons and entities with Extra Expense coverage under a property insurance policy issued by Society that sought to minimize the suspension of business in connection with COVID-19 at the premises covered by their Society property insurance policy (the "Extra Expense Declaratory Judgment Class").

149.    The Illinois Class Plaintiffs seek to represent an Illinois statewide class defined as:

All persons and entities with Business Income or Extra Expense coverage under a property insurance policy issued by Society in Illinois that suffered a bad faith denial of claims or refusal of coverage arising out of suspension of their business due to COVID-19 at the premises covered by their policy (the "Illinois Bad Faith Class").

150.    The Indiana Class Plaintiffs seek to represent an Indiana statewide class defined as:

All persons and entities with Business Income or Extra Expense coverage under a property insurance policy issued by Society in Indiana that suffered a bad faith denial of claims or refusal of coverage arising out of suspension of their business due to COVID-19 at the premises covered by their policy (the "Indiana Bad Faith Class").

151.    The Iowa Class Plaintiffs seek to represent an Iowa statewide class defined as:

All persons and entities with Business Income or Extra Expense coverage under a property insurance policy issued by Society in Iowa that suffered a bad faith denial of claims or refusal of coverage arising out of suspension of their business due to COVID-19 at the premises covered by their policy (the "Iowa Bad Faith Class").

152.    The Minnesota Class Plaintiffs seek to represent a Minnesota statewide class defined as:

All persons and entities with Business Income or Extra Expense coverage under a property insurance policy issued by Society in Minnesota that suffered a bad faith denial of claims or refusal of coverage arising out of suspension of their business due to COVID-19 at the premises covered by their policy (the "Minnesota Bad Faith Class").

153.    The Tennessee Class Plaintiffs seek to represent a Tennessee statewide class defined as:

All persons and entities with Business Income or Extra Expense coverage under a property insurance policy issued by Society in Tennessee that suffered a bad faith denial of claims or refusal of coverage arising out of suspension of their business

due to COVID-19 at the premises covered by their policy (the "Tennessee Bad Faith Class").

154.    The Wisconsin Class Plaintiffs seek to represent a Wisconsin statewide class defined as:

> All persons and entities with Business Income or Extra Expense coverage under a property insurance policy issued by Society in Wisconsin that suffered a bad faith denial of claims or refusal of coverage arising out of suspension of their business due to COVID-19 at the premises covered by their policy (the "Wisconsin Bad Faith Class").

155.    Given Society's public denial and repudiation of its coverage obligations in connection with COVID-19, each of the foregoing classes also include all persons and entities with covered losses who did not a make a claim under their policy.

156.    Excluded from each defined Class is Defendant and any of its members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; governmental entities; the Individual Plaintiffs; and the Court staff assigned to this case and their immediate family members. The Class Plaintiffs reserve the right to modify or amend each of the Class definitions, as appropriate, during the course of this litigation.

157.    The Class Plaintiffs' claims in this action have been brought and may properly be maintained on behalf of each Class proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

158.    **Numerosity—Federal Rule of Civil Procedure 23(a)(1) (on behalf of Class Plaintiffs only)**. The members of each defined Class are so numerous that individual joinder of all Class members is impracticable. While Plaintiffs are informed and believe that there are thousands of members of each Class, the precise number of Class members is unknown to Plaintiffs but may be ascertained from Defendant's books and records. Class members may be notified of the

pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, internet postings, and/or published notice.

159. **Commonality and Predominance—Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3) (on behalf of Class Plaintiffs only)**. The Class Plaintiffs' claims involve common questions of law and fact, which predominate over any questions affecting only individual Class members, including, without limitation:

a. Society issued all-risk policies to the members of the Class in exchange for payment of premiums by Class Plaintiffs and the other Class members;

b. whether the Class suffered a covered loss based on the common policies issued to Class Plaintiffs and the other Class members;

c. whether Society wrongfully denied all claims based on COVID-19;

d. whether Society's Business Income coverage applies to a suspension of business caused by COVID-19;

e. whether Society's Civil Authority coverage applies to a loss of Business Income caused by the orders of state governors requiring the suspension of business as a result of COVID-19;

f. whether the Class suffered compensable Extra Expense Loss in their effort to minimize Business Income Loss caused by COVID-19;

g. whether Society's Contamination coverage applies to a loss of Business Income and Extra Expense as a result of COVID-19;

h. whether Society's Sue and Labor provision applies to require Society to pay for efforts to reduce damage caused by COVID-19;

i.  whether Society has breached its contracts of insurance through a blanket denial of all claims based on business interruption, income loss or closures related to COVID-19 and the related closures; and

j.  whether Class Plaintiffs and the other Class members are entitled to an award of reasonable attorney fees, interest, and costs.

160.  **Typicality—Federal Rule of Civil Procedure 23(a)(3) (on behalf of Class Plaintiffs only)**. Class Plaintiffs' claims are typical of the other Class members' claims because Plaintiffs and the other Class members are all similarly affected by Defendant's refusal to pay under its Business Income, Civil Authority Contamination, Extra Expense, and Sue and Labor coverages. Class Plaintiffs' claims are based upon the same legal theories as those of the other Class members. Class Plaintiffs and the other Class members sustained damages as a direct and proximate result of the same wrongful practices in which Defendant engaged.

161.  **Adequacy of Representation—Federal Rule of Civil Procedure 23(a)(4) (on behalf of Class Plaintiffs only)**. Class Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other Class members who they seek to represent, Class Plaintiffs have retained counsel competent and experienced in complex class action litigation, including successfully litigating class action cases similar to this one, where insurers breached contracts with insureds by failing to pay the amounts owed under their policies, and Class Plaintiffs intend to prosecute this action vigorously. The interests of the above-defined Classes will be fairly and adequately protected by Plaintiffs and their counsel.

162.  **Inconsistent or Varying Adjudications and the Risk of Impediments to Other Class Members' Interests—Federal Rule of Civil Procedure 23(b)(1) (on behalf of Class Plaintiffs only)**. Class Plaintiffs seek class-wide adjudication as to the interpretation, and resultant scope, of Defendant's Business Income, Civil Authority, Contamination, Extra Expense, and Sue

and Labor coverages. Class Plaintiffs maintain that the prosecution of separate actions by individual members of the Classes would create an immediate risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for the Defendant. Moreover, the adjudications sought by Class Plaintiffs could, as a practical matter, substantially impair or impede the ability of other Class members, who are not parties to this action, to protect their interests.

163.    **Declaratory and Injunctive Relief—Federal Rule of Civil Procedure 23(b)(2) (on behalf of Class Plaintiffs only)**. Defendant acted or refused to act on grounds generally applicable to Plaintiffs and the other Class members, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class members.

164.    **Superiority—Federal Rule of Civil Procedure 23(b)(3) (on behalf of Class Plaintiffs only)**. Class Plaintiffs maintain that a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VII.    CLASS CLAIMS FOR RELIEF

### COUNT I
### BREACH OF CONTRACT -- BUSINESS INCOME COVERAGE
**(Asserted by the Nationwide and State Business Income Breach Classes)**

165.    Plaintiffs repeat and reallege Paragraphs 1-164 as if fully set forth herein.

166.    Class Plaintiffs bring this Count individually and on behalf of the other members of the Nationwide and State Business Income Breach Classes.

167.    Plaintiffs' Society policies, as well as those of the other Class members, are contracts under which Society was paid premiums in exchange for its promise to pay Plaintiffs' and the other Class members' losses for claims covered by the policy.

168.    In the Special Property Coverage Form, Society agreed to pay for its insureds' actual loss of Business Income sustained due to the necessary suspension of its operations during the "period of restoration."

169.    A "partial slowdown or complete cessation" of business activities at the Covered Property is a "suspension" under the policy, for which Society agreed to pay for loss of Business Income during the "period of restoration" "that occurs within 12 consecutive months after the date of direct physical loss or damage."

170.    "Business Income" means net income (or loss) before tax that Plaintiffs and the other Class members would have earned "if no physical loss or damage had occurred."

171.    COVID-19 caused direct physical loss and damage to Plaintiffs' and the other Class members' Covered Properties, requiring suspension of operations at the Covered Properties. Losses caused by COVID-19 thus triggered the Business Income provision of Plaintiffs' and the other Class members' Society policies.

172.    Plaintiffs and the other Class members have complied with all applicable provisions of their policies and/or those provisions have been waived by Society or Society is estopped from asserting them, and yet Society has abrogated its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms.

173.    By denying coverage for any Business Income losses incurred by Plaintiffs and the other Class members in connection with the COVID-19 pandemic, Society has breached its coverage obligations under the Policies.

174.    As a result of Society's breaches of the Policies, Plaintiffs and the other Class members have sustained substantial damages for which Society is liable, in an amount to be established at trial.

**COUNT II**
**BREACH OF CONTRACT – EXTRA EXPENSE COVERAGE**
**(Asserted by the Nationwide and State Extra Expense Breach Classes)**

175.    Plaintiffs repeat and reallege Paragraphs 1-164 as if fully set forth herein.

176.    Class Plaintiffs bring this Count individually and on behalf of the other members of the Nationwide and State Extra Expense Breach Classes.

177.    Plaintiffs' Society policies, as well as those of the other Class members, are contracts under which Society was paid premiums in exchange for its promise to pay Plaintiffs' and the other Class members' losses for claims covered by the policy.

178.    In the Special Property Coverage Form, Society agreed to pay necessary Extra Expense that its insureds incur during the "period of restoration" that the insureds would not have incurred if there had been no direct physical loss or damage to the Covered Property.

179.    "Extra Expense" means expenses "to avoid or minimize the suspension of business and to continue 'operations,'" and also includes expenses "to repair or replace property."

