**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE: SOCIETY INSURANCE CO. | ) | |
| COVID-19 BUSINESS | ) | MDL No. 2964 |
| INTERRUPTION PROTECTION | ) | |
| INSURANCE LITIGATION | ) | Master Docket No. 20 C 5965 |
| | ) | |
| | ) | Judge Edmond E. Chang |
| | ) | |
| | ) | Magistrate Judge Jeffrey I. Cummings |
| This Document Relates to All Cases | ) | |

**MEMORANDUM OPINION AND ORDER**

This Opinion decides two motions: the Plaintiffs' motion to file a Master Con-solidated Amended Complaint, R. 152; and the defense motion to dismiss all claims in the MDL Action premised on the Civil Authority or Contamination provisions of Society Insurance's policies, R. 175.[1] As detailed by the Opinion, the former is granted in part, with modifications and exceptions; the latter is denied in substantial part as unnecessary given the decision on the Master Consolidated Amended Complaint. The Court will allow further—though limited—Rule 12 and 56 practice to the extent that the Master Consolidated Amended Complaint raises new claims that were not de-cided in the prior Opinion of February 22, 2021, R. 131.

**I. Background**

This multi-district litigation addresses Society's across-the-board denials of business-interruption coverage for a variety of restaurants and other businesses in the hospitality industry whose operations deteriorated due to the COVID-19

---

[1]Citations to the record are noted as "R." followed by the docket number.

pandemic. After appointing counsel to lead the litigation on the Plaintiffs' behalf, and after conferring with the parties on which motions to decide as bellwethers, the Court picked three cases: *Big Onion Tavern Group, LLC, et al. v. Society Insurance*, No. 1:20-cv-02005; *Valley Lodge Corp. v. Society Insurance*, No. 1:20-cv-02813; and *Rising Dough, Inc. et al. v. Society Insurance*, No. 1:20-cv-05981. *See* R. 69. Society filed a motion to dismiss for failure to state a claim in the *Rising Dough* action, R. 20, No. 1:20-cv-05981, and a motion to dismiss for failure to state a claim or, in the alternative, for summary judgment in the *Big Onion* and *Valley Lodge* actions. R. 113, No. 1:20-cv-02005; R. 17, No. 1:20-cv-02813.

The Plaintiffs have brought claims alleging coverage under a variety of Society's policy provisions, including coverages for the interruption of Business Income and, separately, for Civil Authority, Contamination, and Extra Expense. The Illinois-based Plaintiffs (in the *Big Onion* and *Valley Lodge* actions) also brought claims under Section 155 of the Illinois Insurance Code, 215 ILCS 5/155, for various "vexatious and unreasonable" insurance-claims practices. The substance of these allegations is discussed in much greater detail in the prior opinion. R. 131 at 3–10. Society communicated the denial of the Plaintiffs' claims for coverage in several ways: preemptively, by circulating a memorandum to its insurance-agency partners on March 16, 2020, implying that its policies would not cover any pandemic-related claims; by denying individual claims filed by certain Plaintiffs; and in a March 27, 2020 memorandum to all policyholders declaring that "pandemic events" are generally excluded from insurance coverage. *See id.* at 8–10.

2

This Court denied, for the most part, Society's motions to dismiss and its alternative summary judgment motions. R. 131. Although the Court agreed with Society that the claims under the Civil Authority, Contamination, and Extra Expense coverages, as well as the Sue and Labor provision of Society's standard policy, could not proceed, *see id.* at 24–29, the Court determined that the claims under the policy's Business Interruption coverage and Illinois Insurance Code Section 155 survived the motions, *id.* at 12–24, 29–31.

Each side has now brought a motion following up on the summary judgment decision, seeking to consolidate and streamline the litigation. R. 152, Pls.' Mot. for Leave to File Master Cons. Am. Compl.; R. 175, Defs.' Mot. to Dismiss All Claims Premised upon Civil Authority/Contamination. One key question at stake in both motions is how the summary judgment decision on the bellwether cases affects the dozens of other cases within this multidistrict litigation. What follows is an explanation on how to balance the efficiencies of the MDL litigation with the rights at stake in each individual case.

