**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE: SOCIETY INSURANCE CO. | ) | MDL No. 2964 |
| COVID-19 BUSINESS INTERRUPTION | ) | |
| PROTECTION INSURANCE | ) | Master Docket No. 20-cv-5965 |
| LITIGATION | ) | |
| | ) | Judge Edmond E. Chang |
| | ) | |
| **This Document Relates to All Cases** | ) | Magistrate Judge Jeffrey I. Cummings |
| | ) | |

**DEFENDANT SOCIETY INSURANCE'S MEMORANDUM OF LAW
IN OPPOSITION TO MOTION FOR CERTIFICATION OF
A LIMITED FUND CLASS PURSUANT TO FED. R. CIV. P. 23(B)(1)(B) AND
APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL**

Michael D. Sanders
PURCELL & WARDROPE, CHTD.
10 South LaSalle Street, Suite 1200
Chicago, IL 60603
(312) 427-3900
(312) 427-3944 (facsimile)
msanders@pw-law.com

Laura A. Foggan (admitted *pro hac vice*)
April N. Ross (admitted *pro hac vice*)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C.  20004
(202) 624-2500 (telephone)
lfoggan@crowell.com
aross@crowell.com

*Counsel for Defendant Society Insurance*

Defendant Society Insurance Company ("Society"), by and through its undersigned counsel, respectfully submits this memorandum in opposition to the Motion for Class Certification of a Limited Fund Class Pursuant to Fed. R. Civ. P. 23(b)(1)(B) and Appointment of Class Representatives and Class Counsel.[1]

## INTRODUCTION

With their improper and premature bid for a "limited fund" class, Plaintiffs and Co-Lead Counsel seek to preempt the independent claims of other policyholders and place themselves in sole control of all litigation concerning Society's COVID-19 coverage, both within and outside this MDL.[2] They also purport to lay claim to all of Society's assets, substituting their judgment for the determination of the Wisconsin Insurance Commissioner, which oversees Society's financial condition, ignoring the existence of state guaranty funds, and otherwise attempting to elevate their interests above those invested in the ongoing operation of Society's business and the rights of other policyholders.

Despite their ambitions, Plaintiffs' motion fails for multiple reasons:

---

[1] In anticipation of this motion, Plaintiffs specifically asked whether Society would consent to certification in the MDL litigation of a Rule 23(b)(1)(B) limited fund class consisting of all Society property policyholders nationwide, whether or not a claim for COVID-19 related business income loss has been submitted to Society. Having considered Plaintiffs' specific request and its parameters, Society advised Plaintiffs that it did not agree that such a class should be certified. There was no discussion of any other possible definition of a class, nor have Plaintiffs moved for certification of any alternative formulation to their request for a single nationwide class of all property insurance policyholders. Society reserves the right to evaluate, and respond to, any other possible class proposal, which will necessarily present its own calculus of the numerosity, commonality, typicality and adequacy of representation, as well as other considerations.

[2] Besides being a blatant power-grab, Plaintiffs' motion is improper. Society pointed out the significant procedural and substantive issues with the proposed Master Complaint in its opposition to Plaintiffs' motion for leave (D.E. 166). Although the court granted Plaintiffs leave to file a modified Master Complaint, significant questions remain regarding the propriety of certifying a mandatory class under a complaint where Plaintiffs themselves represented that other individual plaintiffs were not waiving their "right to proceed with [their] individual claims on a parallel track *notwithstanding any class(es) which may be certified*" (D.E. 153-1 at Preamble) (emphasis added). This is an independent basis for denying class certification.

- First, Plaintiffs have not come close to carrying their burden of proving—as a factual or legal matter—that certification of any class consisting of all Society property insurance policyholders nationwide is warranted, based on Rule 23's prerequisites of numerosity, commonality, typicality and adequacy of representation;

- Second, Plaintiffs attempt to invoke a limited fund class vehicle that is inappropriate and inapplicable to the context of insurance coverage claims;

- Third, Plaintiffs have not established, nor begun to establish by any reliable evidence, the value of the purported claims, or that Society has insufficient funds to satisfy valid claims; and

- Fourth, Plaintiffs improperly seek to include within the proposed class tens of thousands of Society policyholders who *never submitted* a pandemic-related insurance claim to Society, and who therefore lack Article III standing;

Plaintiffs' motion should be denied because they have not made the necessary showing under Rule 23 to certify a limited fund class consisting of all Society property insurance policyholders nationwide, regardless of whether they submitted a claim to Society for COVID-19 related business income loss.[3]

## **ARGUMENT**

"The class-action device was designed as 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Gen. Tele. Co. v. Falcon*, 457 U.S. 147, 156 (1982). Plaintiffs have not carried their burden of demonstrating the need for an exception to the usual rule in this case, and have not established the propriety of their specific request for certification of a limited fund class under Rule 23(b)(1)(B). Plaintiffs' motion for certification of a limited fund class should be denied.