180.    Due to COVID-19 and the Closure Orders, Plaintiffs and the other members of the Class incurred Extra Expense at Covered Property

181.    Plaintiffs and the other members of the Class have complied with all applicable provisions of the Policies and/or those provisions have been waived by Society or Society is estopped from asserting them, and yet Society has abrogated its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms.

182. By denying coverage for any business losses incurred by Plaintiffs and the other members of the Class in connection with the Closure Orders and the COVID-19 pandemic, Society has breached its coverage obligations under the Policies.

183. As a result of Society's breaches of the Policies, Plaintiffs and the other members of the Class have sustained substantial damages for which Society is liable, in an amount to be established at trial.

**COUNT III**
**DECLARATORY JUDGMENT – BUSINESS INCOME COVERAGE**
**(Asserted by the Business Income Declaratory Judgment Class)**

184. Class Plaintiffs repeat and reallege Paragraphs 1-164 as if fully set forth herein.

185. Class Plaintiffs bring this Count individually and on behalf of the other members of the Business Income Declaratory Judgment Class.

186. Plaintiffs' Society policies, as well as those of the other Class members, are contracts under which Society was paid premiums in exchange for its promise to pay Plaintiffs' and the other Class members' losses for claims covered by the Policy.

187. Plaintiffs and the other Class members have complied with all applicable provisions of the Policies and/or those provisions have been waived by Society or Society is estopped from asserting them, and yet Society has abrogated its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms and has wrongfully and illegally refused to provide coverage to which Plaintiffs are entitled.

188. Society has denied claims related to COVID-19 on a uniform and class wide basis, without individual bases or investigations, such that the Court can render declaratory judgment irrespective of whether members of the Class have filed a claim.

189. An actual case or controversy exists regarding Plaintiffs' and the other Class members' rights and Society's obligations under the Policies to reimburse Plaintiffs for the full

40

amount of Business Income losses incurred by Plaintiffs and the other Class members in connection with suspension of their businesses stemming from the COVID-19 pandemic.

190.    Pursuant to 28 U.S.C. § 2201, Plaintiffs and the other Business Income Declaratory Judgment Class members seek a declaratory judgment from this Court declaring the following:

    i.    Class Plaintiffs' and the other Business Income Declaratory Judgment Class members' losses incurred in connection with the novel coronavirus, the Closure Orders, and the necessary interruption of their businesses stemming from the COVID-19 pandemic are insured losses under the Policies;

    ii.    Society has waived any right it may have had to assert defenses to coverage or otherwise seek to bar or limit coverage for Class Plaintiffs' and the other Business Income Declaratory Judgment Class members' losses by issuing blanket coverage denials without conducting a claim investigation as required by law; and

    iii.    Society is obligated to pay Class Plaintiffs and the other Business Income Declaratory Judgment Class members for the full amount of the losses incurred and to be incurred in connection with the covered business losses related to the Closure Orders during both the four-week indemnity period and the necessary interruption of their businesses stemming from the COVID-19 pandemic.

**COUNT IV**
**DECLARATORY JUDGMENT – EXTRA EXPENSE COVERAGE**
**(Asserted by the Extra Expense Declaratory Judgment Class)**

191.    Plaintiffs repeat and reallege Paragraphs 1-164 as if fully set forth herein.

192.    Class Plaintiffs bring this Count individually and on behalf of the other members of the Extra Expense Declaratory Judgment Class.

193.    Plaintiffs' Society policies, as well as those of the other Class members, are contracts under which Society was paid premiums in exchange for its promise to pay Plaintiffs' and the other Class members' losses for claims covered by the Policy.

194.    Plaintiffs and the other Class members have complied with all applicable provisions of the Policies and/or those provisions have been waived by Society or Society is estopped from asserting them, and yet Society has abrogated its insurance coverage obligations pursuant to the

Policies' clear and unambiguous terms and has wrongfully and illegally refused to provide coverage to which Plaintiffs are entitled.

195. Society has denied claims related to COVID-19 on a uniform and class wide basis, without individual bases or investigations, such that the Court can render declaratory judgment irrespective of whether members of the Class have filed a claim.

196. An actual case or controversy exists regarding Plaintiffs' and the other Class members' rights and Society's obligations under the Policies to reimburse Plaintiffs and the other Class members for the full amount of Extra Expense losses incurred by Plaintiffs in connection with Closure Orders and the necessary interruption of their businesses stemming from the COVID-19 pandemic.

197. Pursuant to 28 U.S.C. § 2201, Plaintiffs and the other Extra Expense Declaratory Judgment Class members seek a declaratory judgment from this Court declaring the following:

    i.   Plaintiffs' and the other Extra Expense Declaratory Judgment Class members' Extra Expense losses incurred in connection with the Closure Orders and the necessary interruption of their businesses stemming from the COVID-19 pandemic are insured losses under their Policies; and

    ii.  Society is obligated to pay Plaintiffs and the other Extra Expense Declaratory Judgment Class members for the full amount of the Extra Expense losses incurred and to be incurred in connection with the covered losses related to the Closure Orders during the period of restoration and the necessary interruption of their businesses stemming from the COVID-19 pandemic.

## COUNT V
## BAD FAITH DENIAL OF INSURANCE COVERAGE
### (Asserted by the Illinois Bad Faith Class)

198. The Illinois Class Plaintiffs repeat and reallege Paragraphs 1-164 as if fully set forth herein.

199. The Illinois Class Plaintiffs bring this Count individually and on behalf of the other members of the Illinois Bad Faith Class.

200.     Society adopted a corporate policy of immediately denying the claims (either verbally or through cursory emails or form letters) or publicly repudiating its obligation to provide coverage, without conducting any investigation, let alone a reasonable investigation based on all available information as required under the laws of the State of Illinois.

201.     To discourage policyholders from even submitting claims, Society, through its Chief Executive Officer Rick Parks, misled policyholders by citing a pandemic exclusion that does not exist in Society's policies, when he sent a March 27, 2020 memo to all Society policyholders, including all Illinois policyholders. In doing so, Society knowingly misrepresented to its insurers relevant facts or policy provisions contained in policies they issued, in violating of the laws of the State of Illinois.

202.     Further, based on information and belief, Society directed its insurance agents to make sham claim notifications before Society's policyholders even noticed their claims. Society took these actions, before claims were even submitted, as part of its plan to discourage claim notifications and to avoid any responsibility for its policyholders' staggering losses.

203.     Society's blanket denials of the Illinois Class Plaintiffs' and the other Illinois Bad Faith Class members' claims were vexatious and unreasonable. In most cases, Society offered no reason for its denials and failed to raise any bona fide disputes as to the whether the claims were covered by the Policies.

204.     Society's denials of claims by the Illinois Class Plaintiffs and the other Illinois Bad Faith Class members constitute "improper claim practices under Illinois law"—namely, Society's (1) refusals to pay Plaintiffs' claims without conducting reasonable investigations based on all available information and (2) failure to provide reasonable and accurate explanations of the bases in its denials. *See* 215 ILCS 5/154.6 (h), (n).

<u>COUNT VI</u>
<u>BAD FAITH REFUSAL TO HONOR CLAIM - INDIANA</u>
**(Asserted by the Indiana Bad Faith Class)**

205.    The Indiana Class Plaintiffs repeat and reallege Paragraphs 1-164 as if fully set forth herein.

206.    The Indiana Class Plaintiffs bring this Count individually and on behalf of the other members of the Indiana Bad Faith Class.

207.    The Indiana Class Plaintiffs and the other Indiana Bad Faith Class members contracted with Society to provide them with comprehensive business insurance to insure against all risks (unless specifically excluded) a business might face.

208.    These comprehensive business insurance policies include provisions that provide coverage for the direct physical loss of or damage to the premises as well as actual loss of business income and extra expenses sustained during the suspension of operations as a result of such loss or damage.

209.    The Indiana Class Plaintiffs and the other Indiana Bad Faith Class members reported a loss of business property and business income under their respective business insurance policies and tendered claims for insurance coverage or were discouraged by Society's repudiation of its coverage obligation from doing so.

210.    Society acted in bad faith when, with the knowledge specified in paragraph 211 below, it:

      a.  decided, on a blanket basis, that it would not pay any business interruption claims arising from or associated with coronavirus;

      b.  failed to conduct a fair, unbiased, and thorough investigation of or inquiry into the Indiana Class Plaintiffs' and the other Indiana Bad Faith Class members' claims;

    c.   advised the Indiana Class Plaintiffs and the other Indiana Bad Faith Class members that a business closure pursuant to a government order was not a direct physical loss under their policies and that the presence (actual or alleged) of coronavirus on insured premises was not a covered cause of loss without qualifying those statements in any respect, including, but not limited to, stating that Society was interpreting undefined contract terms in making these determinations.

    d.   failed to articulate a reasonable basis for denial of the claims presented by the Indiana Class Plaintiffs and the other Indiana Bad Faith Class members.

211.    As its actions show, Defendant knew of its lack of a reasonable basis for denying claims for coverage submitted by the Indiana Class Plaintiffs and the other Indiana Bad Faith Class members or repudiating its obligation to cover such claims.

212.    Accordingly, the Indiana Class Plaintiffs and the other Indiana Bad Faith Class members have been injured as a result of Defendant's bad faith conduct and are entitled to damages, and all other allowable damages, including attorney's fees in an amount to be proven at trial.

**COUNT VII**
**BAD FAITH REFUSAL TO HONOR CLAIMS – IOWA**
**(Asserted by the Iowa Bad Faith Class)**

213.    The Iowa Class Plaintiffs repeat and reallege Paragraphs 1-164 as if fully set forth herein.

214.    The Iowa Class Plaintiffs bring this Count individually and on behalf of the other members of the Iowa Bad Faith Class.