## II. Analysis

### A. Standard of Review

As the saying goes, "the plaintiff is the master of the complaint." *Holmes Group, Inc. v. Vornado Air Circulation Systems, Inc.*, 535 U.S. 826, 831 (2002)

3

(cleaned up).[2] A plaintiff may amend a complaint once "as a matter of course" early on in the litigation, but even after that time has passed, may amend the pleading either with consent of the other side or with leave of court. Fed. R. Civ. P. 15(a)(1), (2). "The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). Having said that, leave to amend may be denied when there are compelling reasons against doing so, "such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." *Barry Aviation, Inc. v. Land O'Lakes Municipal Airport Comm'n*, 377 F.3d 682, 687 (7th Cir. 2004) (cleaned up).

In the context of an MDL, additional considerations come into play. First, because MDLs bring together related litigations for pretrial proceedings, 28 U.S.C. § 1407(a), but do not formally consolidate them into one action in the manner of, say, a class action, it is imperative to clarify whether an amended pleading submitted by a bellwether plaintiff applies only to that plaintiff's case, or whether it instead also controls the other cases within the MDL. Separate actions within MDLs start and end with separate identities, but case management and consolidation can alter the in-between:

> transferred for…pretrial proceedings retain their separate identities, especially for purposes of entering final judgments and pursuing appeals. Yet transferee courts and parties may choose to manage those cases in ways that

---

[2]This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

> change that default rule and give up the separate identities of the original suits transferred to the MDL litigation.

*Bell v. Publix Super Markets, Inc.*, 982 F.3d 468, 489 (7th Cir. 2020). "Parties may elect to file a 'master complaint' and a corresponding 'consolidated answer,' which supersede prior individual pleadings. In such a case, the transferee court may treat the master pleadings as merging the discrete actions for the duration of the MDL pretrial proceedings. No merger occurs, however, when the master complaint is not meant to be a pleading with legal effect but only an administrative summary of the claims brought by all the plaintiffs." *Gelboim v. Bank of America Corp.*, 574 U.S. 405, 413 n.3 (2015) (cleaned up) (citing *In re Refrigerant Compressors Antitrust Litigation*, 731 F.3d 586, 590–92 (6th Cir. 2013)).

Whether an amended complaint is treated as a master, superseding complaint or instead as an "administrative summary" is a "pragmatic" issue, and looks to the behavior of the parties and the court. *Bell*, 982 F.3d at 490. Some relevant factors include:

> (1) how the plaintiffs labeled the new complaint, (2) whether the plaintiffs served the defendants with the new complaint instead of the original pleadings, (3) whether key deadlines were set in relation to the new complaint, (4) whether the court entertained motions to dismiss the consolidated complaint, and (5) whether the parties and the court looked solely to the allegations in the consolidated complaint when arguing and deciding such motions.

*Id.* The fifth factor is "perhaps" the most important. *Id.* (*Bell* spelled out those considerations in a backward-looking context, that is, in trying to figure out what the parties and the district court there intended to do. *Id.* at 491. Obviously, the point of this Opinion is to be explicit and leave no room for doubt.)

5

Second, because MDLs are intended to streamline litigation, this Court must consider whether the amended complaint would indeed promote efficiency. *See, e.g., In re Gen. Motors LLC Ignition Switch Litig. (GM I)*, Nos. 14-MD-2543, 14-MC-2543, 2015 WL 3619584, at *7 (S.D.N.Y. June 10, 2015). This, of course, depends in part on whether it is a consolidated master complaint with operative effect across multiple individual cases within the MDL, or merely an administrative summary. The Court must consider the new complaint's likely impact on discovery and pretrial-motion practice.

Third, the Court must consider whether the new pleading affects the defendant's and other plaintiffs' substantive rights differently from the original pleading. Because actions within an MDL are consolidated only for pretrial purposes and then are transferred back to their originating districts for trial, 28 U.S.C. § 1407(a), there remain substantial interests in allowing each plaintiff to remain the master of its own complaint, and in preserving the defendant's right to defend different cases differently. In particular, a master complaint within an MDL cannot, on its own (that is, without the action later being certified as a class) override the requirement that the cases eventually be remanded to their originating districts for trial, unless all parties waive this right. *See Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35–37, 41–42 (1998); *Armstrong v. LaSalle Bank Nat'l Ass'n*, 552 F.3d 613, 616 (7th Cir. 2009). At the same time, the Court must squeeze as much efficiency as practicable from the MDL proceeding by saving both litigant and judicial resources before the cases return for trial (if trial is what ends up happening).