---

[3] Plaintiffs suggest that the class should also include any policyholder that had extra expense coverage, sought to minimize the suspension of business at a covered premises, and was denied extra expense coverage. The Court dismissed the extra expense coverage claims in the bellwether cases (and proposes to apply that dismissal against all Master Complaint Plaintiffs and "identical coverage claims in other non-bellwether actions"), and should not permit a class based on extra expense allegations to be certified here. D.E. 131 at 25-29; D.E. 229 at 17.

I. **PLAINTIFFS HAVE NOT MET THEIR BURDEN OF PROOF.**

As an initial matter, Plaintiffs' class certification motion must be denied because it is predicated on nothing more than the unsubstantiated, untested, and conclusory allegations in Plaintiffs' Master Complaint. Plaintiffs bear the burden of proving that class certification is warranted, and must do so by a preponderance of the evidence. *Bell v. PNC Bank, Nat'l Ass'n*, 800 F.3d 260, 373 (7th Cir. 2015). This burden is higher than "a mere pleading standard" and requires Plaintiffs to "affirmatively demonstrate [their] compliance with" all Rule 23 requirements; "that is, [they] must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011) (italics in original). "[E]videntiary proof" is required, and "mere allegations are insufficient." *Langendorf v. Skinnygirl Cocktails, LLC*, 306 F.R.D. 574, 578 (N.D. Ill. 2014).

District courts evaluating class certification "may not simply assume the truth of the matters asserted by the plaintiff." *Messner v. Northshore U. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012). Rather, the court "must make whatever factual and legal inquiries are necessary to ensure that requirements for class certification are satisfied before deciding whether a class should be certified, even if those considerations overlap with the merits of the case." *Am. Honda Motor Co., Inc. v. Allen*, 600 F.3d 813, 815 (7th Cir. 2010). The Seventh Circuit will vacate an order granting class certification that is not sufficiently supported with admissible evidence. *Id.* at 819.

Plaintiffs fall far short of meeting their burden under Rule 23. Rather than submit admissible evidence, their motion is replete with generic and conclusory statements of "fact" supported by nothing more than citations to Plaintiffs' Master Complaint. *See, e.g.* D.E. 215 at 11-13. On some key points, Plaintiffs do not bother citing any support at all, such as when they declare that the proposed "Class Representatives' interests align with other Class members' interests" (D.E. 215 at 13). The same is true of Plaintiffs' limited fund arguments, which are based

on "back of the envelope" musings about claim value and are otherwise unsupported. Because Plaintiffs failed to carry their evidentiary burden, the Court should deny the motion.

## II. PLAINTIFFS HAVE NOT ESTABLISHED THE REQUIREMENTS FOR CLASS CERTIFICATION.

Plaintiffs' motion must also be denied because they cannot demonstrate the prerequisites for certification of a limited fund class under Rule 23(a) and (b)(1). The Supreme Court and Seventh Circuit have both "cautioned strongly against overuse of (b)(1) classes" due to the mandatory, non-opt out nature of such classes, and warning that "[t]oo liberal an application of the mandatory-class device risks depriving people of one of their most important due process rights: the right to their own day in court." *Spano v. The Boeing Co.*, 633 F.3d 574, 587 (7th Cir. 2011). The proposed class here is precisely the type of overreach courts reject, and the motion should be denied.[4]

### A. The Rule 23(a) Prerequisites Are Not Met.

As the party seeking certification, Plaintiffs "assume[] the burden of demonstrating that certification is appropriate." *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 596 (7th Cir. 1993). Plaintiffs do not come close to meeting their burden.

#### 1. Plaintiffs Have Not Proven Numerosity.

Plaintiffs declare that the 25,249 businesses with Society policies in 2020 "are all proposed Class members." D.E. 215 at 10. The Rule 23(a)(1) numerosity requirement is not a counting exercise, but rather, focuses on the infeasibility of joining all members of the proposed class and,

---

[4] Plaintiffs' separate request to enjoin state court proceedings (D.E. 233), filed after the motion to certify a limited fund class, similarly threatens fundamental constitutional rights of state court litigants and seeks to upend long-standing principles of comity between the federal and state courts. Plaintiffs' attempt to enjoin state litigation legitimately filed by putative class members also raises questions about whose interests Plaintiffs and Co-Lead Counsel intend to promote and whether they meet the Rule 23(a)(4) adequacy requirement

thus, the practicality of the class vehicle. Here, Society's policyholders can be identified and served. *Cf. Tipton v. CSX Transportation, Inc.*, No. 3:15-CV-311-TAV-CCS, 2017 WL 10398077, at *7 (E.D. Tenn. Sept. 26, 2017) (Rule 23(a)(1) not satisfied with "speculative evidence" given "ease of identifying and serving all potential plaintiffs").