215. The Iowa Class Plaintiffs and the other Iowa Bad Faith Class members contracted with Defendant to provide them with comprehensive business insurance to ensure against all risks (unless specifically excluded) that a business might face.

216. These comprehensive business insurance policies include provisions that provide coverage for the direct physical loss of or damage to the premises, as well as actual loss of business income and extra expenses sustained during the suspension of operations as a result of such loss or damage.

217. The Iowa Class Plaintiffs and the other Iowa Bad Faith Class members reported a loss of business property and business income under their respective business insurance policies and tendered claims for insurance coverage or were discouraged by Society's repudiation of its coverage obligation from doing so.

218. Society acted in bad faith when, with the knowledge specified in paragraph 219 below, it:

    a.  decided, on a blanket basis, that it would not pay any business interruption claims arising from or associated with coronavirus;

    b.  failed to conduct a fair, unbiased, and thorough investigation of or inquiry into the Iowa Class Plaintiffs' and the other Iowa Bad Faith Class members' claims;

    c.  advised the Iowa Class Plaintiffs and the other Iowa Bad Faith Class members that a business closure pursuant to a government order was not a direct physical loss under their policies and that the presence (actual or alleged) of coronavirus on insured premises was not a covered cause of loss without qualifying those statements in any respect, including, but not limited to,

stating that Society was interpreting undefined contract terms in making these determinations.

    d. failed to articulate a reasonable basis for denial of the claims presented by the Iowa Class Plaintiffs and the other Iowa Bad Faith Class members.

219. As its actions show, Defendant knew of its lack of a reasonable basis for denying claims for coverage submitted by the Iowa Class Plaintiffs and the other Iowa Bad Faith Class members or repudiating its obligation to cover such claims.

220. Accordingly, the Iowa Class Plaintiffs and the other Iowa Bad Faith Class members have been injured as a result of Defendant's bad faith conduct and are entitled to damages, and all other allowable damages, including attorney's fees in an amount to be proven at trial.

**COUNT VIII**
**STATUTORY BAD FAITH – MINN. STAT. § 604.18**
**(Asserted by the Minnesota Bad Faith Class)**

221. The Minnesota Class Plaintiffs repeat and reallege Paragraphs 1-164 as if fully set forth herein.

222. The Minnesota Class Plaintiffs bring this Count individually and on behalf of the other members of the Minnesota Bad Faith Class.

223. The Minnesota Class Plaintiffs and the other Minnesota Bad Faith Class members have tendered claims to Society, in this action or otherwise, formally demanding Business Interruption Coverage and Extra Expense Coverage for covered business-interruption losses they have incurred. Under the policy's terms, the Minnesota Class Plaintiffs' and the other Minnesota Bad Faith Class members' claims were due and payable.

224. Despite receiving notice of the Minnesota Class Plaintiffs' and the other Minnesota Bad Faith Class members' claims, Society failed to complete a reasonable investigation into the merits or the claims and instead, concocted and implemented a uniform practice of issuing blanket

denials of coverage without conducting any investigation—much less a reasonable investigation—and providing its insureds with boilerplate denials that reflected Society's failure to account for the specific facts and losses presented by each Minnesota Class Plaintiff and each of the other Minnesota Bad Faith Class members.

225.    Society's denials of coverage to the Minnesota Class Plaintiffs and the other Minnesota Bad Faith Class members were arbitrary, unreasonable, and failed to reasonably construe the insurance policy and consider the facts of each claim.

226.    Society knew that it lacked a reasonable basis for denying insurance benefits to the Minnesota Class Plaintiffs and the other Minnesota Bad Faith Class members and/or acted in reckless disregard of the lack of reasonable basis for denying the benefits.

227.    Society's denial of the Minnesota Class Plaintiffs' and the other Minnesota Bad Faith Class members' claims and its failure and/or refusal to pay benefits owed under their policies was done in bad faith, vexatiously, and without reasonable cause.

228.    Society's refusal to pay the Minnesota Class Plaintiffs' and the other Minnesota Bad Faith Class members' claims has inflicted additional expense, loss, or injury on the Minnesota Class Plaintiffs and the other Minnesota Bad Faith Class members, including attorney's fees to bring suit to obtain and enforce coverage.

229.    The Minnesota Class Plaintiffs and the other Minnesota Bad Faith Class members are entitled to prejudgment and post judgment interest, all costs and disbursements allowed under the law, as well as all penalties, taxable costs, and attorney's fees provided by Minn. Stat. § 604.18, subd. 3.

**COUNT IX**
**PUNITIVE DAMAGES – WITH RESPECT TO BREACH OF CONTRACT**
**(Asserted by the Tennessee Bad Faith Class)**

230.    The Tennessee Class Plaintiffs repeat and reallege Paragraphs 1-164 as if fully set forth herein.

231.    The Tennessee Class Plaintiffs bring this Count individually and on behalf of the other members of the Tennessee Bad Faith Class.

232.    Society's breach of contract has been intentional, fraudulent, malicious, or reckless, justifying an award of punitive damages.

**COUNT X**
**STATUTORY BAD FAITH – T.C.A. § 56-7-105**
**(Asserted by the Tennessee Bad Faith Class)**

233.    The Tennessee Class Plaintiffs repeat and reallege Paragraphs 1-164 as if fully set forth herein.

234.    The Tennessee Class Plaintiffs bring this Count individually and on behalf of the other members of the Tennessee Bad Faith Class.

235.    The Tennessee Class Plaintiffs and the other Tennessee Bad Faith Class members have tendered claims to Society, by originally filing a class action, more than 60 days ago, formally demanding Business Interruption Coverage for covered, business interruption losses that they have incurred. Under the policy's terms, their claims were due and payable. Society, acting in bad faith, vexatiously, and without reasonable cause, refused to pay those claims.

236.    Society's refusal to pay has inflicted additional expense, loss, or injury on the Tennessee Class Plaintiffs and the other Tennessee Bad Faith Class members, including attorney's fees to bring suit to obtain and enforce coverage.

237.    The Tennessee Class Plaintiffs and the other Tennessee Bad Faith Class members are entitled to all damages provided by T.C.A. § 56-7-105(b).

### COUNT XI
### BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
#### (Asserted by the Wisconsin Bad Faith Class)

238.    The Wisconsin Class Plaintiffs repeat and reallege Paragraphs 1-164 as if fully set forth herein.

239.    The Wisconsin Class Plaintiffs bring this Count individually and on behalf of the other members of the Wisconsin Bad Faith Class.

240.    The Wisconsin Class Plaintiffs and the other Wisconsin Bad Faith Class members contracted with Defendant to provide them with comprehensive business insurance to ensure against all risks (unless specifically excluded) a business might face.

241.    An implied duty of good faith and fair dealing is an element in every Wisconsin contract between insurance companies and their insureds.

242.    Society's contracts are subject to the implied covenants of good faith and fair dealing that all parties would act in good faith and with reasonable efforts in performing their contractual duties and not to impair the rights of other parties to receive the rights, benefits, and reasonable expectations under the contracts. These included the implied covenants that Defendant would act fairly and in good faith in carrying out their contractual obligations to provide the Wisconsin Class Plaintiffs and the other Wisconsin Bad Faith Class members with comprehensive business insurance.

243.    Defendant breached the implied covenant of good faith and fair dealing by:

    a.    Selling policies that appear to provide liberal coverage for loss of property and lost business income with the intent of interpreting undefined or poorly defined terms, undefined terms, and ambiguously written exclusions to deny coverage under circumstances foreseen by Defendant;

  b. Denying coverage for loss of property and lost business income unreasonably, and without a rational basis in their policy and applicable law, by applying undefined, ambiguous, and contradictory terms contrary to applicable rules of policy construction and the plain terms and purpose of the policies;

  c. Denying the Wisconsin Class Plaintiffs' and the other Wisconsin Bad Faith Class members' claims for loss of property and loss of business income without conducting a fair, unbiased and thorough investigation or inquiry;

  d. Compelling policyholders, including the Wisconsin Class Plaintiffs and the other Wisconsin Bad Faith Class members, to initiate litigation to secure the policy benefits to which they are entitled.

244. The Wisconsin Class Plaintiffs and the other Wisconsin Bad Faith Class members met all or substantially all of their contractual obligations, including by paying all the premiums required by Defendant.

245. Defendant's failure to act in good faith in providing comprehensive business insurance coverage to the Wisconsin Class Plaintiffs and the other Wisconsin Bad Faith Class members denied them the full benefit of their bargain.

246. Accordingly, the Wisconsin Class Plaintiffs and the other Wisconsin Bad Faith Class members have been injured as a result of Defendant's breach of the covenant of good faith and fair dealing and are entitled to damages in an amount to be proven at trial.

## COUNT XII
## BAD FAITH REFUSAL TO HONOR CLAIM
### (Asserted by the Wisconsin Bad Faith Class)

247. The Wisconsin Class Plaintiffs repeat and reallege Paragraphs 1-164 as if fully set forth herein.

248.    The Wisconsin Class Plaintiffs bring this Count individually and on behalf of the other members of the Wisconsin Bad Faith Class.

249.    The Wisconsin Class Plaintiffs and the other Wisconsin Bad Faith Class members contracted with Defendant to provide them with comprehensive business insurance to ensure against all risks (unless specifically excluded) a business might face.

250.    These comprehensive business insurance policies include provisions that provide coverage for the direct physical loss of or damage to the premises as well as actual loss of business income and extra expenses sustained during the suspension of operations as a result of such loss or damage.

251.    Governmental entities at the state and local level of Wisconsin have ordered a series of Public Health Orders, mandating that Wisconsinites refrain from mass gatherings and places various restrictions on restaurants, cafes, bars, and other food service outlets. These restrictions have ranged from a total prohibition on seated dining to limitations on the number of persons and the arrangement of people and furniture permitted in dining areas at any given time to maintain adequate space between patrons.