## B. Clarifying the Operative Pleading

"[T]he dangers of ambiguity can be avoided if the court and the parties decide explicitly, from the beginning, the legal status of the consolidated complaint(s)." *Bell*, 982 F.3d at 490. Here, the Court now decides that the proposed Master Consolidated Amended Complaint (MCAC) can serve as the consolidated, operative pleading for (1) the bellwether actions; and (2) the same coverage claims asserted by non-bellwether plaintiffs. But the MCAC will *not* supersede additional claims asserted by non-bellwether plaintiffs that are not also asserted in the MCAC. Most prominently, claims premised on specific state-law bad-faith denial of coverage laws are not superseded (other than Illinois Section 155 claims, which the Court addressed in the Opinion of February 22, 2021; those claims are pleaded and included in the MCAC).

The parties have offered competing positions on the necessity, effect, and function of the proposed MCAC. For their part, the bellwether plaintiffs "propose that the Complaint be the operative pleading, *not* an 'administrative summary.'" R. 153, Mem. in Support of Mot. for Leave to File Cons. Am. Compl., at 4 (emphasis in original). They "believe that this will streamline proceedings by having the parties' and the Court's attention focused on one operative pleading and on one master docket. In that way, the Court and the parties will only have to mind one master lawsuit, rather than many individual dockets." *Id.* For its part, Society argues that the MCAC does not actually "consolidate the parties and claims from the underlying cases into one pleading. Instead, it includes only a small number of the plaintiffs and a subset of the pending claims in this MDL." R. 166, Society's Opp. to MCAC, at 1. Society observes

7

(rightly) that although the bellwether plaintiffs' brief asserts that the MCAC will function as the superseding operative pleading, the draft MCAC itself states that "[t]he fact that a particular Plaintiff [within the MDL] is not expressly listed as an Individual Plaintiff [in the MCAC] does not waive that Plaintiff's right to proceed with its individual claims on a parallel track notwithstanding any class(es) which may be certified pursuant to Fed. R. Civ. P. 23 in the future." R. 153-1, Master Consolidated Amended Complaint, at 1; *see also* Society's Opp. at 1. The MCAC further describes itself as "intended to serve as Class Plaintiffs' complaint proceeding through trial," notably leaving out any description of which complaint would serve as the operative pleading for other individual plaintiffs. MCAC at 1.

The bellwether plaintiffs clearly have the right to choose which claims to assert in their own cases. Neither this Court nor Society should presume to direct that choice, at least for a proposed first amendment to their respective complaints. But because actions within an MDL "retain their separate identities" unless merged, *Bell*, 982 F.3d at 489, the bellwether plaintiffs are *not* the masters of the other individual plaintiffs' complaints. The "purpose of the bellwether … process is to provide significant information regarding the entire pool of cases that are part of the MDL." *In re Testosterone Replacement Therapy Prods. Liab. Litigation*, 2017 WL 2574057, at *1 (N.D. Ill. May 22, 2017). Bellwether cases are intended to be representative of their peers not necessarily in the formal, legal sense but instead as serving as the common springboard from which Court decisions on substance (like the dismissal motions and early summary judgment motions), procedure, and discovery can then apply to like

8

cases and claims. So, the bellwether plaintiffs cannot assert (absent universal agreement from all other plaintiffs) that their consolidated pleading can, simply by virtue of being filed, supersede pleadings in what remain, formally, separate actions. It is true that counsel for the bellwether plaintiffs might very well be certified as representatives of one or more classes, *see* MCAC at 37–65; R. 213, Mot. to Certify Class, but at this point in the litigation, before the grant of class certification, superseding all other pleadings in the MDL is not appropriate.

At the same time, the purpose of the MDL mechanism is frustrated if each case must proceed on a completely independent track, and if no court decision in one case can be applied to any other. Society argues that because any MCAC would necessarily proceed alongside many other underlying individual-plaintiff complaints, the MDL not only does not gain any efficiency, but in fact becomes more confusing and difficult to manage. Society's Opp. at 2. But that's not quite right either. Again, the bellwether plaintiffs were chosen precisely because they are substantially representative of the claims at stake in the MDL as a whole. *See* R. 69 (identification of bellwether motions); *see also* R. 68, Transcript of Status Hearing (Nov. 2, 2020). It would be unnecessary and duplicative for Society and all of the plaintiffs in every case to litigate the same claims (and defenses) individually when the bellwether decisions—and, going forward, decisions arising from the MCAC—apply just as well to the individual cases. Disallowing the bellwether plaintiffs to file a representative MCAC (again, not "representative" in the class-action sense, at least not yet) with any superseding effect would also nullify most of the efficiency gains that could be had from applying the

Court's dispositive-motion decisions (and other decisions) more broadly. Indeed, even Society argues, as discussed more fully below, in favor of applying the bellwether dismissals of the Civil Authority and Contamination claims to non-bellwether actions. The converse should be true too: the survival of the dismissal motions and early summary judgment motions should apply to the non-bellwether cases too.