Moreover, Plaintiffs' bare assumption that *all* 2020 Society policyholders fall within the proposed class definition is entirely unsubstantiated and non-credible. Plaintiffs' proposed class definition requires, *inter alia*, that a policyholder "suffered a suspension of business related to COVID-19" and that they "were denied coverage" (D.E. 215 at 9).[5] Plaintiffs offer absolutely no proof respecting how many policyholders meet either criteria, let alone both. The Court need not—and should not—accept their speculative conjecture. Indeed, Plaintiffs' speculation is demonstrably false. For instance, a large number of businesses remained open as essential businesses under state and local regulations with no interruption in operations throughout the Pandemic. Most regulations expressly stated that stores that sell groceries, medicine, consumer goods (such as cleaning and personal care products), and alcoholic and non-alcoholic beverages could remain open with no suspension of operations throughout the Pandemic. Regulations also varied substantially by locality in terms of duration and scope. Plaintiffs have made no effort to identify what state and local regulations may have been applicable to Society's policyholders, or whether particular businesses suffered any suspension of business related to COVID-19.

Plaintiffs cannot meet the numerosity requirement of Rule 23(a)(1) without some proof of which, and how many, Society policyholders meet the proposed class definition. Plaintiffs'

---

[5] Plaintiffs inaccurately contend that Society announced a blanket denial of all claims arising from COVID-19 under property insurance policies. In fact, Society expressly stated that each claim would be evaluated based on its individual facts and circumstances, and advised policyholders that they could present claims under property insurance policies for individual evaluation. For example, the March 16, 2020 memorandum from Society's CEO, Rick Parks, "encourage[s] any policyholder or third-party claimant who wishes to present a [COVID-19-related] claim to do so." D.E. 153_1 at 75.

suggestion that the 25,249 businesses with Society policies in 2020 "are all proposed Class members" is erroneous speculation.

### 2. Plaintiffs Have Not Proven Commonality.

Rule 23(a)(2)'s commonality requirement does not simply ask whether there is a common *question* to be litigated (D.E. at 10-11). As the Supreme Court explained, "[w]hat matters to class certification… is not the raising of common 'questions' – even in droves – but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Dukes*, 564 U.S. at 350 (citation omitted; italics in original). The existence of "dissimilarities within the proposed class…have the potential to impede the generation of common answers." *Id.*

Plaintiffs' own arguments show that dissimilarities abound. The COVID-19 orders cited by Plaintiffs varied by state and locality and, even within the same order, by type of business (*e.g.*, essential vs. non-essential). D.E. 215 at 4; D.E. 151_1 at ¶¶ 62-107. Whether a particular business suffered any suspension of its operations, and what impact COVID-19 had on its ongoing operations are not questions amenable to class-wide answers, nor are they issues that can be resolved for all class members "in one stroke." *Dukes*, 564 U.S. at 350. Further, Plaintiffs argue that policy interpretation turns on extrinsic evidence (D.E. 206 at 1), which necessarily depends on the record of each individual policyholder's insurance policy procurement. Plaintiffs also cite

the "installing [of] safety features" (D.E. 215 at 11), [6] which necessarily depends on facts regarding what, if any, safety features each individual policyholder allegedly installed and why.[7]

One of Plaintiffs' Co-Lead Counsel conceded that significant dissimilarities exist among Plaintiffs. Before the Joint Panel on Multidistrict Litigation (the "JPML"), the *Big Onion* plaintiffs (represented by Shelby S. Guilbert, Jr.) urged that the impact of COVID-19 "on businesses varies significantly by region of the country and by the scope and length of each state's 'stay-at-home' order (assuming any given insured's state even has one) which, as is common knowledge, also vary dramatically on a state-by-state, business-by-business basis." MDL No. 2942, D.E. 198 at 4.[8] The *Big Onion* plaintiffs also specifically noted that the question of "how to calculate the policyholder's damages" is "of necessity…a highly-fact-intensive inquiry." *Id.* at 3. That is because "myriad, intensive factual inquiries…will drive the different types and amounts of recovery available (*e.g.*, some plaintiff-restaurants being unable to mitigate their losses by serving take out)." *Id.* at 14.

Thus, as their own counsel concedes, Plaintiffs cannot establish commonality.

---

[6] With respect to extra expense claims, the lack of common facts is evident. Those claims, which turn on individualized determinations of what steps may have been appropriate to minimize the suspension of business at a particular location for a particular business, cannot meet the commonality requirement.

[7] While these issues remain to be determined, this Court also preliminarily noted that a handful of Plaintiffs' claims may not rest on facts common to the other Plaintiffs' allegations where they plead either (a) that the civil authority orders prohibited *all* access to their premises; *or* (b) that their premises had in fact been contaminated or shut down due to the possibility of contamination. D.E. 229 at 19-20 & 22-23. As the Court noted, these were the Court's impressions on "an initial review" of the subject complaints. *Id.* at 19. Accordingly, Society reserves the right to challenge this view in later motions to dismiss, as the Court's order expressly provides. *Id*. at 23.