252.    As a direct result of these mandates and due to the persistent presence and prevalence of coronavirus in the community, the Wisconsin Class Plaintiffs and the other Wisconsin Bad Faith Class members have suffered direct physical loss of their insured property within the meaning of Society's policy resulting in substantial loss of business income.

253.    The Wisconsin Class Plaintiffs and the other Wisconsin Bad Faith Class members reported a loss of business property and business income under their respective business insurance policies.

254.    Defendant denied the Wisconsin Class Plaintiffs' and the other Wisconsin Bad Faith Class members' claims for insurance coverage.

255.    Society acted in bad faith when it:

    a.   failed to conduct a fair, unbiased, and thorough investigation of or inquiry into the Wisconsin Class Plaintiffs' and the other Wisconsin Bad Faith Class members' claims;

    b.   advised the Wisconsin Class Plaintiffs and the other Wisconsin Bad Faith Class members that a business closure pursuant to a government order was not a direct physical loss under their policies and that the presence (actual or alleged) of coronavirus on insured premises was not a covered cause of loss without qualifying those statements in any respect, including, but not limited to, stating that Society was interpreting undefined contract terms in making these determinations.

    c.   failed to articulate a reasonable basis for denial of the claims presented by the Wisconsin Class Plaintiffs and the other Wisconsin Bad Faith Class members.

256.    Defendant knew of or recklessly disregarded the lack of a reasonable basis for denying claims for coverage submitted by the Wisconsin Class Plaintiffs and the other Wisconsin Bad Faith Class members.

257.    Accordingly, the Wisconsin Class Plaintiffs and the other Wisconsin Bad Faith Class members have been injured as a result of Defendant's bad faith conduct and are entitled to damages, punitive damages, and attorneys' fees in an amount to be proven at trial.

## VIII.    <u>REQUEST FOR RELIEF</u>

WHEREFORE, Class Plaintiffs, individually and on behalf of the other Class members, respectfully request that the Court enter judgment in their favor and against Defendant as follows:

    a.   Entering an order certifying the proposed nationwide and state Classes, as requested herein, designating Class Plaintiffs as Class representatives, and appointing Plaintiffs' undersigned

Plaintiffs' MDL Co-Lead Counsel and Counsel for the Class Plaintiffs and the Proposed Classes as Class Counsel;

b.      Entering judgment on Counts I-II in favor of Class Plaintiffs and the other members of the nationwide and state Business Income Breach Classes and Extra Expense Breach Classes; and awarding damages for breach of contract in an amount to be determined at trial;

c.      Entering declaratory judgments on Counts III-IV in favor of Class Plaintiffs and the other members of the Business Income Declaratory Judgment Class and Extra Expense Declaratory Judgment Class as follows:

i.    Business Income and Extra Expense incurred in connection with the novel coronavirus, the Closure Orders, and the necessary interruption of their businesses stemming from the COVID-19 pandemic are insured losses under their Policies;

ii.   Society has waived any right it may have had to assert defenses to coverage or otherwise seek to bar or limit coverage for Individual Plaintiffs' losses by issuing blanket coverage denials without conducting a claim investigation as required by law; andand

iii.  Society is obligated to pay for the full amount of the Business Income and Extra Expense losses and costs incurred and to be incurred related to the novel coronavirus, the Closure Orders, and the necessary interruption of their businesses stemming from the COVID-19 pandemic;

d.      Entering judgment on Counts V-XII in favor of Class Plaintiffs and the other members of the state Bad Faith Classes in an amount equal to the maximum damages allowable for bad faith denial of insurance coverage in the jurisdictions in which each of the Class Plaintiffs respectively operates, which amount(s) shall be established at the conclusion of this action.

e.      Ordering Defendant to pay both pre- and post-judgment interest on any amounts awarded;

f.      Ordering Defendant to pay attorneys' fees and costs of suit; and

g.      Ordering such other and further relief as may be just and proper.

## IX.    JURY DEMAND

Class Plaintiffs hereby demand a trial by jury on all claims so triable.

*** *** ***

## X.  CLASS CLAIMS PRESERVED FOR PURPOSES OF APPEAL

## FACTUAL ALLEGATIONS – COUNTS XIII TO XVIII

258.   Class Plaintiffs operate restaurants and other businesses in Illinois, Indiana, Iowa, Minnesota, Tennessee, and Wisconsin. To protect their businesses in the event that they suddenly had to suspend operations for reasons outside of their control, or in order to prevent further property damage, Plaintiffs purchased insurance coverage from Society, including Special Property Coverage, as set forth in Society's Businessowner's Special Property Coverage Form.

259.   Society's Special Property Coverage Form provides business interruption coverage, including Civil Authority, Contamination, and Sue and Labor coverages, described below.

260.   Class Plaintiffs were forced to suspend or reduce operations at their businesses due to COVID-19 and the resultant Closure Orders issued by civil authorities with jurisdiction over their businesses, mandating at times since March 2020, among other measures, closures, elimination of services, restricted hours, and capacity limits. Plaintiffs were also forced to take necessary steps to prevent further damage and minimize the suspension of business and continue operations.

261.   Class Plaintiffs have performed all of their obligations under each of their policies. The Covered Property, with respect to the policies, is the real and personal property of the business premises of each respective Plaintiff.

262.   Each Plaintiff's Special Property Coverage Form, included within the policies, includes identical Civil Authority, Contamination, and Sue and Labor coverages.

263.     In many parts of the world, property insurance is sold on a specific peril basis. Such policies cover a risk of loss if that risk of loss is specifically listed (*e.g.*, hurricane, earthquake, H1N1, etc.). Most property policies sold in the United States, however, including those sold by Society, are all-risk property damage policies. These types of policies cover all risks of loss except for risks that are expressly and specifically excluded. In the Special Property Coverage Form provided to Plaintiffs under the heading "Covered Causes of Loss," Society agreed to "pay for direct physical loss or damage to Covered Property" "unless the loss is excluded or limited by" the Special Property Coverage Form.

264.     In the Special Property Coverage Form, Society did not exclude or limit coverage for losses from viruses.

265.     Losses due to COVID-19 are a Covered Cause of Loss under the Society policies with the Special Property Coverage Form.

266.     The presence of virus or disease can constitute physical damage to property, as the insurance industry has recognized since at least 2006. When preparing so-called "virus" exclusions to be placed in some policies, but not others, the insurance industry drafting arm, ISO, circulated a statement to state insurance regulators that included the following:

> Disease-causing agents may render a product impure (change its quality or substance), or enable the spread of disease by their presence on interior building surfaces or the surfaces of personal property. When disease-causing viral or bacterial contamination occurs, potential claims involve the cost of replacement of property (for example, the milk), cost of decontamination (for example, interior building surfaces), and business interruption (time element) losses. .. Although building and personal property could arguably become contaminated (often temporarily) by such viruses and bacteria, the nature of the property itself would have a bearing on whether there is actual property damage. An allegation of property damage may be a point of disagreement in a particular case.

267.     Society also agreed to "pay for the actual loss of Business Income" that Plaintiffs sustain "and any Extra Expense caused by action of civil authority that prohibits access to" the

Covered Property when a Covered Cause of Loss causes damage to property other than the Covered Property and the civil authority prohibits access to the property and its surrounding area and takes such action "in response to dangerous physical conditions."

268.    Society's Special Property Coverage Form provides "Contamination" coverage that pays for the actual loss of Business Income and Extra Expense caused by "'Contamination' that results in an action by a public health or other governmental authority that prohibits access to the described premises or production of your product." The Special Property Coverage Form broadly defines a covered loss due to "Contamination" as occurring in a variety of circumstances, including the following: (a) "Contamination" that results in an action by a public health or other governmental authority that prohibits access to the described premises or production of your product; (b) a "Contamination threat", or (c) "publicity" resulting from the discovery or suspicion of "Contamination." The Special Property Coverage Form defines "Contamination" as "a defect, deficiency, inadequacy or dangerous condition in your products, merchandise or premises."

269.    Society's Special Property Coverage Form, under a section entitled "Duties in the Event of Loss or Damage" mandates that Society's insured "must see that the following are done in the event of loss or damage to Covered Property . . . [t]ake all reasonable steps to protect the Covered Property from further damage and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim." This type of coverage has historically been known as "Sue and Labor" coverage or a "Sue and Labor" provision, and property policies have long provided coverage for these types of expenses.

270.    Indeed, the presence of COVID-19 has caused civil authorities throughout the country to issue orders requiring the suspension of business at a wide range of establishments, including civil authorities with jurisdiction over Plaintiffs' businesses.

271. The presence of COVID-19 caused "direct physical loss of or damage to" each "Covered Property" under the Plaintiffs' policies by denying use of and damaging the Covered Property, and by causing a necessary suspension of operations during a period of restoration.

272. The Closure Orders prohibited access to Plaintiffs' Covered Property, and the area immediately surrounding Covered Property, in response to dangerous physical conditions resulting from a Covered Cause of Loss.

273. Losses caused by COVID-19 and the related Closure Orders caused Plaintiffs to incur Business Income and Extra Expense losses, and triggered the Civil Authority, Contamination, and Sue and Labor provisions of the Society policy.

274. Society has denied Plaintiffs' claims for coverage.

## CLAIMS FOR RELIEF – COUNTS XIII TO XVIII

### COUNT XIII
### BREACH OF CONTRACT – CIVIL AUTHORITY COVERAGE
**(Asserted by All Class Plaintiffs)**

275. Plaintiffs repeat and reallege Paragraphs 1 to 164 and 258 to 274 as if fully set forth herein.

276. Plaintiffs' Society policies are contracts under which Society was paid premiums in exchange for its promise to pay Plaintiffs' losses for Civil Authority coverage claims covered by the policy.