To balance the interests in the formal separate identities of the cases but continue to gain the efficiencies of the MDL, the Court invokes Federal Rule of Civil Procedure 42(a). That familiar rule says: "If actions before the court involve a common question of law or fact, the court may: (1) join for hearing or trial any or all matters at issue in the actions; (2) consolidate the actions; or (3) issue any other orders to avoid unnecessary cost or delay." Given its authority under Rule 42(a), the Court therefore makes the following decisions about the effect of the MCAC:

- The MCAC completely supersedes prior complaints in each of the individual bellwether actions: *Big Onion Tavern Group, LLC, et al. v. Society Insurance*, No. 1:20-cv-02005; *Valley Lodge Corp. v. Society Insurance*, No. 1:20-cv-02813; and *Rising Dough, Inc. et al. v. Society Insurance*, No. 1:20-cv-05981. The MCAC will function as the only operative pleading in these actions.

- The MCAC also supersedes individual non-bellwether plaintiffs' claims for coverage under the same specific coverage provisions of the Society insurance policy that are identified in the MCAC. As the Court reads the MCAC, this means that Counts 1–20 supersede any claims based on the same coverage provisions in any of the actions within the MDL.

10

- But to the extent that individual non-bellwether plaintiffs have alleged claims that are *not* included within the MCAC, those claims are *not* superseded and may proceed on a parallel track. As the Court reads the MCAC, this category primarily encompasses individual claims under specific bad-faith denial of coverage laws analogous to the Illinois Section 155 claims asserted in the MCAC. (The Illinois Section 155 claims as pleaded in the MCAC *do* supersede other Illinois Section 155 claims filed in the non-bellwether actions.) In order to move the litigation as efficiently as possible overall, all of the claims for bad-faith denial of coverage other than the Illinois Section 155 claims asserted by the bellwether plaintiffs will be stayed for the time being. The Court anticipates that discovery on the Section 155 claims will likely overlap almost entirely with the discovery needed on the other state-law claims, such that the litigation on those claims will not be unduly delayed if and when the stay is lifted.[3]

- The parties have disputed whether it is necessary or appropriate for the bellwether plaintiffs to replead for purposes of appellate preservation the claims that this Court has already dismissed or on which the Court has already

---

[3] The Court considered, but rejected, the idea of dismissing the other state-law bad-faith claims without prejudice and with leave to reinstate as part of its consolidation order. This mechanism was deployed for certain economic-loss claims in *In re General Motors LLC Ignition Switch Litigation*, 2015 WL 3619584, at *8–*9 (S.D.N.Y. June 10, 2015). It is not entirely certain what effect a dismissal without prejudice of that sort would have if the cases were to return to the transferee courts for trial. Not all courts would necessarily believe they were bound by the reinstatement authorization. Here, staying the non-Illinois bad-faith claims for the time being serves to streamline discovery just as well as dismissal without prejudice would, without the difficulty and potential adverse consequences to the non-bellwether individual plaintiffs that the reinstatement process might entail.

11

granted summary judgment to Society (for example, Counts 12–18 of the MCAC). Society observes that in the Seventh Circuit, it is likely unnecessary to replead, as the eventual appealable final judgment will bring up all prior decisions in the case, even those made as to a complaint that has been superseded. *See Bastian v. Petren Resources Corp.*, 892 F.2d 680, 682–83 (7th Cir. 1990). But the bellwether plaintiffs observe that in the Eighth Circuit (which would cover the Iowa and Minnesota cases) claims not repleaded in an amended complaint may be considered waived on appeal. *See Tolen v. Ashcroft*, 377 F.3d 879, 882 n.2 (8th Cir. 2004). Out of an abundance of caution, the Court will allow plaintiffs to replead these claims. But in order to avoid an unnecessary, duplicative round of briefing, the Court proposes that it deem Society to have renewed its motions targeting Counts 12–18. of the MCAC, and the Court would then simply apply its previous Opinion on the dispositive motions, granting the motions in part as before and denying them in part as before. The Court would set another answer or response deadline only on the remaining counts. This will be a topic of discussion at the next status hearing.