[8] Mr. Guilbert also contended that: "If anything, conducting epidemiological modeling of the spread of COVID-19 across a number of different geographic areas is more likely to devolve into ***granular and dissimilar inquiries***, rebutting the claim that the presence of the virus is a 'pure' and 'basic' question of fact easily resolvable by coordination among dozens of plaintiffs." *Id.* at 12-13 (emphasis added).

### 3.    Plaintiffs Have Not Proven Typicality.

Plaintiffs also fail to demonstrate that the claims and defenses of their proposed class representatives meet the typicality requirement.  Society's insureds encompass a variety of business classifications.  Plaintiffs have not shown that the essential characteristics of the claims of the class at large are the same as the claims of the proposed class representatives, all of which are restaurants.  Restaurant claims will not be typical of claims by construction companies, grocery stores, hotels, or retail stores.  Plaintiffs provide no evidence that all putative class members are similarly affected by different COVID-19 regulatory orders, or even that all putative class members suffered suspension of their businesses, much less that all Society policyholders presented claims, were subject to blanket refusals, or suffered business losses due to COVID-19.[9]

Further, not all businesses were "similarly affected" by the myriad orders issued by state and local governments.  Some businesses never closed or suffered business income loss, while others may have voluntarily restricted their operations beyond the extent required under applicable orders.  These differences exist even among businesses that fall within the same broad category (*e.g.*, restaurants).  Plaintiffs argue policyholders that did not file insurance claims are also members of the proposed Class because Society allegedly made a "public denial and repudiation of its coverage obligations" (D.E. 215 at 9).  Even if Society had denied all claims on a blanket basis (it did not), policyholders who did not file claims are subject to unique defenses that are atypical of those policyholders who did file claims, such as the proposed class representatives (*e.g.*, the implications of not filing a claim, why each policyholder elected not to file a claim, etc.).  These unique issues defeat the typicality prong of Rule 23(a), and thus defeat plaintiffs' motion for class

---

[9] The "lockdown" orders caused differing economic outcomes across industries.  Weinstock, Lida, *COVID-19: Employment Across Industries*, Congressional Research Service Report IN11564, at 4 (Jan. 5, 2021), *available at* https://crsreports.congress.gov/product/pdf/IN/IN11564.

certification. *See, e.g., Mullins v. Direct Digital, LLC*, 795 F.3d 654, 671 (7th Cir. 2015) (class action defendants have a due process right to raise individualized defenses against each class member); *see also Romberio v. UnumProvident Corp.*, 385 F. App'x 423, 431-32 (6th Cir. 2009) (typicality requirement not met because "[t]hat all of the plaintiffs may have been subjected to some or all of Unum's alleged wrongful practices does not eliminate the need for an individualized assessment as to the ultimate propriety of the benefits decisions affecting each and every class member").

### 4. Plaintiffs Have Not Proven Adequacy of Representation by the Proposed Class Representatives or Counsel.

For the proposed class representatives, Plaintiffs merely make the *ipse dixit* proclamation that their "interests align with the other Class members' interests…." (D.E. 215 at 13). However, there is simply no evidence on this point. To adequately represent a class, proposed representatives must be more than mere figureheads with no knowledge about the case and excessive reliance on counsel. *See, e.g.*, *Shiring v. Tier Techs., Inc.*, 244 F.R.D. 307, 316 (E.D. Va. 2007); *Scott v. N.Y. City Dist. Council of Carpenters Pension Plan*, 224 F.R.D. 353, 356 (S.D.N.Y. 2004).

Here, Plaintiffs have provided no evidence of, *inter alia*, what, if anything, the proposed class representatives know about this litigation; their commitment to prosecuting this case on behalf of a class; what potential conflicts exist within the class; any credibility issues or unique defenses that apply to their claims, such as receipt of PPP loans or other relief; their relationship with proposed class counsel; and any incentives offered for their service as class representative. *See In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, 827 F.3d 223, 233-34 (2d Cir. 2016) (adequacy of representation not met where class members had divergent interests); *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 726 (7th Cir. 2011) ("A named plaintiff who has serious credibility problems or who is likely to devote too much

attention to rebutting an individual defense may not be an adequate class representative.").  At the very least, the commonality and typicality issues discussed above raise questions about whether the proposed class representatives can adequately represent absent class members, including, for example, those subject to different and unique defenses.