277. Society promised to "pay for the actual loss of Business Income" sustained "and any Extra Expense caused by action of civil authority that prohibit access to" the Covered Property when a Covered Cause of Loss causes damage to property other than the Covered Property and the civil authority takes its action "in response to dangerous physical conditions."

278. The Closure Orders issued in Illinois, Indiana, Iowa, Tennessee, Wisconsin, and other states triggered the Civil Authority provision under Plaintiffs' Society policies. COVID-19

caused direct physical loss or damage to property near the Covered Property in the same manner described above that it caused direct physical loss or damage to the Covered Property. The civil authority orders were actions taken in response to the dangerous physical conditions resulting from the direct physical loss or damage to such properties. And, the civil authority orders prohibited access to an immediately surrounding area that included the Covered Property.

279.    Plaintiffs have complied with all applicable provisions of the Policies and/or those provisions have been waived by Society or Society is estopped from asserting them, and yet Society has abrogated its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms and has wrongfully and illegally refused to provide coverage to which Plaintiffs are entitled.

280.    By denying coverage for any business losses incurred by Plaintiffs in connection with the Closure Orders and the COVID-19 pandemic, Society has breached its coverage obligations under the Policies.

281.    As a result of Society's breaches of the Policies, Plaintiffs have sustained substantial damages for which Society is liable, in an amount to be established at trial.

## COUNT XIV
## BREACH OF CONTRACT – CONTAMINATION COVERAGE
### (Asserted by All Class Plaintiffs)

282.    Plaintiffs repeat and reallege Paragraphs 1 to 164 and 258 to 274 as if fully set forth herein.

283.    Plaintiffs' Society policies are contracts under which Society was paid premiums in exchange for its promise to pay Plaintiffs' losses for Contamination coverage claims covered by the policy.

284. Society promised to "pay for the actual loss of Business Income and Extra Expense caused by 'Contamination' that results in an action by a public health or other governmental authority that prohibits access to the described premises or production of your product."

285. Society specifically defines "Contamination" as "a defect, deficiency, inadequacy or dangerous condition in your products, merchandise or premises."

286. The Special Property Coverage Form also provides a broad definition for determining when a covered loss due to "Contamination" occurs, including the following: (a) "Contamination" that results in an action by a public health or other governmental authority that prohibits access to the described premises or production of your product; (b) a "Contamination threat", or (c) "publicity" resulting from the discovery or suspicion of "Contamination."

287. COVID-19 constitutes Contamination that resulted in the Closure Orders that prohibits access to the described premises or the production of product.

288. Plaintiffs have complied with all applicable provisions of the Policies and/or those provisions have been waived by Society or Society is estopped from asserting them, and yet Society has abrogated its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms and has wrongfully and illegally refused to provide coverage to which Plaintiffs are entitled.

289. By denying coverage for any business losses incurred by Plaintiffs in connection with the Closure Orders and the COVID-19 pandemic, Society has breached its coverage obligations under the Policies.

290. As a result of Society's breaches of the Policies, Plaintiffs have sustained substantial damages for which Society is liable, in an amount to be established at trial.

## COUNT XV
## BREACH OF CONTRACT – SUE AND LABOR COVERAGE
### (Asserted by All Class Plaintiffs)

291.    Plaintiffs repeat and reallege Paragraphs 1 to 164 and 258 to 274 as if fully set forth herein.

292.    Plaintiffs' Society policies are contracts under which Society was paid premiums in exchange for its promise to pay Plaintiffs' losses for Sue and Labor coverage claims covered by the policy.

293.    In the Special Property Coverage Form, Society agreed to give due consideration in settlement of a claim to expenses incurred in taking all reasonable steps to protect Covered Property from further damage.

294.    In complying with the Closure Orders and otherwise suspending or limiting operations, Plaintiffs incurred expenses in connection with reasonable steps to protect Covered Property.

295.    Plaintiffs have complied with all applicable provisions of the Policies and/or those provisions have been waived by Society or Society is estopped from asserting them, and yet Society has abrogated its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms and has wrongfully and illegally refused to provide coverage to which Plaintiffs are entitled.

296.    By denying coverage for any Sue and Labor expenses incurred by Plaintiffs in connection with the Closure Orders and the COVID-19 pandemic, Society has breached its coverage obligations under the Policies.

297.    As a result of Society's breaches of the Policies, Plaintiffs sustained substantial damages for which Society is liable, in an amount to be established at trial.

**COUNT XVI**
**DECLARATORY JUDGMENT – CIVIL AUTHORITY COVERAGE**
**(Asserted by All Class Plaintiffs)**

298.    Plaintiffs repeat and reallege Paragraphs 1 to 164 and 258 to 274 as if fully set forth herein.

299.    Plaintiffs' Society policies are contracts under which Society was paid premiums in exchange for its promise to pay Plaintiffs' losses for Civil Authority coverage claims covered by the policy.

300.    Plaintiffs have complied with all applicable provisions of the Policies and/or those provisions have been waived by Society or Society is estopped from asserting them, and yet Society has abrogated its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms and has wrongfully and illegally refused to provide coverage to which Plaintiffs are entitled.

301.    Society has denied claims related to COVID-19 on a uniform basis, without individual bases or investigations.

302.    An actual case or controversy exists regarding Plaintiffs' rights and Society's obligations under the Policies to reimburse Plaintiffs for the full amount of covered Civil Authority losses incurred by Plaintiffs in connection with Closure Orders and the necessary interruption of their businesses stemming from the COVID-19 pandemic.

303.    Pursuant to 28 U.S.C. § 2201, Plaintiffs seek a declaratory judgment from this Court declaring the following:

      i.    Plaintiffs' Civil Authority losses incurred in connection with the Closure Orders and the necessary interruption of their businesses stemming from the COVID-19 pandemic are insured losses under their Policies; and

     ii.    Society is obligated to pay Plaintiffs the full amount of the Civil Authority losses incurred and to be incurred in connection with the covered losses related

to the Closure Orders and the necessary interruption of their businesses stemming from the COVID-19 pandemic.

## COUNT XVII
## DECLARATORY JUDGMENT – CONTAMINATION COVERAGE
### (Asserted by All Class Plaintiffs)

304.    Plaintiffs repeat and reallege Paragraphs 1 to 164 and 258 to 274 as if fully set forth herein.

305.    Plaintiffs' Society policies are contracts under which Society was paid premiums in exchange for its promise to pay Plaintiffs' losses for Contamination coverage claims covered by the policy.

306.    Plaintiffs have complied with all applicable provisions of the Policies and/or those provisions have been waived by Society or Society is estopped from asserting them, and yet Society has abrogated its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms and has wrongfully and illegally refused to provide coverage to which Plaintiffs are entitled.

307.    Society has denied claims related to COVID-19 on a uniform basis, without individual bases or investigations.

308.    An actual case or controversy exists regarding Plaintiffs' rights and Society's obligations under the Policies to reimburse Plaintiffs for the full amount of covered Contamination losses incurred by Plaintiffs in connection with Closure Orders and the necessary interruption of their businesses stemming from the COVID-19 pandemic.

309.    Pursuant to 28 U.S.C. § 2201, Plaintiffs seek a declaratory judgment from this Court declaring the following:

i.    Plaintiffs' covered Contamination losses incurred in connection with the Closure Orders and the necessary interruption of their businesses stemming from the COVID-19 pandemic are insured losses under their Policies; and

      ii.    Society is obligated to pay Plaintiffs the full amount of the covered Contamination losses incurred and to be incurred in connection with the Closure Orders and the necessary interruption of their businesses stemming from the COVID-19 pandemic.

**COUNT XVIII**
**DECLARATORY JUDGMENT – SUE AND LABOR COVERAGE**
**(Asserted by All Class Plaintiffs)**

310.    Plaintiffs repeat and reallege Paragraphs 1 to 164 and 258 to 274 as if fully set forth herein.

311.    Plaintiffs' Society policies are contracts under which Society was paid premiums in exchange for its promise to pay Plaintiffs' losses for Sue and Labor coverage claims covered by the policy.

312.    Plaintiffs have complied with all applicable provisions of the Policies and/or those provisions have been waived by Society or Society is estopped from asserting them, and yet Society has abrogated its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms and has wrongfully and illegally refused to provide coverage to which Plaintiffs are entitled.

313.    Society has denied claims related to COVID-19 on a uniform basis, without individual bases or investigations.

314.    An actual case or controversy exists regarding Plaintiffs' rights and Society's obligations under the Policies to reimburse Plaintiffs for the full amount Plaintiffs reasonably incurred to protect Covered Property from further damage by COVID-19.

315.    Pursuant to 28 U.S.C. § 2201, Plaintiffs seek a declaratory judgment from this Court declaring the following:

      i.    Plaintiffs' reasonably incurred expenses to protect Covered Property from further damage by COVID-19 are insured losses under their Policies; and

64

    ii.    Society is obligated to pay Plaintiffs for the full amount of the expenses they reasonably incurred to protect Covered Property from further damage by COVID-19.

## REQUEST FOR RELIEF – COUNTS XIII TO XVIII

WHEREFORE, Class Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendant as follows:

a.    Entering judgment on Counts XIII to XV in favor of Class Plaintiffs; and awarding damages for breach of contract in an amount to be determined at trial;

b.    Entering declaratory judgments on Counts XVI to XVIII in favor of Class Plaintiffs as follows;

    i.    Civil Authority, Contamination, and Sue and Labor losses incurred in connection with the Closure Orders and the necessary interruption of Class Plaintiffs' businesses stemming from the COVID-19 pandemic are insured losses under their Policies; and

    ii.    Society is obligated to pay for the full amount of the Civil Authority, Contamination, and Sue and Labor losses incurred and to be incurred related to COVID-19, the Closure Orders, and the necessary interruption of Class Plaintiffs' businesses stemming from the COVID-19 pandemic;

c.    Ordering Defendant to pay both pre- and post-judgment interest on any amounts awarded;

d.    Ordering Defendant to pay attorneys' fees and costs of suit; and

e.    Ordering such other and further relief as may be just and proper.