With these parameters in place, as well as those discussed in the remaining sections of this Opinion, the Court is confident that the bellwether plaintiffs are provided with the appropriate amount of latitude as to their own litigation strategy, while not infringing on the other individual plaintiffs' rights nor on Society's rights, and while providing efficiencies in discovery and motion practice that will move the MDL as a whole forward. The MCAC will serve as the guiding complaint for the

remainder of the current stage of discovery given the stay on the distinguishable claims in the non-bellwether cases.

## C. *Lexecon* Rights and New Plaintiffs

The bellwether plaintiffs have sought to add new plaintiffs—that is, plaintiffs who had not filed or joined in any of the complaints currently within the MDL—"directly" via the MCAC. Pls.' Mem. at 5. Society takes issue with this approach, as well as with plaintiffs' addition of new classes and claims not asserted in any of the prior underlying complaints. Society's Opp. at 5. As to the brand-new plaintiffs, Society further observes that this puts its *Lexecon* rights at stake, given that there is no obvious transferor court to which to remand those plaintiffs' claims for trial (if the litigation gets to that point). *Id.* at 9–10. The Plaintiffs propose to solve this problem by "amending complaints and adding and/or substituting parties as appropriate" before remand, arguing that "the 'new' plaintiffs can simply be joined as plaintiffs into one of the preexisting complaints under Rule 20." R. 174, Pls.' Reply at 4.

On review of the competing interests, the Court holds that it is improper to add new plaintiffs—especially those not located within the Northern District of Illinois—"directly" to this MDL. The MDL statute is clear in its division of labor between the transferor and transferee district courts, contemplating that the case will originate in its proper home district (taking into account venue and jurisdictional concerns as well) and then later return to that district for trial. 28 U.S.C. § 1407. The Court has also not been able to find persuasive caselaw that explains precisely, with regard to statutory and precedential authority, how plaintiffs may be added "directly" to an

13

MDL where venue and personal jurisdiction would not otherwise be proper in the transferee district. Nor is there direct authority for the proposition that either this Court or the transferor court can prejudge adding a plaintiff into another pre-existing case.

The cleanest solution, and one that is most evidently in keeping with § 1407, is to require any new plaintiffs to file new cases in their home districts (they presumably can file them as co-plaintiffs), and for those actions then to be transferred into the MDL. At that point, those plaintiffs can choose to consolidate their cases with those of the bellwether plaintiffs in whole or in part. Because the Judicial Panel on Multidistrict Litigation has already, of course, entered a transfer order establishing MDL 2964, R. 1, district courts around the country are on notice to transfer relevant cases to this Court. Indeed, a number of tag-along cases have already been filed in other districts and then transferred to this Court within days. Any delays in the progress of the litigation under the MCAC would thus be minor and well worth the clarity all parties will gain for remand purposes.

The Court therefore orders any new plaintiffs to file actions in their home districts (assuming proper jurisdiction and venue) and then to ensure that those actions are transferred before this Court. The Court will set a filing deadline for the MCAC with ample time for this process to be completed, so that any new plaintiffs can be consolidated in the bellwether action as the new and existing bellwether plaintiffs see fit.

14

This approach preserves all parties' *Lexecon* rights, as it will be eminently clear where (and in which case) each action should be remanded for trial at the appropriate time in the litigation. Society's other *Lexecon* worry, that the Plaintiffs seek to waive its *Lexecon* rights as well as their own, is misplaced and premature. The MCAC contains a waiver of *plaintiffs' Lexecon* rights insofar as the plaintiffs named in the MCAC "believe that all claims should proceed before this Court for all purposes and all such parties consent to venue and personal jurisdiction in this Court." *See* MCAC at 1. No fair reading of this language could construe it as plaintiffs' attempt to waive the *Lexecon* rights of *Society*, nor do plaintiffs have the ability to do so. *See, e.g.*, *In re Depuy Orthopaedics, Inc.*, 870 F.3d 345, 351 (5th Cir. 2017). Society has made abundantly clear that it does not wish to waive its own *Lexecon* rights at this time. Society's Opp. at 9–10. (If any claims within the MCAC are eventually certified as class actions, and if any of those class actions proceed to trial, then that might obviate the return of cases to transferor courts, but that bridge can be crossed later.)