Very real questions also exist about whether proposed class counsel can adequately represent absent class members. Counsel's motive for seeking certification of a limited fund class is disclosed at the very beginning of their motion – namely, Co-Lead Counsel wish to control all settlement discussions, to the exclusion of other proposed class members and their counsel (D.E. 215 at 1-2). Counsel further tipped their hand by their recent motion seeking to enjoin all state court class actions and foreclose any settlement or compromise discussions other than their own (*see* D.E. 233).  There is a clear conflict of interest between Co-Lead Counsel's desire to enjoin state litigation and the interests of policyholders who elected to file their own lawsuits in state court with counsel of their choosing.

The conflict between the interests of proposed class counsel and individual class members is further underscored by the fact that one of the Co-Lead Counsel has broken ranks. Mr. Guilbert and his clients wish to proceed as individual plaintiffs (D.E. 215 at 13, n. 13). This confirms the fact that some policyholders wish to continue controlling their own lawsuits, and is an acknowledgement that proposed class counsel will not fully and adequately represent the interests of all individual class members.  *See Creative Montessori Learning Centers v. Ashford Gear LLC*, 662 F.3d 913, 918 (7th Cir. 2011). Disregarding these putative class members' preferences and the work performed by their attorneys and those courts, Plaintiffs ask this Court to sweep aside all state court litigants and their selected counsel in favor of Co-Lead Counsel, and a limited fund

class in this Court. This should give this Court great pause, particularly because the cases before the court are premised on diversity jurisdiction and the parties' claims are subject to state law.

Counsel's proposal for a limited fund class also elevates the interests of some policyholders over others. This self-serving proposal would harm proposed class members that may have non-COVID property claims, such as losses from fire, windstorm, civil commotion or vandalism. Plaintiffs are attempting to seize what they characterize as all of Society's net capital and its property reinsurance limits solely to fund their unproven COVID-related property claims, leaving nothing to be allocated to legitimate, non-COVID property claims. Of course, property claims unrelated to COVID-19 orders continue to exist; fires and tornados are still occurring. By seeking to divert all of Society's funds to pay for one type of claim to the exclusion of all others, proposed class counsel seek to elevate not only their own interests in controlling settlement discussions, but the interests of policyholders with COVID-related property claims (but not other property losses) above the interests of all other Society policyholders. This would harm proposed class members that suffer non-COVID related losses in addition to business interruptions due to COVID. This directly contravenes the fundamental "equitable" purpose of limited fund classes and the adequacy of representation requirement. *Cf. Spano v. The Boeing Co.*, 633 F.3d 574, 587 (7th Cir. 2011) ("It is not enough to say that the named plaintiffs want [certain] relief...if the class is defined so broadly that some members will actually be harmed by that relief.").

### B.    Plaintiffs Do Not Meet the Requirements of Rule 23(b)(1)(B).

#### 1.    Subjecting Insurance Coverage Claims to "Limited Fund" Class Certification under Rule 23(b)(1)(B) Is Inappropriate.

Plaintiffs specifically seek certification of a Rule 23(b)(1)(B) "limited fund" class. Their motion is fatally flawed because a Rule 23(b)(1)(B) limited fund class cannot apply to policyholder claims seeking coverage from an insurance company.

11

Insurers are regulated entities, subject to state regulator oversight – particularly with respect to their payment of policyholder claims and, ultimately, their solvency. The state insurance commissioner is charged by law with overseeing the financial condition of licensed insurers. By asking a court to determine that possible claims for COVID-related coverage exceed the available funds set aside by the insurer to satisfy its obligations, Plaintiffs are seeking to have this Court displace and assume the responsibilities of the existing state insurance regulatory system, which is designed to ensure policyholder interests are protected, and all policyholders are treated fairly in the event of an insurer's insolvency. *See, e.g., Skokie Castings, Inc. v. Illinois Ins. Guar. Fund*, 375 Ill. Dec. 777, 784 (2013) (purpose of the Illinois Insurance Guaranty Fund is to "place claimants in the same position that they would have been" absent their insurer's insolvency); *Stecher v. Iowa Ins. Guar. Ass'n*, 465 N.W.2d 887, 888 (1991) (the Iowa Insurance Guaranty Association is "empowered by statute to assume certain obligations of insolvent insurers"). The suggestion that this Court should put a "hold" on the capital assets of Society to preserve them for one designated class of policyholders – here, policyholders that have not even established that coverage exists under commercial property policies for COVID-related claims – is deeply problematic. *See, e.g., Daskalea v. Washington Humane Soc.*, 275 F.R.D. 346, 366 (D.D.C. 2011) (declining to certify limited fund class constituting a "significant and inappropriate departure from" the "historical model" of limited fund classes). It would deprive all other Society policyholders—*e.g.*, those whose established property claims arise from proven covered causes such as fire or windstorm or tornado, and those with covered claims under other lines of coverage—of the ability to obtain payment for any claims that exceed the amounts set aside in reserves, and through the authorized control level of risk-based capital that Society must have on hand by law.