## JURY DEMAND – COUNTS XIII TO XVIII

Class Plaintiffs hereby demand a trial by jury on all claims so triable.

*** *** ***

## XI.    INDIVIDUAL PLAINTIFFS' CLAIMS FOR RELIEF

**COUNT XIX**
**BREACH OF CONTRACT**
**(Asserted by the Individual Plaintiffs)**

316.    Individual Plaintiffs reallege Paragraphs 1 to 125 as if fully set forth herein.

317.    Each policy issued to the Individual Plaintiffs is an insurance contract under which Society was paid premiums in exchange for its promise to pay Individual Plaintiffs' losses for claims covered by the policy, such as business losses incurred as a result of the Illinois Closure Orders interrupting their ordinary business operations and the necessary interruption of their businesses stemming from the COVID-19 pandemic.

318.    Individual Plaintiffs have complied with all applicable provisions of the policies, including payment of the premiums in exchange for coverage under the policies, and yet Society has abrogated its insurance coverage obligations.

319.    By denying coverage for any business income losses incurred by Individual Plaintiffs caused by COVID-19, the Illinois Interruption Orders, and the COVID-19 pandemic, Society has breached its coverage obligations under the policies issued to the Individual Plaintiffs.

320.    As a result of Society's breaches, the Individual Plaintiffs have sustained substantial damages for which Society is liable, in an amount to be established at trial.

**COUNT XX**
**DECLARATORY JUDGMENT**
**(Asserted by the Individual Plaintiffs)**

321.    Individual Plaintiffs reallege Paragraphs 1 to 125 and 316 to 320 as if fully set forth herein.

322.    Each policy issued to Individual Plaintiffs is an insurance contract under which Society Insurance was paid premiums in exchange for its promise to pay Individual Plaintiffs' losses for claims covered by their policy, such as business losses incurred as a result of the Illinois Closure Orders forcing the interruption of their ordinary business operations.

323.    Individual Plaintiffs have complied with all applicable provisions of their policies, including payment of the premiums in exchange for coverage under their policies.

324.    Society has arbitrarily and without justification refused to reimburse Individual Plaintiffs for any losses incurred by Individual Plaintiffs in connection with the covered business losses caused by COVID-19, the Illinois Closure Orders, and the necessary interruption of their businesses stemming from the COVID-19 pandemic.

325.    An actual case or controversy exists regarding Individual Plaintiffs' rights and Society's obligations under their policies to reimburse Individual Plaintiffs for the full amount of losses incurred by Individual Plaintiffs in connection with the Illinois Orders and the necessary interruption of their businesses stemming from the COVID-19 pandemic.

326.    Pursuant to 28 U.S.C. § 2201, Individual Plaintiffs seek a declaratory judgment from this Court declaring the following:

(a) Individual Plaintiffs' losses incurred in connection with the novel coronavirus, the Illinois Closure Orders, and the necessary interruption of their businesses stemming from the COVID-19 pandemic are insured losses under the policies;

(b) Society has waived any right it may have had to assert defenses to coverage or otherwise seek to bar or limit coverage for Individual Plaintiffs' losses by issuing blanket coverage denials without conducting a claim investigation as required under Illinois law; and

(c) Society  is obligated to pay Individual Plaintiffs for the full amount of the losses incurred and to be incurred in connection with the covered business losses related to the Illinois Closure Orders during both the four-week indemnity period and the necessary interruption of their businesses stemming from the COVID-19 pandemic.

## COUNT XXI
## STATUTORY PENALTY FOR BAD FAITH DENIAL OF INSURANCE UNDER 215 ILCS 5/155
### (Asserted by the Individual Plaintiffs)

327.    Individual Plaintiffs reallege Paragraphs 1 to 125 and 316-326 as if fully set forth herein.

328. Upon receipt of the their business interruption claims, Society immediately denied the claims (either verbally or through cursory emails) without conducting any investigation, let alone a "reasonable investigation based on all available information" as required under Illinois law. *See* 215 ILCS 5/154.

329. To discourage policyholders from even filing claims, Society, through its Chief Executive Officer Rick Parks, misled policyholders by citing a pandemic exclusion that does not exist in policies issued by Society Insurance in a March 27, 2020 memo issued to all policyholders, in blatant violation of Illinois law that prohibits insurers from knowingly misrepresenting to their insureds relevant facts or policy provisions contained in policies they issued. *See id*.

330. To make matters worse, based on information and belief, Society directed its insurance agents, who are not Individual Plaintiffs' agents, to make sham claim notifications before Society's policyholders even noticed their claims. Society took these actions, before claims were even submitted, as part of its plan to discourage claim notifications and to avoid any responsibility for its policyholders' staggering losses, in violation of Illinois law.

331. Society's denials were vexatious and unreasonable.

332. Society's denials constitute "improper claims practices" under Illinois law— namely Society's (1) refusals to pay Individual Plaintiffs' claims without conducting reasonable investigations based on all available information and (2) failure to provide reasonable and accurate explanations of the bases in its denials. See 215 ILCS 5/154.6 (h), (n).

333. Society offered no reason for its denials and failed to raise any bona fide disputes as to the whether the claims were covered by the policies.

334. Therefore, pursuant to 215 ILCS 5/155, Individual Plaintiffs request that, in addition to entering a judgment in favor of Individual Plaintiffs and against Society for the amount owed under the policies at the time of judgment, the Court enter a judgment in favor of Individual

Plaintiffs and against Society for an amount equal to the greater of (1) 60% of the amount which the trier of fact finds that Individual Plaintiffs are entitled to recover under the policies, exclusive of costs; and (2) $60,000 per Plaintiff. *See* 215 ILCS 5/155.

335.    Individual Plaintiffs further request that the Court enter a judgment in favor of Individual Plaintiffs and against Society in an amount equal to the attorneys' fees and costs incurred by Plaintiffs for the prosecution of this coverage action against Society, which amount will be proved at or after trial, pursuant to 215 ILCS 5/155.

### REQUEST FOR RELIEF
**(Asserted by the Individual Plaintiffs)**

WHEREFORE, the Individual Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendant as follows:

a.    Entering a declaratory judgment on Count XX of the Complaint in favor of the Individual Plaintiffs and against Society, declaring as follows:

i.   The Individual Plaintiffs' losses incurred in connection with the novel coronavirus, the Business Interruption Orders and the necessary interruption of their businesses stemming from the COVID-19 pandemic are insured losses under the policies;

ii.  Society has waived any right it may have had to assert defenses to coverage or otherwise seek to bar or limit coverage for Class Plaintiffs' and the other Business Income Declaratory Judgment Class members' losses by issuing blanket coverage denials without conducting a claim investigation as required under Illinois law; and

iii. Society Insurance is obligated to pay Individual Plaintiffs for the full amount of the losses incurred and to be incurred in connection with the covered business losses related to the Illinois Closure Orders during the four-week indemnity period and during the necessary interruption of their businesses stemming from the COVID-19 pandemic.

b.    Entering a judgment on Count XIX of the Complaint in favor of Individual Plaintiffs and against Society and award damages for breach of contract in an amount to be proven at trial;

c.     Entering a judgment on Count XXI of the Complaint in favor of Individual Plaintiffs and against Society in the amount equal to amount equal to the greater of (1) 60% of the amount which the trier of fact finds that Individual Plaintiffs are entitled to recover under the policies, exclusive of costs; and (2) $60,000 per Individual Plaintiff;

d.     Entering a judgment in favor of Individual Plaintiffs and against Society in an amount equal to all attorneys' fees and related costs incurred for the prosecution of this coverage action against Society, pursuant to 215 ILCS 5/155, which amount to be established at the conclusion of this action;

e.     Awarding to Individual Plaintiffs and against Society prejudgment interest, to be calculated according to law, to compensate Individual Plaintiffs for the loss of use of funds caused by Society's wrongful refusal to pay Individual Plaintiffs for the full amount in costs incurred in connection with their business interruption claims.

f.     Award Individual Plaintiffs such other, further, and additional relief as this Court deems just and appropriate.

## JURY DEMAND

The Individual Plaintiffs hereby demand trial by jury on all issues so triable.

Dated: April 2, 2021

Respectfully submitted,

/s/ Adam J. Levitt

Adam J. Levitt
**DiCELLO LEVITT GUTZLER LLC**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
Telephone: 312-214-7900
alevitt@dicellolevitt.com

Timothy W. Burns
**BURNS BOWEN BAIR LLP**
One South Pinckney Street, Suite 930
Madison, Wisconsin 53703
Telephone: 608-286-2302
tburns@bbblawllp.com

Shannon M. McNulty
**CLIFFORD LAW OFFICES, P.C.**
120 North LaSalle Street, #3100
Chicago, Illinois 60602
Telephone: 312-899-9090
smm@cliffordlaw.com

W. Mark Lanier
**THE LANIER LAW FIRM PC**
10940 West Sam Houston Parkway North
Suite 100
Houston, Texas 77064
Telephone: 713-659-5200
WML@lanierlawfirm.com

*Plaintiffs' MDL Co-Lead Counsel and*
*Counsel for the Class Plaintiffs and the*
*Proposed Classes*

Shelby S. Guilbert, Jr.
**MCGUIREWOODS LLP**
1230 Peachtree Street, NE, Suite 2100
Atlanta, Georgia 30309
Telephone: 404-443-5723
sguilbert@mcguirewoods.com

*Plaintiffs' MDL Co-Lead Counsel and*
*Counsel for the Individual Plaintiffs*

71

# Exhibit A

**Droese, Brooke**

| | |
|---|---|
| **From:** | Society Insurance <marketing@societyinsurance.com> |
| **Sent:** | Monday, March 16, 2020 5:56 PM |
| **To:** | Droese, Brooke |
| **Subject:** | COVID-19 & Insurance Coverage |

 FROM THE DESK OF *Rick Parks* 

Society agency partners,

On March 5, I provided a message to you outlining a general view of how our policies would likely respond in the event of a wider outbreak of the COVID-19 virus. Given the fact that COVID-19 has reached pandemic status, and some states have taken steps to limit operations of certain businesses, I wanted to follow up with some guidance on questions you may be receiving from your clients.