Moving on to the addition of claims (as distinct from plaintiffs) directly via the MCAC, there is less to be concerned about. So long as the amended complaint adequately relates back to the original complaint, "assert[ing] a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading," Fed. R. Civ. P. 15(c)(1)(B), and the new claims are not prejudicial, futile, or otherwise improper, it is routine for amended complaints to change the legal theory of the case somewhat. "[A]lthough the exercise of *consolidation* implies a gathering of *existing* claims, the fact that the consolidated complaint is

15

not a perfect reflection of the underlying claims does not offend the consolidation process, nor does it unduly prejudice or benefit any party to this litigation." *In re Fluid-master, Inc.*, 149 F. Supp. 3d 940, 948 (N.D. Ill. 2016) (emphases in original). The new claims in the MCAC "are not bad faith attempts to refocus the litigation or to otherwise avoid some necessary procedural framework." *Id.* Rather, "they are minor re-workings of *existing* claims among *existing* parties that reflect the natural evolution of claims in an MDL proceeding, and allowing these changes will assist in the efficient litigation of this consolidated proceeding." *Id.* (emphases in original). Just so here. The new claims arise out of Society's denial of coverage for pandemic-related loss of business, and are substantially similar to claims previously asserted. Especially because this litigation is only at the discovery stage, and existing discovery can easily be applied to the new claims, there is no undue prejudice to Society by allowing these new claims (provided, of course, that they are asserted by proper plaintiffs).

In short: the new plaintiffs that were sought to be added "directly" via the MCAC are stricken, for now. If the new individual and existing bellwether plaintiffs wish to include them in the MDL litigation before this Court, they must file new actions in the appropriate district courts and wait for those actions to be transferred in to MDL 2964 here. At that point, they may seek to consolidate those new actions via the MCAC. Accordingly, the Court proposes August 16, 2021, as the filing deadline for the MCAC in order to give enough time for this process to be completed. The Plaintiffs may add new *claims* via the MCAC provided they are asserted by proper plaintiffs and are otherwise sufficiently related to the transactions and theories alleged in

16

the original complaint. As described above, Society will, of course, have the opportunity for Rule 12 and 56 practice targeted at any *new* claims in the MCAC that are not covered by the Opinion of February 22, 2021, R. 131, and can raise any further arguments against those claims at that time.

As a final point, so that discovery can continue to move forward as quickly as possible, all parties are instructed to treat the draft MCAC as the anticipated pleading for now, which will become operative (perhaps with further minor changes) once the Court formally accepts it after the filing deadline.

### III. Society's Proposed Motion to Dismiss

Society's motion to file a dismissal motion against all claims in the MDL actions premised on Civil Authority or Contamination coverage, R. 175, is denied in large part as unnecessary. Because the Court proposes to deem Society's earlier Rule 12(b)(6) and Rule 56 motions as renewed against the Master Consolidated Amended Complaint, and the Court will apply the prior Opinion against the MCAC *and* against *identical* coverage claims in other non-bellwether actions, those claims would be decided in Society's favor.

But the key word in the preceding sentence is "identical." The Court is not confident that all of the actions listed in Society's proposed motion to dismiss are truly identical in their pleading of Civil Authority and Contamination coverage. To the extent that some claims in some non-bellwether actions may be meaningfully distinguishable from the claims decided in the Opinion of February 22, 2021, R. 131, those claims are neither superseded by the MCAC nor dismissed at this time. Those claims

17

will proceed on a separate litigation track, and Society can pursue further Rule 12 or 56 practice against those claims as it sees fit. As the Court held above, it is not appropriate to treat the MCAC as superseding all other individual plaintiffs' claims at this time, and the cases cited in that section of the opinion hold that actions within an MDL retain their separate status and may be handled as such for all pretrial purposes (including dismissing or entering summary judgment on those claims) for distinct reasons.

To understand why some of the Civil Authority claims and Contamination claims are not necessarily identical to the bellwether claims, it is useful to explain again the reasoning in the decision granting summary judgment to Society on those claims in the bellwether actions. R. 131, Mem. Op. and Order, at 24–28. First, the Court dismissed claims based on the Civil Authority coverage on the basis that plaintiffs had not pleaded that government orders prohibited *all* access to their premises. The Civil Authority coverage pays for loss of income caused by action of a civil authority that "prohibits access" to the insured's premises *and* to the "area immediately surrounding" the property." *See* Businessowners Special Property Coverage Form, 5.k (cited and discussed in more detail at R. 131 at 24–25; full copies of the insurance policy can be found, e.g., at R. 14, 1:20-cv-05981, Exh. A; R. 1, 1:20-cv-02813, Exh. B; R. 29, 1:20-cv-02005, Exh. D). But the Court identified a key problem for the bellwether plaintiffs:

> Specifically, the policy's text requires that the civil authority "prohibit[] access to the described premises," *and* that "[a]ccess to the area immediately surrounding the damaged property is prohibited by civil authority as a result of

the damage, and the described premises are within the area." Businessowners Special Property Coverage Form, 5.k. As Society correctly observes, even if the general public is prohibited from congregating in the covered premises, *there is no allegation that employees are outright prohibited from accessing the premises—or from accessing the immediately surrounding areas, for that matter.* Indeed, for some of the Plaintiffs, take-out customers and in-room dining guests may access the premises (and the immediately surrounding areas). The Civil Authority coverage is not triggered by mere "loss of" property; there must be "prohibited" "access."