Indeed, the premise that a disputed theory of insurance coverage can open the door to a limited fund class is fundamentally flawed. If this were permissible, aggressive plaintiffs' counsel could freeze the ability of insurers to respond to valid claims in the aftermath of virtually any disaster resulting in mass property damage, where plaintiffs suffering harm to their property or income contest policy terms and claim coverage should exist. For instance, in the aftermath of Hurricane Katrina, policyholder advocates sought to invalidate or avoid the application of flood exclusions. Had their arguments been accepted, the value of their claims would have exceeded the amounts set aside by insurers for covered property claims. Accepting disputed coverage claims at the pleading stage as a basis for certification of a limited fund class would disrupt the insurance mechanism in the aftermath of significant catastrophes or losses, freezing insurers' operations based on unsubstantiated coverage theories precisely when insurers are most needed to respond to valid covered claims. The limited fund class action, designed for the vastly different mass tort setting, is inapplicable to insurance coverage claims and the regulated context of the insurance industry. The Court should deny class certification here.

### 2. Plaintiffs Have Not Established that Society Has Insufficient Funds to Satisfy the Claims at Issue.

Plaintiffs' class certification motion also fails because Plaintiffs cannot establish the fundamental predicate of a limited fund class. In *Ortiz v. Fibreboard Corp.*, the Supreme Court explained that "[t]he first and most distinctive characteristic" of a limited fund class is "that the totals of the aggregated claims and the fund available for satisfying them…demonstrate the inadequacy of the fund to pay all the claims." 527 U.S. 815, 838 (1999). Here, Plaintiffs have not made any reliable showing of the amount of their purported claims, have not begun to show that Society has insufficient funds to pay valid claims, and have ignored the regulatory system through

which the satisfaction of valid policyholder insurance claims is protected by state regulatory regimes.

As an initial matter, Plaintiffs' proffered "support" for the limited fund concept is their positing the amount of the "average claim," which is stated as fact without evidentiary support and purportedly based on year-over-year net income declines for just 17 chosen restaurants in five states. There is no evidence that these figures are accurate or these restaurants are representative of all restaurants,[10] or of other types of businesses, that the applicable shutdown orders affected these restaurants' businesses or how they were affected, or that the alleged declines in net income are attributable wholly or in part to the pandemic. Plaintiffs cannot obtain class certification by employing "back of the envelope" calculations that simply multiply the total number of Society policyholders (many of whom did not suspend operations or present any claim)) by what Plaintiffs contend (without anything nearing legal or factual support) are the average losses for their seventeen self-selected and atypical plaintiffs. (D.E. 215 at 16).

Plaintiffs made no attempt to demonstrate that these plaintiffs are a fair proxy for all putative class members, or to provide detail about the nature of their operations and areas in which losses were experienced (*e.g.*, labor costs, food cost, inventory loss, rent and utility expense marketing expense), whether the losses were "typical," and whether mitigation efforts were made and what impact they had on each business's bottom line. As the *Big Onion* plaintiffs explained, "myriad, intensive factual inquiries…will drive the different types and amounts of recovery available…." MDL No. 2942, D.E. 198 at 14.

---

[10] Performance of individual restaurants during the Pandemic differed substantially, depending on numerous business-specific factors, including the nature of the restaurant (*e.g.*, fast casual vs. fine dining), the ability of management to pivot to take-out menus and delivery services, the percentage of income from alcohol sales, and myriad other considerations.

Further, a decline in net income is not the measure of a claim. Restaurants are volatile businesses, and an assessment of each business's historical trends as well as the changes in the economy (uninsured loss of market), among many other factors would be necessary to determine the amount of damages, even if coverage were found. And, among other things, Plaintiffs have not shown the effect of, and their accounting for, other relief received (*e.g.*, government assistance or grants).[11] None of this is close to the required showing of the value of the aggregated claims.

Plaintiffs' unsupported assertions about Society's ability to fund valid claims fare no better. *See, e.g., In re Trans Union Corp. Privacy Lit.*, 211 F.R.D. 328, 347 (N.D. Ill. 2002) (rejecting limited fund class action purportedly justified by plaintiffs' statutory damages claims theoretically "exceeding Trans Union's net worth"). Society was examined by the Wisconsin Office of the Commissioner of Insurance ("the Commissioner") in November 2020. The Commissioner's report notes that Society's admitted assets increased by 21.5%, earned premiums increased by 10.3%, and its surplus increased by 28.2%, since its prior examination in 2014. (D.E. 215_4 at 26). The Commissioner also found that Society's surplus exceeded the regulatory requirement by more than $123 million. *Id*. at 20. Society is not under the "supervision" of any regulatory authorities, nor did the Commissioner's examination recommend any operational changes. *Id*. at p. 25. Plaintiffs' unsupported "back of the envelope" calculations and assertions are no substitute for the careful examination of Society's solvency and financial strength undertaken by its regulator.[12]

---

[11] Plaintiffs' 0.50 "risk adjustment" (D.E. 215 at 16) is also flawed, unexplained, and wildly optimistic. According to a University of Pennsylvania analysis, federal courts have dismissed approximately 96% of policyholder lawsuits seeking COVID-19-related business income coverage. *See* https://cclt.law.upenn.edu/. The Eighth Circuit, the sole circuit court to have decided these issues, affirmed the dismissal of the claims before it. *See Oral Surgeons, P.C. v. Cincinnati Ins. Co.*, No. 20-3211, 2021 WL 2753874, at *1 (8th Cir. July 2, 2021).