I'll address both first-party property coverages and third-party liability coverages. As I indicated in my earlier message, while the current circumstances are unlikely to result in facts that support first-party coverage under our policies, or liability to a policyholder, we encourage any policyholder or third-party claimant who wishes to present a claim to do so.

To help facilitate answering coverage questions related to COVID-19, an email address has been established: COVID-19@societyinsurance.com

If a policyholder desires to present a claim for property or liability coverages, they can contact us at our regular claim email address: claims@societyinsurance.com

Workers compensation claims should be sent to our regular claim email address for work comp: wcclaims@societyinsurance.com

We will respond to and address each email as quickly as possible.

This is how various coverages would likely respond to COVID-19 claims:

**FIRST-PARTY CLAIMS**

**Business Income coverage:**
Whether it be a full shutdown of business, a partial suspension of operations or an alteration in business operations that remain open, Business Income coverage must be due to a suspension caused by *direct physical loss of or damage to covered property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss*. **Extra Expense** coverage also requires the same coverage triggers. In general, a quarantine of any size, or brought about by a governmental action without a Covered Cause of Loss, would likely not trigger Business Income or Extra Expense coverages under our policies.

**Civil Authority coverage:**
Civil Authority additional coverage pays for actual loss of Business Income and Extra Expense caused by an action of civil authority that prohibits access to the described premises when *a Covered Cause of Loss*

*causes damage to property other than property at the described premises.* A widespread governmental imposed shutdown due to COVID-19 (coronavirus) would likely not trigger the additional coverage of Civil Authority.

**Contamination coverage:**
This additional coverage for Contamination will pay for costs to clean and sanitize the premise, if the insured's operations are *suspended* due to "contamination." A governmental agency, such as a Health Department, must close a specific business because of the discovery or suspicion of food contamination. Because COVID-19 is spread through human contact and is not seen as a foodborne illness, it would be unlikely to trigger this coverage.

**Product Spoilage coverage:**
Product Spoilage requires a specific and unique Spoilage Covered Cause of Loss. These are a change in temperature or humidity due to a mechanical breakdown or failure of equipment, or contamination by a refrigerant or power outage. Any alleged COVID-19 (coronavirus) exposures or spoilage from the extended shelf life of a product is not a Spoilage Covered Cause of Loss.

**THIRD-PARTY LIABILITY AND WORKERS COMPENSATION**

**Liability Coverages:**
General liability coverage applies to bodily injury caused by an occurrence. COVID-19 illness allegations presented by third-party claimants would be considered on an individual basis. An important element to proving liability would be evidence that an illness occurred due to exposure at a particular business, and that the business was negligent in allowing the exposure. Both of these would be very difficult to prove in a community-spreading viral outbreak. Allegations of bodily injury by third parties should always be referred to us for review, but it's unlikely negligence could be substantiated.

**Workers Compensation:**
The burden to prove that Workers Compensation benefits apply for COVID-19 would be very difficult. Disease claims have specific elements outlined within the Workers Compensation statute necessary to find a claim compensable. These elements would include, but not be limited to, the following, as each state may have additional tests to be met. First a worker must show their job is at a greater risk to exposure than the general public. A worker must also show they contracted COVID-19 while in the course of their employment, and it must arise out of their employment. Both arising-out-of and in-the-course-of tests are required to find compensability. Once again, this is difficult to establish in a community-spreading viral outbreak, but all purported claims should be referred to us for review.

We realize this is a challenging time both for you and our policyholders. While the contact points I mentioned at the beginning of this message should be sufficient for most inquiries, please feel free to reach out to our Vice President-Property, Auto & Liability Claims, Bill Bunzel (bbunzel@societyinsurance.com), or our Vice President-Workers Compensation Claims, Mike Zajicek (mzajicek@societyinsurance.com), with any broader questions or concerns. They stand ready to help.

**Rick Parks**
President & CEO

**Society Insurance | societyinsurance.com**

   

Society Insurance | 150 Camelot Drive, Fond du Lac, WI 54936

Unsubscribe {recipient's email}

Update Profile | About Constant Contact

Sent by marketing@societyinsurance.com

**THIS IS A TEST EMAIL ONLY.**
This email was sent by the author for the sole purpose of testing a draft message. If you believe you have received the message in error, please contact the author by replying to this message. Constant Contact takes reports of abuse very seriously. If you wish to report abuse, please forward this message to abuse@constantcontact.com.

# Exhibit B



March 23, 2020

LEGACY HOSPITALITY LLC DBA THE
VIG
1527 N WELLS ST
CHICAGO IL    60610

| | |
|---|---|
| **Claim Number:** | P4065705 |
| **Insured:** | LEGACY HOSPITALITY LLC DBA THE VIG |
| **Claimant Name:** | LEGACY HOSPITALITY LLC DBA THE VIG |
| **Date of Loss:** | 03/20/2020 |
| **Type of Loss:** | OTHER |
| **Location of Loss:** | 1527 N WELLS ST, CHICAGO, IL 60610 |
| **Policy Number:** | BP18012824 |

Society would like you to know that we appreciate and value you as a customer.   We regret to inform you, however, that Society will have to deny your claim because there is no insurance coverage for this claim under the Society Policy for the reasons discussed below.

**I.      THE CLAIM**

We summarize the facts based upon Society's investigation to-date as well as the materials we have received.  If you have any additional materials or information that you believe is relevant to this claim or that you would like us to consider, please send it for our review.

Within the past few days, local, state and federal governments have requested businesses to shut down to the general public in order to reduce the spread of COVID-19.

**II.      REASONS FOR DISCLAIMER OF COVERAGE**

We have investigated your claim, and after careful review of the claim and the Society Policy we have concluded that there is no coverage for your claim.

**A.      Not a Covered Cause of Loss**

150 Camelot Drive
P.O. Box 1029
Fond du Lac, WI 54936-1029
888-576-2438
societyinsurance.com

March 23, 2020
P4065705
LEGACY HOSPITALITY LLC DBA THE
VIG

The Businessowners Special Property Coverage Form of the Society Policy insures a direct physical loss or damage to Covered Property at the premises caused by or resulting from a Covered Cause of Loss within the policy period.

### Relevant Policy Language, Form TBP2 (05-15)

**A.**     **Coverage**
      **3.**     **Covered Causes of Loss**
           Direct Physical Loss unless the loss is excluded or limited under this coverage form.

A Covered Cause of Loss is a direct physical loss not otherwise excluded or limited by the policy. A slowdown in business due to the public's fear of the coronavirus or a suspension of business because a governmental authority (i.e. the governor or the mayor) has ordered or recommended all or certain types of businesses to close is not a direct physical loss. In addition, the actual or alleged presence of the coronavirus is not a Covered Cause of Loss.

### B.    No Coverage Under Additional Coverage, A.5(k) Civil Authority

The Society Businessowners Special Property Coverage Form includes Civil Authority additional coverage (Section A. 5(k)), which insures only for actual loss of Business Income and Extra Expense caused by an action of civil authority that prohibits access to the described premises when "a Covered Cause of Loss causes damage to property other than property at the described premises."

### Relevant Policy Language, Form TBP2 (05-15)

**A.**     **Coverage**
      **5.**     **Additional Coverages**
         **g.**     **Business Income**
           1.     Business Income
           ***
           (c)    Business Income means the:
              (i)     Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred if no physical loss or damages had occurred, but not including any Net Income that would likely have been earned as a result of an increased in the volume of business due to favorable business conditions caused by the impact of the Covered Cause of Loss on customers or on other businesses; and
              (ii) Continuing necessary operating expenses incurred.
                  ***
         **h.**     **Extra Expense**
      ***
           (2)     Extra Expense means expense incurred:
              (a)     To avoid or minimize the suspension of business and to continue "operations":

March 23, 2020
P4065705
LEGACY HOSPITALITY LLC DBA THE
VIG

        (i)     At the described premises; or

        (ii)    At replacement premises or at temporary locations, including relocation expenses, and costs to equip and operate the replacement or temporary locations.

    (b)    To minimize the suspension of business if you cannot continue "operations"

    (c)    To:

        (i)     Repair or replace any property; or

        (ii)   Research, replace or restore the lost information on damages "valuable papers and records"

(3)    With respect to the coverage provided in this Additional Coverage, suspension means:

    (a)    The partial slowdown or complete cessation of your business activities; or

    (b)    That a part or all of the described premises is rendered untenantable if coverage for Business Income applies

\*\*\*

**k.**    **Civil Authority (7)**

When a **Covered Cause of Loss** causes damage to property other than property at the described premises, we will pay for the actual loss of **Business Income** you sustain and necessary **Extra Expense** caused by action of civil authority that prohibits access to the described premises, provided that both of the following apply:

(1)    Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the described premises are within the area; and

(2)    The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property

Civil authority coverage for Business Income will begin immediately after the time of the first action of civil authority that prohibits access to the described premises and will apply for a **period of up to four consecutive weeks** from the date on which such coverage begins.