R. 131 at 25 (emphasis added).

The Court's review of the pleadings in the cases that Society listed in its proposed motion to dismiss, *see* R. 175-2, Exh. 1, reveals that most of them likewise do not plead a complete lack of access to the premises. Without this key ingredient, those claims based on Civil Authority coverage cannot proceed, and once Society's earlier motion is deemed renewed in response to the MCAC, those claims will be dismissed. But a few cases *do* appear, at least on an initial review, to possibly plead a *complete* lack of access (that is, including employees and ownership, and not just members of the public). These cases, with paragraph citations to their operative complaints, are:

- *Deerfield Italian Kitchen, Inc. v. Society Insurance, Inc.*, 1:20-cv-03896, which pleaded that government orders prevented access and that plaintiff has had to "cease and/or significantly reduce operations at all its locations." ¶¶ 46–47.

- *Peg Leg Porker Restaurant, LLC v. Society Insurance*, 1:20-cv-05979, which pleaded that "The events discussed in the paragraphs above (Executive Orders, Metro Orders, Safer at Home Orders and COVID-19 exposure), and others that will follow the filing of this lawsuit, have rendered the Insured Premises

untenantable and forced Plaintiff, through no fault of its own, to cease business activities at the Insured Premises on March 20, 2020." ¶ 24.

- *Wiseguys Pizzeria & Pub LLC v. Society Insurance*, 1:20-cv-06159, which pleaded that the government closure orders prohibited access to the covered property and the area immediately surrounding the covered property. ¶¶ 52, 83.

- *R. Latitude, Inc. v. Society Insurance*, 1:21-cv-01292, pleaded that the government-ordered closure of its business was not only due to the general shutdown orders, but was more specifically mandated because 20 individuals who had been on its premises tested positive for Covid-19. ¶¶ 94–95.

Again, the Court has not yet decided whether these claims will survive a motion to dismiss. But given that these allegations are not squarely within the parameters of the Court's earlier Opinion, the Court will give each set of plaintiffs in these cases and Society the opportunity to submit further briefing if they want.

Second, the Court dismissed the bellwether plaintiffs' claims based on the policy's Contamination coverage on the basis that there had been no specific allegations that their premises had in fact been contaminated or shut down due to the possibility of contamination. R. 131, Mem. Op. and Order, at 26–28. The Court reasoned:

The text of this coverage provision requires, first and foremost, that the Plaintiffs' "operations" be "suspended" due to "contamination." [Businessowners Special Property Coverage Form, 5.m.] "Contamination" is defined as "a defect, deficiency, inadequacy, or dangerous condition in your products, merchandise[,] or premises." *Id.* § 5.m(4)(a). As Society notes, the Plaintiffs have maintained operations during the pandemic, and the suspensions of business have

> not been caused by contamination of the premises, machinery, or equipment *themselves*. R. 114, 20 C 2005, Def.'s LR 56.1 St. of Undisputed Mat. Facts, ¶¶ 39–78. And the Plaintiffs have not made a particularized factual argument that one or more of them has been closed due to actual COVID-19 contamination of the premises, machinery, or equipment. R. 125, 20 C 2005, Pls.' Resp. to Def.'s LR 56.1 St. of Facts, ¶¶ 39–78.

R. 131 at 26 (emphasis in original). The second portion of the Contamination coverage provision on which the Plaintiffs relied "requires that the Plaintiffs' 'operations' be 'suspended' due to 'contamination,'" Businessowners Special Property Coverage Form, 5.m, and plaintiffs had not alleged "suspensions of business … caused by contamination of the premises, machinery, or equipment themselves." R. 131 at 27.