[12] Society Insurance recently had its overall financial strength affirmed as A- (Excellent) with Stable Outlook by international rating agency A.M. Best Rating Services. Society has maintained this rating and outlook since 2007. For the latest Best Credit Rating, see www.ambest.com.

Plaintiffs also make sweeping generalizations about reinsurance, but Society's reinsurance program is described in its Report on Examination and, again, is subject to regulatory oversight. Of course, whether and to what extent the reinsurance contracts may indemnify or reimburse Society for, or pay on its behalf, damages that Plaintiffs and putative class members seek depends on the application of retentions, terms, conditions, exclusions, and limits of the reinsurance contracts and the applicable facts, including – if any – the ultimate basis for and amounts of liability under the insurance policies at issue in this proceeding, individually and collectively. Plaintiffs' unsupported assertions about the value of their claims and the resources available to Society to fund valid claims are inaccurate and unreliable.

Finally, all fifty states "have a guaranty mechanism in place for the payment of covered claims" arising from the insolvency of licensed insurers.[13] *See In re Liquidation of American Eagle Ins.*, 704 N.W.2d 44 (2005). These guaranty associations are funded by assessments against solvent insurers, and "ensure the stability of the insurance market" by protecting policyholders of insolvent insurers. *Id.* Thus, even *if* Plaintiffs were correct on all coverage and damages issues, and on the value of their claims, the number of proposed class members, and the sufficiency of Society's available financial resources (which they are not), the state guaranty funds would provide a "safety net" that will "step in to pay covered claims in accordance with state law."[14] As a result, Plaintiffs cannot show the "insufficiency" of funds to satisfy claims that is needed for a limited fund class.

---

[13] *See* https://content.naic.org/cipr_topics/topic_guaranty_associationsfunds.htm.

[14] *See* https://www.ncigf.org/.

## III.  **POLICYHOLDERS WHO DID NOT FILE A CLAIM LACK STANDING.**

Plaintiffs expressly include within their proposed class "all persons and entities with covered losses who *did not* make a claim under their policy" (D.E. at 215 at 9) (emphasis added). But, as most recently articulated in *TransUnion LLC v. Ramirez*, No. 20-297, 141 S. Ct. 2190 (2021), 2021 WL 2599472 (S. Ct. June 25, 2021) (hereafter, "*TransUnion*"), *each putative class member* must have Article III standing—which requires a materialized, concrete injury fairly traceable to the defendant.  Putative class members who never filed claims suffered no such injury because Society never rejected or denied their claim.

"Article III of the Constitution limits federal courts' jurisdiction to certain 'Cases' and 'Controversies.'"  *Clapper v. Amnesty Int'l USA*, 468 U.S. 398, 408 (2013).  To meet this requirement, Plaintiffs must show, *inter alia*, that they suffered a "concrete and particularized injury" traceable to Society.  *Access Living of Met. Chicago v. Uber Tech., Inc.*, 958 F.3d 604, 608 (7th Cir. 2020).  This is no less true for members in a class action.  In *TransUnion*, the named plaintiff filed a class action lawsuit under the Fair Credit Reporting Act against credit reporting agency TransUnion regarding its placing of "alerts" on the credit reports of consumers whose names matched a U.S. Treasury Department list of terrorists, drug traffickers, and other serious criminals.  *TransUnion*, 2021 WL 2599472, at *1, *5.  TransUnion, however, only actually disclosed credit reports to third parties for 1,853 of the more than 8,000 class members.  *Id*.  The Supreme Court ruled that class members whose reports were not disclosed lacked Article III standing because they suffered no concrete materialized injury, *i.e.*, TransUnion had not represented them to others as potentially dangerous criminals.  *Id*. at *12.  Although plaintiffs argued that members with undisclosed credit reports faced a significant risk of future harm because their alert-containing reports *could be* disclosed, the Court explained that, in an action for damages, "the mere risk of future harm, standing alone, cannot qualify as a concrete harm" for Article III

standing. *Id.* at \*13. The Court further confirmed that Article III's materialized concrete injury requirement is especially salient in class actions because "every class member must have Article III standing in order to recover individual damages." *Id.* at \*10. Accordingly, federal courts lack subject-matter jurisdiction to hear class actions involving uninjured class members.