\*\*\*

The definitions of Business Income and Extra Expense contained in the Business Income and Extra Expense Additional Coverages also apply to this Civil Authority Additional Coverage.  **The Civil Authority Additional Coverage is not subject to the Limits of Insurance.**

The Civil Authority additional coverage requires that a Covered Cause of Loss cause damage to property <u>other than the property at the described premises</u>, and that access to the area immediately surrounding the damaged property is prohibited by a civil authority.   There is no coverage here because, as detailed above, Coronavirus is not a Covered Cause of Loss, and because a civil authority

March 23, 2020
P4065705
LEGACY HOSPITALITY LLC DBA THE
VIG

has not prohibited access to your business because of a Covered Cause of Loss that caused damage to a premises <u>other than</u> the described premises.

C.    <u>No Coverage Under Additional Coverage, A.5(m) Contamination</u>

Society Businessowners Special Property Coverage Form also includes additional coverage for Contamination (Section A. 5 (m)).

**Relevant Policy Language, Form TBP2 (05-15)**

**A.**    **Coverage**
    **5.**    **Additional Coverages**
        **m.**    **Contamination (8)**

If your "operations" are suspended due to "contamination":

(1)    We will pay for your costs to clean and sanitize your premises, machinery and equipment, and expenses you incur to withdraw or recall products or merchandise from the market. We will not pay for the cost or value of the product.

The most we will pay for any loss or damage under this Additional coverage arising out of the sum of all such expenses occurring during each separate policy period is **$5,000**; and

(2)    We will also pay for the actual loss of **Business Income** and **Extra Expense** you sustain caused by:

(a) "Contamination" that results in an action by a public health or other **governmental authority that prohibits access to the described premises** or production of your product.

* * *

(c) Publicity resulting from the discovery or suspicion of contamination.

Coverage for the actual loss of Business Income under this section will begin immediately upon the suspension of your business operations and will continue for a **period not to exceed a total of three consecutive weeks** after coverage begins.

[….] The definitions of Business Income and Extra Expense, contained in the Business Income and Extra Expense Additional Coverages section shall also apply to the additional coverages under this section.

(4)    Additional Definitions:

(a)    "Contamination" means a defect, deficiency, inadequacy or dangerous conditions in your products, merchandise, or premises.

***

March 23, 2020
P4065705
LEGACY HOSPITALITY LLC DBA THE
VIG

    (d)    "Publicity" means a publication or broadcast by the media, **of the discovery or suspicion of "contamination" at a described premise.**

The Contamination Coverage provides that Society will pay for costs to clean and sanitize the premises, up to $5,000, if the insured's operations are suspended due to "contamination." Contamination is defined as "a defect, deficiency, inadequacy or dangerous conditions in your products, merchandise, or premises." Coverage is provided for loss of business income for a period of up to three consecutive weeks after the suspension of the insured's business operations. The Contamination coverage also covers an actual loss of Business Income and Extra Expense only if caused by (1) "`Contamination' that results in an action by a public health or other governmental authority that prohibits access to the described premises;" or (2) "Publicity resulting from the discovery or suspicion of contamination." "Publicity" is defined as "a publication or broadcast by the media, of the discovery or suspicion of `contamination' at a described premises.

There is no coverage under Section A.5(m) because no government authority has prohibited access to the described premises because of "contamination," as that term has been defined in the policy, and likewise there has been no publication or broadcast by the media of a "contamination" at the described premises. Your business operations have not been suspended, nor has access to your premises been prevented, by a public health authority or other governmental authority because of a "defect, deficiency, in adequacy or dangerous condition" in any of your products, merchandise or premises. In addition, there has been no publication or broadcast by the media of any such "defect, deficiency, in adequacy or dangerous condition" in any of your products, merchandise or premises.

    D.    <u>No Coverage Under the Product Spoilage Endorsement (TBP12)</u>

Product Spoilage is an additional coverage provided by endorsement TBP-12, which requires a specific and unique Spoilage Covered Cause of Loss and is subject to its scheduled limits and deductibles.

**<u>Relevant Policy Language, Form TBP12 (05-15)</u>**

**I.    Spoilage**
    **A.    Coverage**
        1.    We will pay for your loss of "perishable stock" due to spoilage caused by a Spoilage Covered Cause of Loss, as provided by this endorsement.
        2.    Subject to all the provisions and conditions under the Businessowners Special Property Coverage Form, we will also pay for loss of Business Income or Extra Expense at the described premises resulting from loss of "perishable stock" due to spoilage caused by a Spoilage Covered Cause endorsement.

            We cover only the location(s) and limits specified in the Declarations or that is indicated in the Schedule.
        3. If a limit for Spoilage in Vehicles is shown in the Schedule, Spoilage coverage is extended to cover "perishable stock" in your vehicles which you own or operate and are equipped with refrigerating, cooling or humidity control apparatus.
    **B.    Spoilage Covered Causes of Loss**

March 23, 2020
P4065705
LEGACY HOSPITALITY LLC DBA THE
VIG

Subject to the exclusions described in Item **C.** of this section, Spoilage Covered Cause of Loss means the following:

1. Spoilage caused by or resulting from:

    a.    Change in temperature or humidity resulting from mechanical breakdown or mechanical failure of refrigerating, cooling or humidity control apparatus or equipment, only while such apparatus or equipment is at the described location; or

    b.    Contamination by a refrigerant, only while the refrigerating apparatus or equipment is at the described location; or

    c.    Power Outage, meaning change in temperature or humidity at the described location resulting from complete or partial interruption of electrical power, either on or off the described premises, due to conditions beyond your control.

**2.** Spoilage coverage applies to "perishable stock" at the described premises which is:

    a.    Owned by you and used in your business; or

    b.    Owned by others and in your care, custody or control except as otherwise provided in Loss Payment Property Loss Condition **E.5.d.(3)(b).**

Spoilage Covered Cause of Loss is limited to a change in temperature or humidity due to a mechanical breakdown or failure of equipment, or contamination by a refrigerant or power outage. The spoliation coverage applies only to "perishable stock" at the described premises owned by you and used in your business or owned by others and in your care custody and control.

Your claim of alleged COVID-19 (Coronavirus) exposure or spoilage from the inability to use your perishable stock is not a result of change in temperature or humidity due to a mechanical breakdown or failure of equipment, or contamination by a refrigerant or power outage and therefore is not a Spoilage Covered Cause of Loss.

III.    <u>**CONCLUSION**</u>

While Society values you as a customer and understands the difficulty of running a business in these challenging times, Society must deny your claim for the reasons discussed above. As mentioned, if you have any other information that you wish us to consider, please forward it to my attention.

       Please be advised that by its acknowledgment and investigation of the reported loss Society is not waiving any other rights or defenses in connection with this matter. Society reserves the right to supplement and/or amend this letter in the future and to assert any additional defenses, whether specifically enumerated herein, that may be applicable now or in the future.

If you have any questions or concerns, please contact me.

March 23, 2020
P4065705
LEGACY HOSPITALITY LLC DBA THE
VIG

*Christine Frailing*

Christine Frailing
Claims Representative
Phone:  888-576-2438, ext. 5870
Department Fax:  920-922-9810
Email:  cfrailing@societyinsurance.com

cvf


Part 919 of the Rules of the Illinois Department of Insurance requires that our company advise you that, if you wish to take this matter up with the Illinois Department of Insurance, it maintains a Consumer Division in Chicago at 122 S. Michigan Ave., 19th Floor, Chicago, Illinois 60603 and in Springfield at 320 West Washington Street, Springfield, Illinois 62767.

# Exhibit C



**SOCIETY INSURANCE**®

Small details. Big difference."

## A Message From Our CEO on Pandemic Crisis

Our hearts break for the thousands of people who have lost their lives due to coronavirus, the tens of thousands in our country who have fallen ill, and the hundreds of thousands worldwide. It's sobering to know that these numbers will grow exponentially in the coming weeks. It is a human tragedy of almost unimaginable proportions.

The coronavirus pandemic also represents an unprecedented economic catastrophe. It has instantly affected all segments of our economy with some segments, such as hospitality and entertainment, being almost completely shut down. The losses to our country's economy will be in the trillions of dollars.

Insurance has always identified and excluded coverage for loss events that are so large, or are so unpredictable, that they outstrip the capacity of the industry to fund losses, or even price the exposure accurately. Exclusions for acts of war, nuclear incidents and flood are part of insurance policies for these reasons. These are the same reasons that coverages for pandemic events are excluded. The insurance industry combined does not have enough assets to fund these losses and still be able to meet past and future obligations. Only government has the financial power to respond to these types of events.

Society Insurance is advocating in one voice with the insurance industry for the federal government to take decisive and effective action to rescue our economy. Our national insurance company trade association – the American Property Casualty Insurers Association – is working closely with Congress, the White House and the Department of the Treasury to assist in quickly developing these solutions.

This government and insurance partnership approach is not at all unprecedented. The insurance industry has worked with government for decades to provide coverage for flood and to insure our crops. Following the 9/11 attacks, the insurance industry has partnered with the federal government to see that terrorism insurance is available. There is a solution that will help us overcome this pandemic economic crisis, and we will be a part of finding it.

As this work unfolds, our company will support and assist the small businesses we insure with the tools that are available to us. Grace periods for premium payments are being offered. Resources to access government aid or loan programs that are currently available are being shared. Human compassion and empathy are genuinely being offered to policyholders as we connect.

We are all in this together and will find the needed solutions.

*Rick W. Parks*

Rick W. Parks
President & CEO

*March 27, 2020*

150 Camelot Drive
P.O. Box 1029
Fond du Lac, WI 54936-1029
888-576-2438
societyinsurance.com