Like the Civil Authority coverage, the Contamination coverage also requires that a government authority completely prohibit access to the premises or prohibit the "production of your [policyholders'] product." Businessowners Special Property Coverage Form, 5.m(2)(a). However,

> The Plaintiffs have not been prohibited from accessing the premises, and many have continued to produce food for take-out and delivery purposes. R. 114, 20 C 2005, Def.'s LR 56.1 St. of Facts, ¶¶ 39–78; R. 125, 20 C 2005, Pls.' Resp. to Def.'s LR 56.1 St. of Facts, ¶¶ 39–78. And given the definition of "contamination," there is no loss of income due to "contamination threat" or "publicity" from contamination, Businessowners Special Property Coverage Form, 5.m(2)(b), (c), because it is not the premises, machinery, or equipment themselves that have been contaminated.

R. 131 at 27. For these reasons, the Court held that the bellwether plaintiffs had not pleaded any losses that could fall within the Contamination coverage.

Similarly, the Court's initial review of the cases listed by Society in R. 175-2, Exh. 1, reveals that most of those plaintiffs likewise do not plead that their premises

were, in fact, contaminated by the novel coronavirus and had to shut down as a result, or that their business was damaged by the resulting publicity. Nonetheless, a handful of complaints do appear to plead that the virus in fact contaminated those restaurants' premises and that that contamination forced closure or other loss of business. These cases, with paragraph citations to their operative complaints, are:

- *Biscuit Café Inc. et al. v. Society Insurance, Inc.*, 1:20-cv-02514, which alleged that "the continuous presence of COVID-19 on or around Plaintiffs' premises has damaged property by infecting it and has rendered the premises unsafe, uninhabitable, and unfit for their intended use"; the complaint further alleged that people carrying COVID-19, as well as COVID-19 viral particles, had been physically present on the premises. ¶¶ 54–56.

- *726 West Grand LLC et al. v. Society Insurance*, 1:20-cv-03432, which alleged contamination by Covid-19 "in or around Plaintiffs' premises." ¶ 96.

- *The Whistler LLC et al. v. Society Mutual Insurance Company*, 1:20-cv-03959, which alleged that "The impacts of COVID-19 on surfaces and objects constitute 'a dangerous condition' in Plaintiffs' and Class Members' premises and, therefore, 'contamination' as that term is used in TBP2 (05-15)." ¶ 40.

- *Peg Leg Porker Restaurant, LLC v. Society Insurance*, 1:20-cv-05979, alleged that "On or about March 11, 2020, an individual infected with the COVID-19 virus entered the Insured Premises and occupied the dining room, kitchen, bathroom and business offices of the Insured Premises. Upon information and belief, this patron touched and otherwise made contact with doors, utensils,

22

cooking services, light-switches, bathroom fixtures, furniture and other common restaurant surfaces/items thereby infecting numerous areas of the insured Premises with the COVID-19 virus and creating a dangerous property condition therein." ¶ 23.

- *R. Latitude, Inc. v. Society Insurance*, 1:21-cv-01292, which alleged, as discussed above with regard to the Civil Authority coverage, that more than 20 individuals who had been on its premises tested positive for Covid-19 and that its closure was due at least in part to this fact. ¶ 94–97.

Again, the Court has not yet decided whether these claims will survive a motion to dismiss. But given that these allegations are not squarely within the parameters of the Court's earlier Opinion, again the Court will give Society and each set of plaintiffs in these cases the opportunity to submit further briefing if they so desire.

These actions are exempted from blanket dismissal on a claim-by-claim basis. That is to say, nearly all of the plaintiffs in Society's list alleged coverage under both the Civil Authority and Contamination coverages. If the Court has listed a case under one coverage provision but not the other, that means that the Court will allow the case to continue on a parallel litigation track *only* as to that particular coverage provision. Some of the cases are listed under both coverage provisions and therefore may, of course, continue proceeding as to both unless one or both claims are dismissed or proceed to final judgment.

## IV. Conclusion

The Plaintiffs' motion for leave to file the MCAC, R. 152, is granted in part as explained in this Opinion. Society's motion to file a dismissal motion against all claims in the MDL premised on Civil Authority or Contamination provisions, R. 175 is denied as unnecessary. The Plaintiffs may file the Master Consolidated Amended Complaint on August 16, 2021. The Court proposes that Society's earlier Rule 12 and 56 motions will be deemed renewed and denied as against the claims for interruption of Business Income, and deemed renewed and granted as against the claims based on the Civil Authority and Contamination except for the specific cases listed above (further briefing will be set on those claims as needed or requested). At the next status hearing, the Court will discuss the answer and response deadline to the new claims in the Master Consolidated Amended Complaint.

ENTERED:


      s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: August 1, 2021

24