Here, Plaintiffs seek to certify a class including *all* of Society's 25,249 policyholders with business interruption coverage during the course of the Pandemic regardless of whether they filed a claim for COVID-19 related losses (D.E. at 215 at 9). Plaintiffs have presented no evidence on how many of the 25,249 policyholders in their proposed class action actually submitted claims; Society submits that the vast majority did not. None of these policyholders have standing to sue because Society caused them no concrete materialized injury: Society cannot have wrongly handled or denied an insurance claim that was never made.[15] *See Weaver v. Aetna Life Ins. Co.*, 370 F'Appx. 822, 823 (9th Cir. 2010) (plaintiff-insured in putative class action lacked standing to sue under group life insurance policy where she "did not allege that she made a claim for which payment was not received during the time that she paid premiums"); *Impress Communications v. Unumprovident Corp.*, 335 F. Supp. 2d 1053, 1062 (C.D. Cal. 2003) (class action "[p]laintiffs have not suffered an injury until they have sought and been denied benefits" under disability insurance policies); *Anderson v. Nationwide Ins. Ent.*, 187 F. Supp. 2d 447, 455 (W.D. Pa. 2002) (spouse of insured seeking uninsured motorists coverage lacked standing to sue insurer for breach of contract, bad faith, and unfair trade practices because spouse did not file an insurance claim); *Kincaid v. Erie Ins. Co.*, 128 Ohio St. 3d 322 (2011), op. mod., 127 Ohio St. 3d 1550 ("Unless and until the

---

[15] Plaintiffs will likely respond that Society's March 27, 2020 correspondence, attached to the Master dissuaded certain class members from filing otherwise purportedly covered COVID-19 claims. (D.E. 153-1, Ex. C). Plaintiffs offer no evidence, however, that any such putative class member exists. None are among the proposed class representatives. Plaintiffs also attach another Society letter dated March 16, 2020 in which Society specifically "encourage[d]" policyholders to file a claim. (D.E. 153-1, Ex. A).

insured has presented a claim to his or her insurer…and the insurer has either (1) denied the claim or (2) failed to respond to the claim…then there is no controversy and the insured has no standing to file a complaint in litigation."). *See also Atlanta Int'l Ins. Co. v. Atchinson, Topeka, & Sana Fe Ry. Co.*, 938 F.2d 81, 83-84 (7th Cir. 1992) (insurer lacked standing to pursue declaratory judgment against insured because insured had not submitted a "claim for payment"); *Northland Ins. Co. v. Crane*, Case No. 02C7388, 2005 WL 831282, at *2 (N.D. Ill. Apr. 7, 2005) (same). Accordingly, this Court should decline to certify the class because it lacks jurisdiction over the vast majority of putative class members.

IV. **AT A MINIMUM, CERTIFICATION CANNOT BE GRANTED WITHOUT ALLOWING SOCIETY A MEANINGFUL OPPORTUNITY TO OBTAIN CERTIFICATION-RELATED DISCOVERY.**

The existing record and Plaintiffs' complete failure of proof fully support the denial of class certification. Indeed, Plaintiffs' inadequate discovery responses to date have left them unable to carry their burden in connection with this requested relief. *See Parko v. Shell Oil Co.*, 739 F.3d 1083, 1085 (7th Cir. 2014) (noting that courts "must receive evidence… and resolve the disputes before deciding whether to certify" a class) (emphasis added). If, however, the Court does believe Plaintiffs have provided an evidentiary basis for their motion, then Society requests that Plaintiffs be required to provide discovery on these issues to allow Society an opportunity to obtain information that would further demonstrate why class certification must be denied. *See, e.g., In re Brand Name Prescription Drugs Antitrust Litig.*, Case No. 94 C 897, MDL No. 997, 1995 WL 240534 (N.D. Ill. May 27, 1994) (denying conditional class certification so that defendants may conduct discovery into class issues).

## CONCLUSION

For the foregoing reasons, the Court should deny the motion for class certification or, in the alternative, hold the motion in abeyance pending discovery.

Dated: August 10, 2021

Respectfully submitted,

By: */s/Laura A. Foggan*

Laura A. Foggan (admitted *pro hac vice*)
April N. Ross (admitted *pro hac vice*)
Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C.  20004
(202) 624-2500 (telephone)
lfoggan@crowell.com
aross@crowell.com

Michael S. Sanders
PURCELL & WARDROPE, CHTD.
10 South LaSalle Street, Suite 1200
Chicago, IL 60603
(312) 427-3900
(312) 427-3944 (facsimile)
msanders@pw-law.com

***Counsel for Defendant Society Insurance***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 10, 2021, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Northern District of Illinois by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

By: <u>*/s/ Laura A. Foggan*</u>
     Laura A. Foggan